Joanna A. Diakos (JD 7269)
Sarah P. Kenney (SK 5642)
K&L Gates LLP
599 Lexington Avenue
New York, New York  10022-6030
Email: joanna.diakos@klgates.com
          sarah.kenney@klgates.com
Phone:  (212) 536-3900
Fax:  (212) 536-3901

Jeffrey B. Maletta (admitted *pro hac vice*)
Nicholas G. Terris (admitted *pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
E-mail:  jeffrey.maletta@klgates.com
            nicholas.terris@klgates.com
Phone: (202) 778-9000
Fax:     (202) 778-9100

*Counsel for Defendants Direxion Shares ETF Trust,
 Daniel D. O'Neill, Daniel J. Byrne, Gerald E. Shanley, III,
 John Weisser and Rafferty Asset Management, LLC*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re DIREXION SHARES ETF TRUST | Civil Action No. 1:09-CV-08011-RJH |

**DIREXION DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    The Parties ................................................................................................... 3
    B.    The Structure and Operation of ETFs ....................................................... 4
    C.    The Registration Statements at Issue ....................................................... 5

ARGUMENT ................................................................................................................... 7

I.    THERE ARE NO MISREPRESENTATIONS OR ACTIONABLE OMISSIONS ...........7

    A.    The Trust Repeatedly and Clearly Disclosed that the Funds Seek Only
           Daily Leveraged Investment Results ....................................................... 8

         1.    The Trust Registration Statement Included Ample Disclosures
                Regarding the Funds' Daily Investment Objectives ................................ 8

         2.    Plaintiffs' Objections to the Trust's Disclosures are Meritless ............... 10

    B.    Plaintiff's Allegations That the Funds Failed to Achieve Their Daily
           Investment Objectives Are Meritless ..................................................... 18

II.    PLAINTIFFS HAVE FAILED TO FILE THE REQUIRED CERTIFICATIONS ........ 20

III.    STATE STREET COMPELS DISMISSAL ................................................... 21

IV.    PLAINTIFFS SUFFERED NO LOSSES ATTRIBUTABLE TO THE
      ALLEGED MISREPRESENTATIONS ........................................................ 22

V.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE COMPLIANCE WITH
     THE STATUTE OF LIMITATIONS ........................................................... 23

VI.    PLAINTIFFS MAY NOT PROCEED WITH CLAIMS REGARDING FUNDS
      OTHER THAN THE FINANCIAL BEAR AND ENERGY BEAR ............................. 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009)…………………………………………………………………..2, 7

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007)...................................................................................... 3

Bellikoff v. Eaton Vance,
481 F.3d 110 (2d Cir. 2007)................................................................................... 25

Benzon v. Morgan Stanley Distributors, Inc.,
420 F.3d 598 (6th Cir. 2005) ..........................................................................passim

Brumbaugh v. Princeton Partners,
985 F.2d 157 (4th Cir. 1993)................................................................................. 23

Caviness v. Derand Resources Corp.,
983 F.2d 1295 (4th Cir. 1993)............................................................................... 23

City of Pontiac General Employees' Retirement System v. MBIA, Inc.,
637 F.3d 169 (2d Cir. 2011)................................................................................... 24

Clark v. Nevis Capital Mgmt., LLC,
No. 04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005)............................................ 21

DeBruyne v. Equitable Life Assur. Soc. of U.S.,
720 F. Supp. 1342 (N.D. Ill. 1989) ........................................................................ 15

Denny v. Barber,
576 F.2d 465 (2d Cir. 1978) .................................................................................. 14

Feit v. Leasco Data Processing Equipment Corp.,
332 F. Supp. 544 (E.D.N.Y. 1971)........................................................................ 14

Ganino v. Citizens Utils. Co.,
228 F.3d 154 (2d Cir. 2000) ................................................................................... 3

Geiger v. Solomon-Page Group, Ltd.,
933 F. Supp. 1180 (S.D.N.Y. 1996)....................................................................... 15

Halperin, M.D. v. EBanker USA.Com, Inc.,
295 F.3d 352 (2d Cir. 2002)................................................................................... 16

Hoffman v. UBS-AG,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................. 24

In re AES Corp. Sec. Litig.,
    825 F. Supp. 578 (S.D.N.Y. 1993) ..................................................................... 11

In re Charles Schwab Corp. Sec. Litig.,
    257 F.R.D. 534 (N.D. Cal. 2009) ....................................................................... 22

In re Chaus Sec. Litig.,
    801 F. Supp. 1257 (S.D.N.Y. 1992) ................................................................... 23

In re Donald J. Trump Casino Sec. Litig.,
    7 F.3d 357 (3d Cir. 1993) .................................................................................. 10

In re Eaton Vance Corp. Sec. Litig.,
    219 F.R.D. 38 (D. Mass. 2003) ...................................................................... 2, 20

In re Eaton Vance Mutual Fund Fee Litig.,
    403 F. Supp. 2d 310 (S.D.N.Y. 2005) ............................................................... 25

In re Initial Pub. Offering,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................... 20

In re Lehman Bros.,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) ............................................................... 24

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................... 15

In re Merck & Co. Sec. Litig.,
    432 F.3d 261 (3d Cir. 2005) .............................................................................. 12

In re Morgan Stanley Info. Fund Sec. Litig.,
    592 F.3d 347 (2d Cir. 2010) ........................................................................ passim

In re Salomon Smith Barney Mut. Fund Fees Litig.,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................................... 24

In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.,
    08 Civ. 8235 (RJH), 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011) ............................ passim

Kennecott Copper Corp. v. Curtiss-Wright Corp.,
    584 F.2d 1195 (2d Cir. 1978) .............................................................................. 8

Krouner v. Am. Heritage Fund, Inc.,

899 F. Supp. 142 (S.D.N.Y. 1995) ......................................................................14

Krouner v. American Heritage Fund, Inc.,
No. 94 Civ. 7213 (WK), 1996 WL 393584 (S.D.N.Y. July 15, 1996) ...............................15

Lilley v. Charren,
936 F. Supp. 708 (N.D. Cal. 1996) ......................................................................20

Malone v. Microdyne Corp.,
26 F.3d 471 (4th Cir. 1994)..............................................................................14

Matrixx Initiatives, Inc. v. Siracusano,
131 S. Ct. 1309 (2011) .................................................................................. 8

McGraw-Hill Cos. v. Vanguard Index Trust,
139 F. Supp. 2d 544 (S.D.N.Y. 2001) ...................................................................5

Mendell v. Greenberg,
612 F. Supp. 1543 (S.D.N.Y. 1985)......................................................................8

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996)...........................................................................passim

Press v. Quick & Reilly, Inc.,
218 F.3d 121 (2d Cir. 2000)............................................................................15

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004) ....................................................................... 3, 7

Spicer v. Chicago Bd. Options Exch.,
1992 WL 380929 (N.D. Ill. Dec. 10, 1992)..........................................................17

Starr v. Georgeson Shareholder, Inc.,
412 F.3d 103 (2d Cir. 2005)............................................................................12

Werner v. Werner,
267 F.3d 288 (3d Cir. 2001)............................................................................12

White v. Melton,
757 F. Supp. 267 (S.D.N.Y. 1991) ............................................................... 6, 15

Young v. Nationwide Life Ins. Co.,
183 F.R.D. 502 (S.D. Tex. 1998).......................................................................21

**S**TATUTES

15 U.S.C. § 77e ...................................................................................……...6

15 U.S.C. § 77j ...................................................................................……...6

15 U.S.C. § 77k (Section 11 of the 1933 Act) ....................................................passim

15 U.S.C. § 77m (Section 13 of the 1933 Act) ................................................ 3, 23

15 U.S.C. § 77o (Section 15 of the 1933 Act) ....................................................passim

15 U.S.C. § 77s ...................................................................................……17

15 U.S.C. § 77z-1 (Private Securities Litigation Reform Act of 1995) .................................…2, 20

28 U.S.C. § 1658(b) ...................................................................................... 24

**R**ULE

Fed. R. Civ. P. 9(b)...................................................................................7

**R**EGULATIONS

17 C.F.R. § 230.497 (Rule 497) .......................................................................... 6

17 C.F.R. § 274.11A ...................................................................................... 5

17 C.F.R. § 230.430C (Rule 430C(a)) ...................................................................... 6

**O**THER **A**UTHORITIES

Adoption of Registration Form Used by Open-End Management Investment Companies, Securities Act Release No. 6479, Investment Company Act Release No. 13,436, 48 Fed. Reg. 37929 (August 22, 1983)…………………………………………………………………… 6

Exchange-Traded Funds, Securities Act Release No. 33-8901, Investment Company Act Release No. 28193, 73 Fed. Reg. 14618, 14619 (proposed March 18, 2008)…………………….passim

Registration Form Used by Open-End Management Investment Companies, Securities Act Release No. 33-7512, Exchange Act Release No. 34-39748, 63 Fed. Reg. 13916, 13940 (March 23, 1998) ...........................................................................................14

SEC Form N-1A.................................................................................................passim

Securities Offering Reform, Securities Act Release 33-8591, 70 Fed. Reg. 44722, 44773 (Aug. 3, 2005) .............................................................................................................................. ..6

## PRELIMINARY STATEMENT

Plaintiffs' Second Consolidated Amended Class Action Complaint (the "Complaint" or "Compl.") alleges that the Direxion Shares ETF Trust (the "Trust") and other defendants violated §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act").  Compl. ¶¶ 340-56.

The Complaint is transparently meritless because it alleges misstatements or omissions of matters that were very clearly and carefully disclosed.

Plaintiffs principally contend that the Trust failed to disclose adequately that, while each Bear Fund in the Trust is designed to generate returns that approximate triple the inverse of the performance of its benchmark index *on a daily basis*, for longer time horizons, the Fund's performance likely will differ substantially from three times the inverse of the performance of the index.  See, e.g., Compl. ¶¶ 15-20.  Thus, for example, plaintiffs posit that, based on the Fund's prospectus, a shareholder in the Financial Bear 3X Shares who held his investment for a three month period during which the Russell 1000® Financial Services Index declined 10% would have expected an investment return of 30%.  In fact, however, plaintiffs allege that the shareholder may have actually lost money during such a time period.  See, e.g., Compl. ¶¶ 15-20.

This claim is baseless.  The relevant registration statements clearly and repeatedly disclosed that: (i) the relevant Funds have *daily* investment objectives; (ii) the Funds do not attempt to achieve their objective for periods longer than a day; (iii) compounding usually prevents the Funds' cumulative returns from matching the cumulative returns of the index for longer than one day, and (particularly in volatile markets) would often cause a significant divergence and large losses; and (iv) the Funds were suitable only for sophisticated investors.

In an apparent afterthought, plaintiffs also allege that the Funds did not closely track their benchmark indices on a daily basis.  Compl. ¶¶ 11-12, 14-15, 24-25, 36-40.  This is simply

1

incorrect.  More importantly for present purposes, the Trust's disclosures made abundantly clear that, while the Bear Funds sought to provide daily investment returns corresponding to their benchmark indices *before fees and expenses*, the Funds might be unable to meet this target.

Even before <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009) elevated the pleading standards, the Second Circuit "consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus."  <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2, 9 (2d Cir. 1996).  The result should be the same here.

The Complaint suffers from additional defects that independently require dismissal.

<u>First</u>, plaintiffs have not complied with the certification requirement of the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 77z-1; this failure is "fatal to the maintenance of the putative class action."  <u>In re Eaton Vance Corp. Sec. Litig.</u>, 219 F.R.D. 38, 42 (D. Mass. 2003).

<u>Second</u>, it is apparent that the supposed misstatements did not cause plaintiffs' loss. "[W]here the NAV does not react to any misstatements in the Fund's prospectus, no connection between the alleged material misstatement and a diminution in the security's value has been or could be alleged."  <u>In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.</u>, --- F. Supp. ---, 08 Civ. 8235 (RJH), 2011 WL 1206070, at *10 (S.D.N.Y. Mar. 31, 2011).

<u>Third</u>, plaintiffs apparently have no claim even under broader theories of loss causation that <u>State Street</u> rejected.  Notably, the named plaintiffs who provided the most detailed information about their trading history would have lost more money from their investments in the subject Funds if, instead of seeking only daily leveraged investment results, the Funds had performed as plaintiffs allegedly expected.

Fourth, plaintiffs have failed to adequately allege compliance with the relevant one year period of limitations built into the 1933 Act, 15 U.S.C. § 77m.  This period is an element of plaintiffs' cause of action, not an affirmative defense that defendants must plead and prove.

Fifth, assuming *arguendo* that it states a valid § 11 claim, the Complaint must be dismissed to the extent it alleges claims concerning Funds that plaintiffs never personally owned.  Plaintiffs lack Article III standing to pursue such claims, and their attempt to do so contravenes this Court's August 12, 2010 order, dckt. no. 43.[1]

## BACKGROUND[2]

### A.    The Parties

The Trust is an open-end management investment company registered with the U.S. Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940, as amended (the "ICA").  Compl. ¶¶ 74, 93.  The Trust is comprised of a number of separate investment portfolios ("ETFs" or "Funds"), each organized as a separate series of the Trust with its own trading symbol.  Compl. ¶ 74.  Plaintiffs focus on the Trust's so-called "Bear Funds," which have been offered to investors since November 8, 2008.  Compl. ¶¶ 38, 208.  Each Bear

---

[1]     The § 15 "controlling person" claim must be dismissed given plaintiffs' failure to properly allege a primary § 11 violation.  Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004).

[2]     We assume the truth of the Complaint's allegations solely for the purpose of outlining the Complaint's legal defects.  In addition to complaints, courts addressing Rule 12(b)(6) motions examine other sources, such as "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  See also Ganino v. Citizens Util. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) (well-publicized stock prices).  Accordingly, this memorandum refers to the Declaration of Raymund Wong ("Wong Declaration" or "Wong Decl.") and to materials appended to the Declaration of Nicholas Terris ("Terris Declaration" or "Terris Decl."), filed herewith.

Fund seeks returns that approximate triple the inverse of the performance of its benchmark index on a daily basis (e.g., a daily 1% drop in the index would translate to approximately a 3% gain).

Defendant Rafferty Asset Management LLC ("Rafferty") is the investment advisor for the Trust and its ETFs.  Compl. ¶ 80.  The individual defendants were officers or trustees of Rafferty or the Trust who allegedly signed relevant registration statements.  Compl. ¶¶ 75-80.

Plaintiffs are six individuals who allegedly bought shares of two of the Trust's ETFs – the Financial Bear 3X Shares ("Financial Bear") and the Energy Bear 3X Shares ("Energy Bear") during the putative class period.  Compl. ¶¶ 68-73.

### B.       The Structure and Operation of ETFs

A leveraged inverse ETF seeks a daily return tied to a multiple of the opposite of the daily performance of the index it tracks.  Compl. ¶ 92.  For example, the Trust offers the Financial Bear 3X Shares, a fund designed to seek daily investment results before fees and expenses of three times (300%) the inverse (or opposite) of the price performance of the Russell 1000 Financial Services Index.  Compl. ¶ 12.

Most ETFs – including the Funds – are open-end investment companies regulated by the SEC under the Investment Company Act.  Exchange-Traded Funds, Securities Act Release No. 33-8901, Investment Company Act Release No. 28193, 73 Fed. Reg. 14618, 14619 (proposed March 18, 2008), available at http://www.sec.gov/rules/proposed/2008/33-8901fr.pdf (hereinafter "ETF Release," attached hereto as Terris Decl. Ex. G ); Compl. ¶ 87.  Like ordinary open-end mutual funds, ETFs such as the Funds price their shares according to an SEC-prescribed formula for daily net asset value ("NAV").  See ETF Release, 73 Fed. Reg. at 14624, 14627; December 9, 2008 Prospectus, Terris Decl. Ex. C, at 39.  NAV is calculated by dividing a fund's net assets by its shares outstanding.  December 9, 2008 Prospectus, Terris Decl.

Ex. C, at 39.  The Funds and similar ETFs offer to sell and redeem large blocks of their shares

(known as creation units) at NAV.  See ETF Release at 14623, 14627; December 9, 2008

Prospectus, Terris Decl. Ex. C at 38.

Traditional mutual fund shares are purchased by individual investors from the fund itself

and later redeemed or sold back to the fund.  By contrast, except for those who purchase or sell

creation units directly from the funds, ETF shares are bought and sold by investors on the

secondary market through brokers – much like ordinary public company shares.  Compl. ¶ 87.

ETF shares therefore can be bought and sold throughout the trading day, at market prices that

can vary over the course of a day.  ETF Release at 14619-20.

"[B]ecause ETF shares may be created and redeemed by market makers at net asset

value, albeit in large denominations commonly known as creation units, ETF shares typically do

not trade at prices that vary greatly from their net asset values."  McGraw-Hill Cos. v.

Vanguard Index Trust, 139 F. Supp. 2d 544, 546-47 (S.D.N.Y. 2001).  See also ETF Release

14619 n. 9.  The SEC orders and proposed rules authorizing ETFs are designed to facilitate

arbitrage and otherwise ensure a close correspondence between NAV and the secondary market

price. ETF Release at 14627-28.  Secondary market trading has "no direct impact on the NAV

of ETF shares held by other investors."  ETF Release at 14629.

### C.      The Registration Statements at Issue

The Trust's registration statements are filed with the SEC on Form N-1A.  See 17 C.F.R.

§ 274.11A; Form N-1A, Registration Form for Registered Open-End Management Investment

Companies.[3]  A mutual fund's registration statement consists of three parts: (1) a prospectus,

---

[3]      We attach both the SEC Form N-1A operative during the putative class period, Terris
Decl. Ex. H, and the current SEC Form N-1A, Terris Decl. Ex. I.  Both versions are substantively

(2) a statement of additional information, and (3) certain other information, including exhibits and undertakings (which are not alleged to be relevant here).  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 352-53 n.2 (2d Cir. 2010).

As noted in Exhibit B to the Complaint, the Trust filed certain amendments and supplements to its registration statement during the putative class period of November 3, 2008 to April 9, 2009.  Compl. ¶ 2.  The complete filings are available on the SEC's EDGAR web site. The ensuing discussion focuses on the prospectus and statement of additional information dated October 1, 2008 as supplemented on December 9, 2008 (hereinafter the "Prospectus" and "SAI," respectively).  See Terris Decl. Exs. A and B.  The Prospectus and SAI were filed on the SEC's EDGAR system on or about December 9, 2008 pursuant to Rule 497 under the 1933 Act, 17 C.F.R. § 230.497.  See Compl. ¶ 152; Terris Decl. ¶¶ 3a and 3b.[4]  Thus, any purchaser entitled to delivery of a prospectus after this date would have received the December 9 Prospectus and (upon request) the SAI.[5]  No plaintiff alleges he purchased Trust shares before December 9, 2008 and hence no plaintiff has standing to challenge prior disclosures.  In any event, while there are

---

similar for purposes of this litigation.  We cite to the version in effect during the putative class period.

[4]    Rule 497 enables funds to make certain updates to their offering documents without filing a post-effective amendment.  See, e.g., Adoption of Registration Form Used by Open-End Management Investment Companies, Securities Act Release No. 6479, Investment Company Act Release No. 13,436, 48 Fed. Reg. 37929 (August 22, 1983).  Pursuant to Securities Act Rule 430C(a), 17 C.F.R. 230.430C(a), a prospectus filed "under ... Rule 497(b), (c), (d), or (e) will, in all cases, be deemed to be part of and included in the registration statement for purposes of Securities Act Section 11."  Securities Offering Reform, Securities Act Release 33-8591, 70 Fed. Reg. 44722, 44773 (Aug. 3, 2005).

[5]    See 17 C.F.R. § 230.497(c), (e); 15 U.S.C. § 77e (unlawful to deliver any security for sale unless accompanied or preceded by a prospectus complying with 15 U.S.C. § 77j).  The SAI is incorporated by reference in the Prospectus, see Prospectus, rear cover, and is part of the Prospectus "as a matter of law," White v. Melton, 757 F. Supp. 267, 269 (S.D.N.Y. 1991).

some differences, the earlier November 3, 2008 prospectus and statement of additional

information (relevant excerpts of which are attached as Exs. E and F to the Terris Declaration)

contained generally similar relevant disclosures.  After certain amendments to the Trust's

registration statement that are irrelevant for present purposes, see Compl. ¶ 221, the prospectus

and statement of additional information were supplemented again on April 10, 2009.  Plaintiffs

do not challenge the April 10, 2009 version of the prospectus and statement of additional

information.  Compl. ¶¶ 56, 102 n.5, 234.

## ARGUMENT

Under the general pleading rules, "a complaint must contain sufficient factual matter,

accepted as true, to state a claim for relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S.

Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted).  In addition, the

particularity requirements of Fed. R. Civ. P. 9(b) apply to § 11 claims where, as here, the

Complaint clearly alleges intentional misconduct and, hence, the claims are "grounded in fraud."

Rombach v. Chang, 355 F.3d 164, 170-71 (2d Cir. 2004); In re Morgan Stanley Info. Fund Sec.

Litig., 592 F.3d at 358 (2d Cir. 2010).[6]

## I.  THERE ARE NO MISREPRESENTATIONS OR ACTIONABLE OMISSIONS

To state a § 11 claim, a plaintiff must allege that an offering document contained a false

statement of material fact or omitted a material fact "necessary to make the statements therein

not misleading."  15 U.S.C. § 77k(a).  A fact is material only if there is "a substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable investor as

---

[6]   See, e.g., Compl. ¶ 138 (registration statements "purposely obfuscated the true nature of
the risks involved in investing in the defective Direxion ETF products"); ¶ 216 (defendants
"clearly were aware of the significant historical daily underperformance of their Bear ETFs at the
time they filed Direxion's December 9, 2008 prospectus supplement"); ¶ 341 (incorporating all
previous paragraphs); ¶ 346 (defendants "purposely misled the Plaintiffs").

having significantly altered the 'total mix' of information made available." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1309, 1318 (2011) (citation and internal quotation marks omitted). Further, an omission is actionable under the securities laws only when the issuer is subject to a duty to disclose the omitted facts. <u>Id.</u> at 1321; <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d at 361.

Disclosure documents "need not be perfect, but must simply convey a sufficiently accurate picture so as not to mislead." <u>Mendell v. Greenberg</u>, 612 F. Supp. 1543, 1548 (S.D.N.Y. 1985) (citations omitted). "[N]it-picking should not [be] the name of the game." <u>Kennecott Copper Corp. v. Curtiss-Wright Corp.</u>, 584 F.2d 1195, 1200 (2d Cir. 1978).

### A. The Trust Repeatedly and Clearly Disclosed that the Funds Seek Only Daily Leveraged Investment Results

The Complaint principally asserts that the Trust did not adequately disclose that the Bear Funds tracked their benchmarks only on a daily basis rather than over longer investment horizons. Plaintiffs plainly fail to state a claim in this regard.

### 1. The Trust Registration Statement Included Ample Disclosures Regarding the Funds' Daily Investment Objectives

The Trust made extensive and unusually clear disclosures regarding the very issues that are the subject matter of the Complaint. For starters, the Prospectus and SAI both included the following warnings in bold-faced type *on their cover pages* and elsewhere:

> **The Funds are exchange-traded funds that seek *daily leveraged* investment results. The Funds are intended to be used as short-term trading vehicles. The pursuit of leveraged investment goals means that the Funds are riskier than alternatives which do not use leverage. Further, the pursuit of *daily* leveraged investment goals means that the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period. As a consequence, especially in periods of market volatility, the path of the benchmark during the period may be at least as important to the Fund's return for the period as the cumulative return of the benchmark for the relevant period. The Funds are not suitable for all investors. The Funds should be utilized only by**

>    **sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results and (c) intend to actively monitor and manage their investments.**

(Emphasis in original).  <u>See also</u> Prospectus at 4 (same).  These and other related points are

amplified repeatedly in subsequent portions of the Prospectus and SAI.  For example:

- The Prospectus repeatedly states that the Funds seek to track their indices on a daily basis.  Prospectus at 1, 12-35.

- Page 3 of the Prospectus explains that the Funds "seek daily leveraged investment results which should not be equated with seeking a leveraged goal for longer than a day.  For instance, if the Russell 1000® Index gains 10% during a year, the Large Cap Bull 3X Shares should not be expected to provide a return of 30% for the year even if it meets its daily target throughout the year."  This is because "the pursuit of daily goals may result in daily leveraged compounding, which means that the return of an index over a period of time greater than one day multiplied by a Fund's daily target or inverse daily target (*e.g.*, 300% or -300%) will not generally equal a Fund's performance over that same period."

- These principles are illustrated with a simple example on pages 3-4 of the Prospectus.

- Page 8 of the Prospectus repeats that "[n]o Fund attempts to, and no Fund should be expected to, provide returns which are a multiple of the return of the benchmark for periods longer than a single day."  Further "[d]aily rebalancing will impair a Fund's performance if the benchmark experiences volatility."

- Page 8 of the Prospectus uses a graph and explanatory text to illustrate how, in a volatile market, a leveraged Bear Fund **would suffer large losses even over a one year period in which the benchmark is completely flat**.

- For instance, "a hypothetical 3X Fund, whether Bull or Bear, would be expected to lose 6.48% … if its benchmark were flat over a hypothetical one year period during which its benchmark experienced annual volatility of 15%."  In the same flat market, if the benchmark's annual volatility "were to rise to 40%, the hypothetical loss for a one year period would widen to approximately 38%."  Prospectus at 8.

- Each Fund's investment objective is clearly stated in terms of daily returns.  The tracking error risk discussion similarly focuses on the daily target.  <u>See, e.g.</u>, Prospectus at 11, 30.

- The SAI warns on its cover and thereafter that the Funds seek only daily leveraged investment results.  SAI at 1, 2-3.

- The SAI reiterates that volatility can have a substantial negative effect on Fund performance.  SAI at 26-27.  It includes another chart demonstrating how over a one year period, depending on volatility, a Fund can substantially under- or over-perform 300% of the inverse of its one year index performance.  SAI at 30.  As the chart clearly shows, even in a declining market, high volatility can result in large losses in the Bear Funds.[7]

These disclosures are reproduced and attached as Terris Decl. Exs. C and D.

Clearly, no reasonable investor who read the registration statement would be misled.

### 2.   Plaintiffs' Objections to the Trust's Disclosures Are Meritless

Plaintiffs nonetheless attempt to manufacture a § 11 claim by offering pejorative characterizations of the Trust's disclosures, inventing non-existent disclosure duties, and even criticizing the Trust for adhering to SEC-imposed disclosure obligations.  These efforts fail.

### a.   Plaintiffs Cannot Establish Liability by Comparing Supposedly "Anticipated" and "Actual" Cumulative Returns Over Arbitrarily Selected Periods

A number of allegations in the Complaint consist of graphs and text purporting to show divergence between what plaintiffs call the "anticipated" cumulative returns for the Funds (based on the underlying benchmark's cumulative returns) and the "actual" cumulative returns achieved for selected time periods.  See, e.g., Compl. ¶¶ 15-22.

The fundamental and obvious defect in these allegations is that what plaintiffs supposedly anticipated (that the Funds would track their index over weeks and even months) was entirely

---

[7]        This section of the SAI mistakenly states that "each of the Funds is a 'leveraged,' or Bull Fund, in the sense that each has an investment objective to match a multiple of the performance of an index of a given day."  SAI at 26.  While plaintiffs attempt to seize on this inconsequential drafting error, Compl. ¶¶ 110-111, 194, the remaining portions of the registration statement make perfectly obvious that some of the Funds are so-called Bull Funds while others are Bear Funds. See generally In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993) ("a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law").  And one of the charts demonstrating the effect of volatility on investment performance is clearly labeled "Estimated Fund Return Over One Year of 3X Bear ETFs."  SAI at 30.

contrary to the Trust's repeated disclosures that the Funds tracked their benchmark indices only on a daily basis.

What is more, it is plain that plaintiffs have cherry-picked the dates in their graphs for maximum effect. The losses shown for the periods selected for inclusion in the Complaint are not broadly representative of all time periods[8] or of the named plaintiffs' own experiences. Clearly, the Funds were not inevitably going to "lose" or perform opposite the way they were "supposed to." Instead, the Funds diverge from their respective benchmarks (both positively and negatively) when held for certain longer periods due to a combination of such factors as compounding, leverage, and index volatility – just as disclosed in the registration statements.

### b. The Trust's Disclosures Regarding Volatility Were More Than Adequate

Plaintiffs observe that the illustrations in the registration statements only included scenarios with up to 40% volatility in the Prospectus and 55% volatility in the SAI. Compl. ¶¶ 27-35, ¶¶ 119-126, 195, 200-201. However, plaintiffs fail to allege why inclusion of higher volatility levels was needed to avoid misleading investors. Nothing in the Funds' disclosure documents purported to be a prediction of future volatility rates. Indeed, the Prospectus specifically noted that indices to which the Funds are benchmarked "have different historical volatility rates" and that "certain of the Funds' current volatility rates are substantially in excess of 40%." Prospectus at 8. And the reasonable investor already knew that increased volatility risked amplifying the divergence of the Funds' cumulative returns from those of their respective benchmarks. No reasonable investor could claim to be surprised that this trend would continue if volatility rose even higher. See generally In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588

---

[8]     Had plaintiffs instead used February 9, 2009 to March 9, 2009, for example, the Financial Bear would have gained 50% more than triple of the inverse of the benchmark index. See Wong Decl. ¶ 4.

(S.D.N.Y. 1993) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves.").

Plaintiffs complain that the Trust did not include graphs for periods shorter than one year. See, e.g., Compl. ¶¶ 128-132, 197, 200-202, 281.  But the Funds' daily investment objectives and the consequences of daily compounding were clearly and repeatedly explained.  The Trust even provided clear graphical examples of how volatility affected the Funds.  No more was required.[9]

Further, courts have made clear that a plaintiff's inability or failure to perform even complex mathematical calculations cannot be the basis of a claim under the securities laws.  See, e.g., In re Merck & Co. Sec. Litig., 432 F.3d 261, 270-71 (3d Cir. 2005) (no actionable misrepresentation or omission where alleged revelation of the truth consisted of a newspaper story in which the reporter "simply did the math"); Werner v. Werner, 267 F.3d 288, 299-300 (3d Cir. 2001) (alleged omissions immaterial despite need for shareholders to engage in complex, multi-step calculations to ascertain the information); Starr v. Georgeson S'holder, Inc., 412 F.3d 103, 111 (2d Cir. 2005) (exchange agent's failure to disclose the total fee charged for providing its service was immaterial as a matter of law where the agent properly disclosed the fee per share).  Here, plaintiffs had abundant information to enable them to "do the math" and determine the effects of volatility over shorter periods.

---

[9]     Plaintiffs also opine that the Trust should have included "the actual recent volatility levels o[f] the indexes underlying the [F]unds."  Compl. ¶¶ 132, 180-94, 199.  But plaintiffs cannot cite any requirement to disclose (and presumably update) in a registration statement such general, constantly changing, publicly available information.

      **c.      Plaintiffs Cannot Establish Liability by Attempting to Create New Obligations Via a Mathematical Formula**

Plaintiffs also allege that the registration statements were rendered misleading by the omission of a mathematical formula that allegedly allows for prediction of the results of holding the ETFs for longer than a day.  See Compl. ¶¶ 50-51, 114, 115, 119, 256-279.

But Form N-1A does not require the disclosure of any such mathematical formula.  And it strains credulity for plaintiffs to assert that a reasonable investor required the inclusion of this formula in order to fairly understand the nature of the investment and the risks it entailed.  Indeed, given the clear textual discussion and graphical illustrations of the Funds' investment risks, it is doubtful that disclosure of plaintiffs' complex mathematical formula would even "necessarily be helpful to prospective investors"; instead its inclusion would have risked "delug[ing]" investors with "marginally useful information."  Benzon v. Morgan Stanley Distrib., Inc., 420 F.3d 598, 609 n. 6 (6th Cir. 2005) (citation and internal quotation marks omitted).

      **d.      The Regulatory and Analyst Statements Regarding ETFs Do Not Support a Claim for Registration Statement Liability**

Plaintiffs cite to Financial Industry Regulatory Authority ("FINRA") notices, other regulatory announcements, and related analyst reports.  See Compl. ¶¶ 43, 276, 283-95.

However, most of the regulatory pronouncements are directed to brokers who advise individual investors and are required to recommend suitable securities to them.[10]  They do not indicate that any of the registration statements at issue were inadequate.

---

[10]    See generally NASD Conduct Rule 2310(a).  Plaintiffs also cite a March 25, 2010 SEC press release regarding a decision by the SEC Staff to evaluate the use of derivatives by ETFs and to defer consideration of new ETF exemptive applications in the meantime.  Compl. ¶¶ 46-48, 291-93.  The press release has no apparent bearing on the issues in this case.

e.      **Later Registration Statement Disclosures Do Not Support Liability for Earlier Statements**

The Complaint suggests that there should be liability for the registration statements based on subsequent disclosures and the Funds' April 2009 name change.  See, e.g., Compl. ¶¶ 6, 53-55, 60; ¶¶ 227-249.

Many of the disclosures that plaintiffs allege were new starting in April 2009 (Compl. ¶ 6) reflect no more than relatively minor language changes from previous SEC filings.

More fundamentally, plaintiffs cannot state a securities fraud claim by "seiz[ing] upon disclosures made in a later [prospectus] and alleg[ing] that they should have been made in earlier ones."  Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978).  That later registration statements may have had more or different disclosures is no basis to conclude that earlier disclosures were inadequate.  See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 7 (2d Cir. 1996) (rejecting plaintiff's citation "as if it were a smoking gun" to a more specific post-offering report).

Under Fed. R. Evid. 407 (subsequent remedial measures), later disclosures should not even be considered when analyzing whether earlier disclosures were materially misleading at the time they were made.  See, e.g., Krouner v. Am. Heritage Fund, Inc., 899 F. Supp. 142, 147 (S.D.N.Y. 1995); Malone v. Microdyne Corp., 26 F.3d 471, 480 (4th Cir. 1994).[11]

---

[11]     As "proof" that later disclosures were better, plaintiffs allege that, after April 9, 2009, the ratio of shares outstanding to volume in the Bear Funds declined.  Compl. ¶¶ 58, 247.  But given that the great majority of ordinary investors do not read prospectuses, Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 565 (E.D.N.Y. 1971), there is no basis to infer that changes in the Funds' disclosures had any bearing on any (assumed) decline in the Funds' average holding period.  Any change can easily be explained by (for example) different market conditions.  In any event, the reason for any change to the holding period is irrelevant because the Trust's disclosures were clear on their face.

**f.      Plaintiffs' Laundry List of Suggested Disclosures Provides No Basis for Liability**

At various points in the Complaint, plaintiffs allege that the Trust was required to include certain specific disclosures.  See, e.g., Compl. ¶¶ 113, 176, 178, 242-243.

However, Form N-1A imposes no duty to make the particular disclosures desired by plaintiffs.  And because Form N-1A includes "all of the requirements necessary for funds to prepare… registration statements," [12] ordinarily there is no duty to disclose additional information.  See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 248-49 (S.D.N.Y. 2003) (in light of the "extensive congressional and regulatory oversight" of mutual funds, the fact that "no portion" of Form N-1A required the disclosure of such information meant that such disclosure was not required).[13]

Even assuming contrary to law that such a duty did exist, as detailed above, plaintiffs' proposed disclosures are at best either minor variations on disclosures explicitly made or consist of interpretations of facts disclosed in the Trust's registration statement.  Thus, they are immaterial as a matter of law.  See, e.g., Benzon, 420 F.3d at 609 ("Given that the disclosures

---

[12]      Registration Form Used by Open-End Management Investment Companies, Securities Act Release No. 33-7512, Exchange Act Release No. 34-39748, 63 Fed. Reg. 13916, 13940 (March 23, 1998).

[13]      See also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 356, 361-62 (rejecting argument that Form N-1A's general instruction that the purpose of the form "is to provide essential information about the fund" and imposes disclosure obligations beyond the specific requirements of the form);  Press v. Quick & Reilly, Inc., 218 F.3d 121, 131-32 (2d Cir. 2000) (declining to "supplant the SEC's determination of what is material with our own"); Geiger v. Solomon-Page Group, Ltd., 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996) (that the SEC "does not require disclosure of this fact . . . reflects the SEC's expert view that such disclosure is not required"); Krouner v. American Heritage Fund, Inc., No. 94 Civ. 7213 (WK), 1996 WL 393584, at *3 (S.D.N.Y. July 15, 1996) (fund need not disclose investments beyond limits in Form N-1A); White v. Melton, 757 F. Supp. 267, 273 (S.D.N.Y. 1991); DeBruyne v. Equitable Life Assur. Soc. of U.S., 720 F. Supp. 1342, 1353 (N.D. Ill. 1989), aff'd, 920 F.2d 457 (7th Cir. 1990) (disclosures not misleading where they complied with Form N-1A).

Plaintiffs propose are merely interpretations drawn from the facts presented in the prospectuses, and do not actually provide new information, they would not have 'significantly altered the total mix' of the information already presented in the prospectuses.")(citation and internal quotation marks omitted); <u>Olkey</u>, 98 F.3d at 7 (2d Cir. 1996) (while the prospectuses contained "no specific statement" about the alleged bias, a reasonable investor would not be unaware of the risk based on the other disclosures); <u>Halperin, M.D. v. EBanker USA.Com, Inc.</u>, 295 F.3d 352, 361 (2d Cir. 2002) (dismissing complaint where "[t]he allegedly omitted facts were either disclosed **or implied** in the offering memoranda") (emphasis added).

> **g.    Plaintiffs' Remaining Objections to the Trust's Disclosures Are Meritless**

The remaining allegations plainly lack merit.

The Complaint quotes press releases, newspaper articles, and analyst commentary.  <u>See, e.g.</u>, Compl. ¶¶ 100-102, 127, 222-23, 254.  Of course, since such statements are not part of the Trust's registration statements, they cannot be a basis for liability in this § 11 case.  In any event, no statement in these materials made by any defendant is misleading, and some of the quoted materials affirmatively undermine plaintiffs' case.  For example, paragraph 254 states that "ETF providers clearly state that [leveraged and inverse funds] attempt only to provide a multiple of their index on a daily basis."  Paragraph 294 acknowledges that "the vast majority of investors [in the Funds] are large financial institutions that seek out volatility to maximize intraday returns."

Plaintiffs also allege that the Trust was under a duty to disclose the risks of holding the Funds for periods longer than a day because portions of the registration statement included "extensive descriptions of the results of holding the [Funds] over time."  Compl. ¶ 142; ¶¶ 143-

151; ¶¶ 205-206.  But most of these allegations merely criticize the Trust for scrupulously adhering to the SEC regulations embodied in Form N-1A.[14]

The remainder of the Complaint's allegations consist of "semantic quibbling" that cannot be the basis for a claim under the securities laws.  Benzon, 420 F.3d at 612.  For example, plaintiffs distort the obvious meaning of the phrase "product of the series of daily leveraged returns for each day during the relevant period" that appears on the Prospectus and SAI covers.[15] They then represent their distorted interpretation as a mathematical formula, and show how investors would be misled if they thought that the Fund performed in accordance with the formula.  Compl. ¶¶ 159-164.  As with plaintiffs' "anticipated return" averments, the problem with such allegations is that they are based on nothing more than nonsensical misinterpretations of the Trust's disclosures.[16]

---

[14]     See, e.g., Form N-1A Item 3(c) (requiring expense example based on "[a]nnual [f]und [o]perating expenses" noted in Compl. ¶¶ 146-148); Item 6(d) (requiring a description of a fund's dividend policy, noted in Compl. ¶ 145(c)); Item 6(b) and (e) (requiring a description of the procedures for purchasing fund shares and of the risks of frequent purchases and redemptions of fund shares, respectively, noted in Compl. ¶ 205).  "If [defendant] included the language . . . in good faith reliance on the SEC rule, then no liability follows."  Spicer v. Chicago Bd. Options Exch., No. 88 C 2139,1992 WL 380929, at *4 (N.D. Ill. Dec. 10, 1992).  See also 15 U.S.C. § 77s(a).

[15]     It seems perfectly clear that the product of two days of daily returns of 10% on an investment of $1 would be $1.21.  After one day, an investor would have his principal of $1 plus 10%, or $1.10; after the second day, an investor would have his principal of $1.10 plus 10% of that principal, or $.11, for a total of $1.21.  Plaintiffs nonetheless suggest that an investor would somehow understand the product of two daily returns to be simply the rate of return multiplied by itself (e.g., 10% multiplied by 10%, or 1%), so that the investor would expect to receive $1.01.  Even if the correct understanding of the concept of a product of daily returns were not otherwise obvious on its face, the registration statement includes a clear example of what is intended.  Prospectus at 3-4.

[16]     Similarly, plaintiffs inexplicably profess confusion over such words and phrases as "short-term trading vehicles," Compl. ¶ 156, and "volatility," Compl. ¶ 166.  See also Compl. ¶¶ 168, 175, 244 (similar quibbles).  These allegations are frivolous.

**B.      Plaintiff's Allegations That the Funds Failed to Achieve Their Daily Investment Objectives Are Meritless**

Plaintiffs suggest that the Funds did not adequately track their benchmark indices on a daily basis.  Compl. ¶¶ 36-40, 113d; 207-220.

As plaintiffs well know, the Funds have been highly successful in meeting their daily targets.  Even ignoring this reality, the Complaint asserts at most that the attempts at daily tracking "[were] not as skillfully done as [they] should have been," Olkey, 98 F.3d at 8.  This is no basis for § 11 liability.

In contrast to the Complaint's erroneous suggestion that the registration statement at issue guaranteed perfect daily tracking, the Trust actually disclosed that the Funds were "designed to provide daily investment returns, ***before fees and expenses***, that are a multiple of the returns of its index or benchmark for the stated period."  Prospectus at 3 (emphasis added).  Thus, for example, the Financial Bear Fund "seeks daily investment results, before fees and expenses, of 300% of the inverse (or opposite) of the price performance of the Financial Index."  Prospectus at 30.  A fund that seeks a particular return before fees and expenses obviously will often achieve a lower return net of fees and expenses.  Other portions of the registration statement underscored that there was no expectation of exact daily tracking.  See, e.g., Prospectus at 3 ("If the Russell 1000® Index gains 2% on a given day, the Large Cap Bull 3X Shares would be expected to gain ***about*** 6%") (emphasis added); SAI at 1 ("if the Russell 1000® Index loses 1% on a given day … the Large Cap Bear 3X Shares is designed to gain ***approximately*** 3%") (emphasis added).

Moreover, the Trust made abundantly clear that there were a number of reasons why the Funds might not be able to meet these (approximate) targets.  See, e.g., Prospectus at 3. ("[C]ertain factors will tend to cause a Fund's investment results to vary from the stated objective.  A Fund may have difficulty achieving its daily target due to fees and expenses, high

18

portfolio turnover, transaction costs and/or a temporary lack of liquidity in the markets for securities held by the Fund."); Prospectus at 7-8 ("[t]here can be no guarantee that a Fund will achieve a high degree of correlation with its investment objective relative to its benchmark index;" listing numerous factors that could result in a deviation); Prospectus at 11 (similar; section entitled tracking error risk); SAI at 26 (elaborating on possible reasons for tracking error). These disclosures are reproduced and attached as Exs. C and D to the Terris Declaration.

Plaintiffs theorize that one reason the Funds may not have achieved perfect daily tracking was that the Funds were required to sell large amounts of derivative securities "at or shortly before the close of trading each day."  Compl. ¶ 305.  Plaintiffs all but concede that these allegations are pure speculation.[17]  And the Complaint fails to offer any non-conclusory factual allegation indicating that any need to purchase securities late in the day had a material impact on the Funds, let alone injured any of the named plaintiffs.  See Olkey, 98 F.3d at 8 ("It should also be noted that the alleged undisclosed bias had no direct relationship to the losses claimed to have been incurred.").  In any event, the registration statement expressly indicates that some of the factors potentially limiting a Fund's ability to track the performance of its applicable index were "a Fund holding instruments that are illiquid" and "the need to conform a Fund's portfolio holdings to comply with that Fund's investment restrictions or policies."  SAI at 26.  See also id. at 12 (may be necessary to sell illiquid investments "at a price that is lower than the price that could be obtained if the investments were liquid"; and the "sale of illiquid investments may require more time and result in higher dealer discounts and other selling expenses").[18]

---

[17]     See Compl. ¶ 305 ("Plaintiffs believe that, after reasonable opportunity for investigation and discovery, the evidence will show that Defendants executed such rebalancing trades during the last 30 minutes of trading."); ¶¶ 322, 325 (similar).

[18]     In another variation on the theme, plaintiffs seem to allege that the Trust failed to disclose that the Funds might incur transaction costs relating to hedging.  Compl. ¶¶ 331-39.  But see,

## II.    PLAINTIFFS HAVE FAILED TO FILE THE REQUIRED CERTIFICATIONS

Plaintiffs have flouted the Reform Act's command that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint."  15 U.S.C. § 77z-1.  The certification must include, among other things, "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." Id.

"There is no language in this subsection limiting the certification requirement to lead plaintiffs."  In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 42 (D. Mass. 2003).  And applying the requirement to all named plaintiffs filing a class action complaint "advances the [Reform Act's] important policy goals."  Id.  Yet no plaintiff has filed a certification with the current Complaint, and the new plaintiffs named in the Complaint (Haas, Behnken, and Killmon, Compl. ¶¶ 70, 71, 73) have never provided any Reform Act certification.[19]

"Failure of the named plaintiff to file a certification with the complaint is fatal to the maintenance of the putative class action."  In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. at 42 (citation and internal quotation marks omitted).  See also Lilley v. Charren, 936 F. Supp. 708, 715-16 (N.D. Cal. 1996) (dismissing § 11 complaint that failed to allege dates showing shares were issued in IPO).

---

e.g., Prospectus at 10 ("The Funds' use of leverage means that they will incur financing charges which will affect the performance of the Funds."); Prospectus at 10-11 (Funds may incur transaction costs due to shorting techniques).

[19]    The certifications plaintiffs previously provided are ambiguous and incomplete and, as discussed below, hinder the ability of the Court and defendants to ascertain whether plaintiffs have the requisite standing.  See In re Initial Pub. Offering, 241 F. Supp. 2d 281, 347 n.76 (S.D.N.Y. 2003) (Reform Act certification was "integral to the complaint" and therefore was properly considered on a motion to dismiss).

**III.    STATE STREET COMPELS DISMISSAL**

As demonstrated by this Court's opinion in In re State Street Bank & Trust Co. Fixed

Income Funds Investment Litig., --- F. Supp. ---, 08-Civ. 8235 (RJH), 2011 WL 1206070

(S.D.N.Y. Mar. 31, 2011), it is apparent that there can be no loss causation in this case.  See 15

U.S.C. § 77k(e).  The price of ETF shares is not determined purely by the forces of supply and

demand as in traditional open-market securities trading.  Instead, as discussed above in the

Background section, the market prices of fund shares track the funds' NAV.  Because the funds'

NAV is at all times determined by the price of the underlying securities, alleged

misrepresentations regarding a fund's investment objective – rather than the inputs into the NAV

calculation – cannot affect a fund's share price.  See id. at *7 ("Unlike an ordinary share of stock

traded on the open market, the value of a mutual fund share is calculated according to a statutory

formula.") (citation and internal quotation marks omitted); see also Clark v. Nevis Capital

Mgmt., LLC, No. 04 Civ. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (the price of

"shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and omissions

concerning the fund itself") (citing Young v. Nationwide Life Ins. Co., 183 F.R.D. 502, 510

(S.D. Tex. 1998)).

Here, none of the misstatements or omissions alleged by plaintiffs caused the Funds'

NAV and thus the share price to be inflated, only to decline later as a result of the "truth"

becoming known through a corrective disclosure.  Instead, the NAV declines that caused

plaintiffs' losses were due to the decline in the value of the Funds' underlying investments,

regardless of what was disclosed about the investment objective of the Funds.  The securities held

in each Fund's portfolio would have experienced the same market value losses, causing the same

depreciation in the Fund's NAV, regardless of what was disclosed.

21

In short, where as here "the NAV does not react to any misstatements in the Fund's prospectus, no connection between the alleged material misstatement and a diminution in the security's value has been or could be alleged." State Street, 2011 WL 1206070 at *10 (dismissing complaint).

## IV.   PLAINTIFFS SUFFERED NO LOSSES ATTRIBUTABLE TO THE ALLEGED MISREPRESENTATIONS

Even more straightforwardly, it appears that plaintiffs simply did not suffer the supposed injuries of which they complain.

At least two plaintiffs (Remmells and Stoopler) would have lost more money from their investments in the Funds if, instead of seeking only daily leveraged investment results, the Funds had performed as plaintiffs allegedly expected.  This is demonstrated by ¶¶ 2-3 to the Wong Declaration, which is based on plaintiffs' previously filed certifications and on reported Fund price and index level history.[20]  Thus, the alleged misrepresentations cannot be said to have caused plaintiffs' alleged losses even under the more plaintiff-friendly "materialization of the risk" view of loss causation that this Court has soundly rejected.  See, e.g., In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534 (N.D. Cal. 2009).  Plaintiffs simply made erroneous bets on the direction of the market.  If anything, the alleged misstatements limited (rather than exacerbated) the losses stemming from plaintiffs' erroneous investment decisions.  While plaintiffs allege that they would not have purchased Fund shares if they had known that the Funds sought to track their benchmarks on a daily basis, this is merely an insufficient claim of transaction causation.  See State Street, 2011 WL 1206070, at *5.

---

[20]     There is insufficient information on Schwack.  And plaintiffs who never filed the required certifications are not entitled to the benefit of the doubt.

Plaintiffs' failure to file adequate (or in some cases any) certifications similarly obscures whether plaintiffs were personally harmed by the Funds' supposed failure to achieve their daily tracking goals.  Plaintiffs merely posit that hypothetical putative class members investing during arbitrarily selected time periods would have been harmed.  See, e.g., Compl. ¶¶ 208, 212-15.  This is inadequate given that plaintiffs have not (and cannot) allege that the Funds always underperformed their daily targets.

## V.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE COMPLIANCE WITH THE STATUTE OF LIMITATIONS

In a § 11 case, a plaintiff must plead compliance with the limitations period – "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  See In re Chaus Sec. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992); Caviness v. Derand Res. Corp., 983 F.2d 1295, 1302 (4th Cir. 1993).

Here, the Complaint merely asserts in conclusory fashion that less than one year elapsed since the time that plaintiffs en masse discovered or reasonably could have discovered the alleged misstatements.  Compl. ¶ 352.  Such "conclusory statements" are "not entitled to the assumption of truth."  Iqbal, 129 S. Ct. at 1949.  Plaintiffs must plead the time and circumstances of discovery.  See In re Chaus Sec. Litig., 801 F. Supp. 2d at 1265.[21]

In this case, investors may have learned of the supposed misstatements even before investing (e.g., by using easily accessible public sources to compare the Fund's return to that of the benchmark index for periods of longer than one day or to gauge the Funds' daily tracking).  Cf. Brumbaugh v. Princeton Partners, 985 F.2d 157, 159, 163-64 (4th Cir. 1993) (limitations

---

[21]    We do not address possible issues of class action tolling here.  To plead timely individual claims, however, plaintiffs must offer more than bald allegations.

period triggered by memorandum provided to prospective investors).[22]  If a plaintiff knew of the

supposed misrepresentations before investing (<u>e.g.</u>, an investor who like many in the putative

class understood how the Funds worked and used them to day trade, Compl. ¶ 294), he plainly

has no claim.  <u>See</u> 15 U.S.C. § 77k(a) (no § 11 claim for person who knew of untruth in

registration statement at the time he invested).

## VI.    PLAINTIFFS MAY NOT PROCEED WITH CLAIMS REGARDING FUNDS OTHER THAN THE FINANCIAL BEAR AND ENERGY BEAR

Even if plaintiffs had a cognizable claim, the Complaint must be dismissed to the extent it

alleges claims concerning Funds other than the Financial Bear or Energy Bear.

Plaintiffs collectively owned shares in only two Funds – Financial Bear and Energy Bear.

<u>See</u> Compl. ¶¶ 67-73 & Ex. A.  Plaintiffs lack Article III standing "for claims relating to funds in

which they did not personally invest."  <u>Hoffman v. UBS-AG</u>, 591 F. Supp. 2d 522, 532

(S.D.N.Y. 2008).  <u>Accord</u> <u>In re Lehman Bros.</u>, 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2010),

<u>aff'd</u> --- F.3d ---, Nos. 10-0712-cv, 10-0898-cv, 10-1288-cv, 2011 WL 1778726 (2d Cir. May 11,

2011); <u>In re Salomon Smith Barney Mut. Fund Fees Litig.</u>, 441 F. Supp. 2d 579, 607 (S.D.N.Y.

2006).

Additionally, the Court's August 12, 2010 order, dckt. no. 43, authorizes lead plaintiffs

and counsel to litigate only on behalf of Financial Bear and Energy Bear.  Page 9 of the order

indicates that Stoopler, Schwack, and Lee are appointed "to represent holders of the FAZ Fund

… [and] holders of the ERY Fund."  This comports with the mandates of the Reform Act.

---

[22]    Section 13 obliges a plaintiff to sue "within one year after the discovery <u>of the untrue statement</u>."  15 U.S.C. § 77m (emphasis added).  A plaintiff clearly can discover the untruth of a statement in an offering document prior to purchasing shares.  <u>But cf.</u> 28 U.S.C. § 1658(b) (period runs from discovery of the "violation"; a violation of the securities laws cognizable in a private action arguably cannot be alleged until there is a purchase.  <u>City of Pontiac General Employees' Retirement System v. MBIA, Inc.</u>, 637 F.3d 169, 175 (2d Cir. 2011)).

Shareholders of other Funds have had no opportunity to apply for lead plaintiff status as the statute requires.  <u>See</u> 15 U.S.C. § 77z-1(a)(3).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.  <u>See</u> <u>In re Eaton Vance Mutual Fund Fee Litig.</u>, 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005), <u>aff'd</u> <u>sub nom.</u>, <u>Bellikoff v. Eaton Vance</u>, 481 F.3d 110, 118 (2d Cir. 2007).

Dated:  New York, New York
        June 10, 2011

                              K&L GATES LLP

                              By:   /s/ Nicholas G. Terris
                              _____
                              Joanna A. Diakos (JD 7269)
                              Sarah P. Kenney (SK 5642)
                              K&L Gates LLP
                              599 Lexington Avenue
                              New York, New York  10022-6030
                              Email: joanna.diakos@klgates.com
                                        sarah.kenney@klgates.com
                              Phone: (212) 536-3900
                              Fax:     (212) 536-3901

                              Jeffrey B. Maletta (admitted *pro hac vice*)
                              Nicholas G. Terris (admitted *pro hac vice*)
                              1601 K Street, NW
                              Washington, DC 20006-1600
                              E-mail:  jeffrey.maletta@klgates.com
                                        nicholas.terris@klgates.com
                              Phone: (202) 778-9000
                              Fax:     (202) 778-9100

                              *Counsel for Defendants Direxion Shares ETF Trust, Daniel D. O'Neill, Daniel J. Byrne, Gerald E. Shanley, III, John Weisser and Rafferty Asset Management, LLC*