**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re DIREXION SHARES ETF TRUST | Civil Action No. 1:09-CV-08011-RJH |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

William B. Federman
wbf@federmanlaw.com
Stuart W. Emmons
swe@federmanlaw.com
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112

*Lead Counsel for the FAZ Plaintiffs and Proposed Class*

Kenneth G. Gilman
kgilman@gilmanpastor.com
Rene Potkay
rpotkay@gilmanpastor.com
**GILMAN AND PASTOR, LLP**
16 14th Avenue
Wareham, MA 02571
Phone: (508) 291-8400
Fax: (508) 291-3258

Mark C. Rifkin
rifkin@whafh.com
Alan Weiss
aweiss@whafh.com
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Phone: (212) 545-4600
Fax: (212) 545-4653

*Co-Lead Counsel for the ERY Plaintiffs and Proposed Class*

## TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND .......................................................................1

II.  LEGAL ARGUMENT ..................................................................................................10

   A.   The Offering Documents Failed To Disclose, Or Adequately Disclose, The Risks Of Investing In The Bear Funds ............................................................................11

   B.   Defendants Did Not Disclose The Risks Of Holding Bear Funds Beyond A Single Trading Session..........................................................................................................12

   C.   Plaintiffs Were Harmed When The Undisclosed, Unique Risks Of Investing In Bear Funds Materialized ....................................................................................................21

   D.   Defendants Cannot Prove "Negative Loss Causation" Under The Facts Alleged In The Complaint ......................................................................................................22

   E.   Plaintiffs Unquestionably Allege *Some* Injury When The Unique Risks Of Investing In Bear Funds Materialized ........................................................................28

   F.   Plaintiffs Have Article III Standing And Should Be Allowed To Represent Investors In All Four Bear Funds ..........................................................................................30

   G.   Defendants' Argument that Plaintiffs' Claims are Barred by the Statute of Limitations is Without Merit ........................................................................................32

   H.   The Failure to File Certifications For The New Plaintiffs Was Inadvertent and An Oversight That Has Been Corrected..............................................................................33

   I.   Plaintiffs' Allegations Of Post-Class Period Statements Are Proper.....................34

III.  CONCLUSION.............................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000).................................................23

*Blessing v. Sirius XM Radio Inc.*, No. 09 CV 10035 (HB), 2010 WL 4642607
    (S.D.N.Y. Nov. 17, 2010) .................................................................................................31

*Caiola v. Citibank, N.A.,* 295 F.3d 312 (2d Cir. 2002) ..................................................18

*Charles Schwab Corp., Sec. Litig.*, 2010 WL 1463490 (N.D. Cal. April 8, 2010) ..........................16

*City of Pontiac Gen. Emps.' Ret. Sys v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011) ……………......33

*Credit Suisse First Bank Corp. v. American Fin. Grp., Inc.*, No. 99 Civ. 12046,
    2001 WL 300733 (S.D.N.Y. May 28, 2001) .............................................................14

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) ..........................................................4

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ...........................................................4

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..........................................25

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210
    (S.D.N.Y. 2008) (Koeltl, J)..............................................................................15

*Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501 (S.D.N.Y. 2005),
    *aff'd on other grounds*, 157 Fed. Appx. 398 (2d Cir. 2005).......................................35

*Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004)..............................................18

*Freidus v. ING Group N.V.,* 736 F. Supp. 2d 816 (S.D.N.Y. 2010) ...............................17

*Halperin v. eBanker USA.com*, 295 F.3d 352 (2d Cir. 2002) ........................................12

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ...........................................10

*Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071, 2003 WL 21672085
    (S.D.N.Y. July 16, 2003). ................................................................................32

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998)......................13, 21

*In re AES Corp.*, 825 F. Supp. 578 (S.D.N.Y. 1993) .....................................................13

*In re AIG*, 2010 WL 3768146 (S.D.N.Y. Sept. 10, 2010) .............................................17

*In re American Intern. Group, Inc. 2008 Sec. Litig.*,

741 F.Supp.2d 511 (S.D.N.Y. 2010) ........................................................ 14

*In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023,
2001 WL 286758 (S.D.N.Y. Mar. 23, 2001) .......................................... 4

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................ 11, 34

*In re Bank of America Corp. Sec. Der., and ERISA Litigation*,
757 F.Supp.2d 260 (2d Cir. 2010) ........................................................ 16

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
763 F. Supp. 2d 423, 2011 WL 223540 (S.D.N.Y. Jan. 19, 2011 ................................. 13, 14, 22

*In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) .......... 32

*In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) ........................... 26, 27

*In re Citigroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................ passim

*In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005) .................................................... 30

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB),
2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ...................................... 33

*In re Dynex Capital, Inc. Secs. Litig.*, No. 05 Civ. 1897,
2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) .......................................... 32

*In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38 (D. Mass. 2003) ............................... 34

*In re Fuwei Films Sec. Litig.,* 634 F.Supp.2d 419 (S.D.N.Y.2009) .......................................... 22, 23

*In re GeoPharma, Inc.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) ........................................... 18

*In re IAC/InterActiveCorp Securities* Litigation, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) ............... 11

*In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..................... 33

*In re Morgan Stanley Information Fund Sec. Litig.,* 592 F.3d 347 (2d Cir. 2010) .................. 12, 20

*In re Mutual Funds Inv. Litig.*, 590 F. Supp. 2d 741 (D. Md. 2008) ..................................... 25

*In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) ....................................... 23, 25

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ..................................... 25

*In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ........................ 15, 21, 33

*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir. 2001) .................................... 35

*In re State Street Bank and Trust Co. Fixed Income Funds Investment Litig.*,
   No. 08 Civ. 8235 (RJH), 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011) ...................24, 26, 27, 28

*In re TCW/DW N. Am. Gov't Income Tr. Sec. Litig.*, 941 F. Supp. 326 (S.D.N.Y. 1996)................35

*In re Vivendi Universal, S.A. Sec. Litig.,* 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................35

*Iowa Public Empl. Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137 (2d Cir. 2010) ...............................17

*La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432 (S.D.N.Y. 2010) .................................31

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp.2d 221 (S.D.N.Y. 2006) ..................................35

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .......................................23, 25, 27, 30

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. Feb. 10, 2011) ........................................10

*Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51 (S.D.N.Y. 1993) .............................33

*McMahan & Co. v. Wherehouse Entertainment*, 900 F.2d 576 (2d Cir. 1990) ...............................18

*MF Global*, 620 F.3d at 145 .......................................................................................................22

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288
   (S.D.N.Y. Mar. 29, 2010) .......................................................................................................14

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 5222127
   (S.D.N.Y. Dec. 22, 2010) ........................................................................................................32

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996) .......................................13

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)..................................................................31, 32

*P. Stolz Family Partnership L.P. v. Daum*, 355 F. 3d 92 (2d Cir. 2004)........................................12

*Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK,
   2011 U.S. Dist. LEXIS 707 (N.D. Cal. Jan. 5, 2011). ...........................................................19

*Rombach v. Chang*, 355 F. 3d 164, 172 (2nd Cir. 2004) .............................................................11

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87 (2d Cir. 2001) .....................25

*Tedesco v. Mishkin*, 689 F. Supp. 1327 (S.D.N.Y. 1988) ............................................................33

*United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d 1190 (2d Cir. 1993) ......16

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991).......................................................13

*Yu v. State Street Corp.*, 2010 WL 2816259 (S.D.N.Y. July 14, 2010) .........................................16

**Statutes**

15 U.S.C. § 77j ..................................................................................................................1

15 U.S.C. § 77k(e)(3) ........................................................................................................22

15 U.S.C. § 80a-8 ...............................................................................................................1

**Rules**

Fed.R.Civ.P. 9(b) ..............................................................................................................11

Fed.R.Civ.P. 15(a) .............................................................................................................33

Fed.R.Civ.P. 23 ..................................................................................................................31

SEC Rule 408 .....................................................................................................................20

**Regulations**

17 C.F.R. § 230.421 ...........................................................................................................10

17 C.F.R. §230.408(a) ..................................................................................................12, 20

Plaintiffs, by and through their undersigned attorneys, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Complaint").

## I.   INTRODUCTION AND BACKGROUND

From November 5, 2008 through April 9, 2009 (the "Class Period"), Defendants offered and sold shares in a series of non-traditional, inverse, triple leveraged exchange-traded funds ("ETFs"), including the four funds at issue in this case: Financial Bear 3X Shares ("FAZ"), Energy Bear 3X Shares ("ERY"), Large Cap Bear 3X Shares ("BGZ"), and Small Cap Bear 3X Shares ("TZA"). *See* ¶ 10 and Ex. C thereto.  The funds attracted billions of dollars from investors, and earned hundreds of millions of dollars in fees for Defendants. [1] ¶¶ 10, 51.

All four of Defendants' new non-leveraged Bear Funds at issue in this case (the "Bear Funds") are inverse leveraged funds, meaning they purportedly were intended to achieve a ***multiple of the inverse (or opposite)*** of the daily changes in the index to which they were linked. Unlike traditional non-leveraged ETFs, Defendants' Bear Funds are extremely complex, investment vehicles intended to permit investors to invest in the daily changes in particular stock or bond indices or segments.  Defendants offered their new Bear Funds purportedly to permit investors to profit from such daily changes by investing in funds engineered to rise as the underlying index rises (known as Bull funds) or as it falls (known as Bear funds).

All Bear Fund shares were sold throughout the Class Period pursuant to the ***same*** registration statement and base prospectus (the "Prospectus"), which was supplemented on November 3, 2008 (the "First Supplement"), and again on December 9, 2008 (the "Second Supplement"). [2]  Before Direxion provided materially new and radically different disclosures for the

---

[1] The funds were organized as an open-ended investment company under Section 8 of the Investment Company Act of 1940, 15 U.S.C. § 80a-8. ¶ 93.  Open-ended investment companies must comply with the registration requirements of the Securities Act of 1933 to sell securities to the public.  15 U.S.C. § 77j; ¶ 94.
[2] Defendants assert that the Prospectus and the First and Second Supplements were materially similar, and

Bear Funds on April 10, 2009, after the Class Period ended, Plaintiffs and the other members of the Class were not adequately informed – and, indeed, were fundamentally misinformed – about their true nature and the significant risk of investing in the Bear Funds.   Those undisclosed and misunderstood risks relate to the fact that the Bear Funds were designed, according to Defendants' own post-Class Period statement, to achieve their investment objectives (if at all) for a single trading session.   Consequently, until April 10, 2009, investors were not told – and did not understand – that the Bear Funds have a short holding period of *less than one day*, and therefore are appropriate, if at all, only for investors who buy and sell them *within the same trading session*. During the entire Class Period, investors were not informed of this highly material fact or the magnitude of the risks associated with holding Bear Fund investments for longer periods. Significantly, Defendants repeated the radically different warnings and instructions, *for the first time*, at least five separate times in the April 10, 2009 Supplement, including on the cover page. [3] ¶¶ 227, 231, 233, 237.

Throughout the Class Period, the undisclosed and misunderstood risks unique to investing in the Bear Funds are (i) rebalancing and volatility risk,[4] (ii) price pressure risk,[5] (iii) timing risk,[6] (iv)

_____

that they all adequately disclosed the risks of investing in Bear Fund shares.   Def. Br. at 6-7.   While the Second Supplement included additional statements that were not in the Prospectus or the First Supplement, *none* of those statements adequately informed Plaintiffs of the *specific* risks alleged in the Complaint.

[3] Among the disclosures made for the first time in the April 10, 2009, prospectus supplement were that the Bear Funds are not intended to be used by, and are not, appropriate for investors who will not both *buy and sell their entire positions in a single trading session* or who intend to hold their positions. Defendants repeated these statements in bold print on five (5) occasions in the April 10, 2009 Supplement, but never once before that time. *See* ¶¶ 227, 231, 233, 237, Gilman Dec. Ex. H.

[4] Because the Bear Funds were highly engineered to achieve their daily investment results, and a three-times multiple of the opposite of their linked index, the composition of the funds had to be rebalanced every day. Rebalancing necessarily incurs costs, which reduces the actual return earned by the fund each day. Moreover, as the volatility of the underlying index increased, the amount of rebalancing required each day and the associated rebalancing costs also increased.   Moreover, and significantly, as a simple mathematical proposition, as the holding period grew longer, volatility greatly diminished the Bear Funds' results over the longer holding period.   Therefore, the actual returns earned by the Funds were subject to vast and mostly negative deviations from anticipated results over holding periods longer than a day, particularly as the actual holding period grew.   This is compounding risk (or rebalancing risk), which Plaintiffs allege in detail.   ¶¶ 3, 21, 113(e) – (k), 243, 285

[5] Price pressure is the risk caused by the need to rebalance the Bear Fund portfolios within a short period of

2

holding period risk,[7] and (v) hedging risk.[8]   Each of these risks was **different** from, and in **addition** to, the ordinary risks of investing in a fund comprised of several securities, such as the risk that the investment adviser might not select the appropriate securities to include in the fund or the risk that the value of the underlying assets might not move as expected during the trading day.   These unique risks **specific to investing in the Bear Funds** – not simply the ordinary risks of investing in a fund of securities – were not disclosed or were so vaguely referred to as to misrepresent the Bear Fund investments to Plaintiffs and patently mislead investors.   Moreover, those **specific** risks were fundamentally different from and of much greater magnitude than the general risks mentioned or described by Defendants in either the Prospectus or the Supplements.

At most, Defendants included a number of misleadingly vague or generalized statements in the Prospectus and the First and Second Supplements about the Funds' "daily goals," "daily target," "daily investment results," "tracking error" and "rebalancing risk," but none of which meaningfully addressed the particular risks concerning the Bear Funds alleged in the Complaint, for example:

---

time (*i.e.*, within the last 30 minutes of each trading day), forcing Defendants to buy or sell derivative securities at prices that were not favorable for Bear Fund investors.   ¶¶ 308, 309, 320, 322, 325.

[6] Timing risk is closely related to price pressure.   When the investment strategy of the Bear Funds required Defendants to buy the derivative securities, as they bought large amounts of the securities the market prices rose, thus disadvantaging the Bear Funds by raising the prices which Defendants were required to pay to buy the securities.   Conversely, when the investment strategy of the Bear Funds required Defendants to sell the derivative securities, as they sold large amounts of the securities the market prices declined, thus disadvantaging the Bear Funds by reducing the prices Defendants received for the securities they sold.   This is timing risk.   ¶¶ 311, 312, 315-320, 322.

[7] Not until April 10, 2009, did Defendants state that the intended holding period for Bear Funds was, at most, for one trading session.   In fact, the effective holding period was considerably less than twenty-four hours. Indeed, it now appears from Defendants' post class period disclosures that Bear Funds were only appropriate investments if they were both bought and sold between the opening of the financial markets at 9:30 a.m. and the closing of the markets at 3:30 p.m. each day.   Thus, Defendants did not disclose during the Class Period that the Bear Funds were to be held for one day, or even **less than one full trading day**.   Shares bought and held for one full trading day or longer were subject to both price pressure and timing risk.   This is holding period risk.   ¶¶ 321, 324, 326-330

[8] Because investors improperly held their investments for longer than one full trading day, the Bear Funds incurred substantial transaction and other costs to hedge their investments overnight that reduced the Bear Funds' returns.   This is hedging risk or rebalancing risk. Plaintiffs allege that daily hedging costs averaged approximately 200 basis points, or 2%, throughout the Class Period.   ¶¶ 334-9; *See also*, ¶¶ 207-15.

- "The Funds described in this Prospectus seek to provide daily investment results, before fees and expenses, that correspond to the performance of a particular index or benchmark." First Supplement at 1; Second Supplement at 1.
- "The benchmark for the Large Cap Bull 3X Shares is 300% of the daily price performance of the Russell 1000® Index, while the benchmark for the Large Cap Bear 3X Shares is 300% of the inverse, or opposite, of the daily price performance of the Russell 1000® Index." *Id.*
- "The Total Market Bear 3X Shares seeks daily investment results, before fees and expenses, of 300% of the inverse (or opposite) of the price performance of the Total Market Index." First Supplement at 10; Second Supplement at 12-35.
- "Several factors may affect a Fund's ability to achieve its daily target. A Fund may have difficulty achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs, and/or a temporary lack of liquidity in the markets for the securities held by a Fund. First Supplement at 9; Second Supplement at 11.

It was not until April 10, 2009, that Defendants began meaningfully to disclose some risks, for example, concerning index volatility relating to the Bear Funds. When those particular risks – not simply the ordinary risks of investing in a fund of securities – materialized, they caused the losses that Plaintiffs seek to recover in this action.

Moreover, Defendants made extensive references to investor's holding periods of one year, three years, or even longer throughout the registration documents.[9] *See, e.g.,* ¶¶ 59, 141-151, 159, 164-5. In fact, reading all the disclosures *in pari materia*, Defendants encouraged investors to hold Defendants' leveraged ETFs for extended periods and repeatedly implied that there were no material undisclosed risks involved. Thus, Defendants' discussion of daily results and daily targets was misleading because, among other critical issues, Defendants did not tell prospective investors they had to **buy and sell their entire positions in less than one day**. To the contrary, before April 10, 2009, Defendants' statements encouraged investors to hold Bear Fund shares for extended periods of time. ¶¶ 141-151, 159, 165-5. Additionally, Defendants' grossly misleading statement

---

[9] *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir.2003) (in the context of determining the materiality of allegedly false or misleading statements or omissions found in registration statements or prospectuses, the document in question must be read "as a whole."); *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023, 2001 WL 286758, at *4 (S.D.N.Y. Mar. 23, 2001) ("[i]n determining whether the statements contained in a prospectus are materially misleading, the prospectus must be read as a whole."); see *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)

that a Bear Fund was likely *either* **to** under-perform *or* over-perform (but simply not match) its target over time, ¶¶ 103-104, also falsely implied that the Bear Funds **could be effectively held for periods longer than a day**.

Rather than disclosing that the risk of loss increased if investors held Bear Fund shares for a day or longer, Defendants said **exactly the opposite**. In the Second Supplement, filed on December 9, 2008, Defendants **twice** said that "the pursuit of daily leveraged investment goals means that the return of a Fund **for a period longer than a day** will be the **product** of a series of daily leveraged returns for each day during the relevant period." ¶¶ 59, 159, 164-5; Second Supplement, Cover Page and p. 4 (emphasis added). That statement suffers from two serious defects. *First*, it implied that it was appropriate to hold Bear Fund shares "for a period longer than a day" – which is fundamentally inconsistent with the material fact finally disclosed by Defendants after the Class Period that Bear Fund shares were not to be held for more than **one trading session**. *Second*, the statement literally meant that over a long enough holding period, the Bear Funds would eventually have a return of **zero**.[10] ¶¶ 158-64. Defendants' statement falsely implied that risk was **reduced** over time until it eventually became zero when, in fact, risk rose dramatically over time. ¶¶ 162-64. This statement misrepresented the fundamental risks of holding Bear Funds shares for a day or longer.

Moreover, Defendants included in the Prospectus and First and Second Supplements only the most generalized statements purporting to explain why the Bear Funds might not meet their "daily target" or achieve their intended results **over periods longer than a day**:

- "Differences [over time] may result from the compounding effect of daily market fluctuations, the use of leverage and the Bear Funds' inverse correlation." First Supplement at 9; Second Supplement at 11.
- "Several factors may affect a Fund's ability to achieve its daily target. A Fund may have difficulty achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs, and/or a temporary lack of liquidity in the markets for the securities held

---

[10] As Plaintiffs allege, the word "product" in the Second Supplement means "the result of multiplying" a series of daily leveraged returns, each of which was less than 1. The result of multiplying a series of fractions quickly converges to zero, thus making it appear (falsely) that the Bear Funds posed no risk over extended holding periods. ¶ 159.

by a Fund. A failure to achieve a daily target may cause a Fund to provide returns *for a longer period* that are worse than expected." *Id.*

- "The costs associated with the Funds' portfolio turnover will have a negative impact on *longer-term investors*."

Apart from implying that the Bear Funds could be held for periods longer than a day, Defendants' vague and incomplete discussions of risk in no way informed Plaintiffs of the true nature and extent of the specific risks of investing in the Bear Funds.

Furthermore, Defendants' statements that results may vary if the ETF is held for more than a day, must be read in light of the understated examples of potential deviations provided in the Principal Risks portion of the Prospectus and Supplements. In fact, the Prospectus and First Supplement barely addressed "index volatility" and had no "Volatility Risk" segment in its Principal Risk Section; instead these documents made one reference to an assumed volatility rate under a different section entitled "Correlation Risk."

With far less than meaningful information, the Prospectus and First and Second Supplements provided "volatility" illustrations of the effects over **one year periods** of volatility rates that were substantially below the actual volatility index rates of the Bear Funds' underlying indexes at the time. Flat market, upward trending market and downward trending market graphs assumed a volatility rate of 15% and appeared in the Prospectus and First Supplements.   ¶ 104.

In fact, however, prior to and throughout the five-month Class Period, the financial markets and indexes at issue were experiencing extremely high volatility that *dwarfed the volatility rates illustrated by Defendants*. *See*, *e.g.*, ¶¶ 120, 121, 181-84 (setting forth moving 30-day average index volatility for each Bear Fund from December 17, 2007 through April 17, 2009). For example, the annualized volatility rates at the time of the First and Second Supplements in November and December 2008, respectively, and at other dates, relevant to investors during the Class Period were as follows:

| | 6-month | 3-month | 2-month | 1 month |
|---|---|---|---|---|

6

|  | volatility | volatility | volatility | volatility |
|---|---|---|---|---|
| **FAZ** | | | | |
| 10/1/2008 | | 75.16% | 77.98% | 100.09% |
| 10/31/2008 | | 85.24% | 99.38% | 95.02% |
| 12/8/2008 | | 107.74% | 109.28% | 117.89% |
| 2/13/2009 | | 98.47% | 79.56% | 98.47% |
| **ERY** | | | | |
| 10/31/2008 | | 88.15% | 104.86% | 129.46% |
| 12/8/2008 | | 104.79% | 116.51% | 99.48% |
| 2/13/2009 | | 66.33% | 42.98% | 44.25% |
| **TZA** | | | | |
| 2/27/2009 | 64% | | | |
| **BGZ** | | | | |
| 2/27/2009 | 57% | | | |

¶¶ 121, 228.   ***None*** of these volatility rates were disclosed in the Prospectus or in the First or Second Supplement.   ¶¶ 122, 182, 188, 190-1, 195.

Instead, despite the fact that the Bear Funds' performance was dependent, in substantial part, upon the volatility of the underlying indices, the Prospectus and First Supplement materially misstated that the assumed volatility rate of 15% – a small fraction of the actual annualized volatility rates – was an "approximate rate for a major domestic index."[11]   ¶¶ 30, 104, 119, 122. Moreover, even if the 15% volatility rate assumed by Defendants were reasonable – and it was not – the graphs still would have materially understated the risks to Bear Fund investors because the graphs, by the Defendants' own statements, illustrated the effect of volatility only for a hypothetical Bull Fund, not a Bear Fund (such as those at issue in this case), which is far more susceptible to volatility.[12]   ¶¶ 104, 109-111, 125-6.   And although the Second Supplement assumed a slightly higher volatility rate, it still was deficient for the same reasons.   ¶¶ 173, 177(b), 180-91, 192.

---

[11] The volatility rates derived from more recent data (*e.g.,* one, two, or three month data) are more predictive than are volatility rates derived from data for a longer time period (*e.g.* 12 months), which mix recent levels with more distant levels.   ¶¶ 31, 123, 189.

[12] In an unrelated "**Special Note Regarding the Correlation Risks of Bull Funds**" in the SAI, Defendants acknowledged that at the same 15% volatility rate, if an index were flat over a one-year period, a Bear 3X Fund would lose 12.6% of its value, ***twice*** as much as the 6.4% loss illustrated for a Bull Fund over the same period.   ¶¶ 104, 126.

Defendants' illustration of unrealistically low "volatility" rates grossly understated and materially failed to disclose the extent to which Plaintiffs and other Class members were exposed to such catastrophic risk of large rapid losses. *See, e.g.,* ¶¶ 129-30, 200-01. The losses that would be associated with the actual higher volatility rates at that time were so much greater than those associated with a 15% volatility rate as to render the 15% example not only useless, but also extremely misleading.  Instead of disclosing and describing the true nature and extent to which the Bear Funds exposed investors to the risk of loss from market volatility, Defendants said in a press release at the beginning of the Class Period on November 8, 2008, that the Bear Fund shares would allow investors "*to actively capitalize on the volatility of today's markets*." ¶¶ 13, 33, 35, 101, 127, 240. (emphasis added).  Thus, Defendants incorrectly implied that investors could *profit* from the then-current market volatility (which volatility they grossly understated).  Nothing could have been more false. Similar statements were made at other times throughout the Class Period.  ¶¶ 222-23.

Defendants' misrepresentations regarding volatility were crucial because, as Plaintiffs allege Defendants operated their Funds pursuant to an undisclosed mathematical formula.   The mathematical formula Defendants used to manage the Bear Funds (which was never disclosed), ¶¶ 14, 50-52, 114-15, 256-74, dictated that results over time equaled a constant value raised to a "power" reflecting leverage, volatility, and length of the holding period.  ¶ 269.  Thus, as Plaintiffs allege and Defendants were aware, the Bear Funds' results would *not* correlate with the direction in which the underlying indices moved over time, but rather with market volatility and the length of the holding  period – a fact that Defendants never disclosed.[13]  ¶ 272.

---

[13] In other words, Defendants never disclosed specific facts demonstrating how when market volatility and the holding period increased, the risks also increased substantially such that the Bear Funds' results would deviate from the inverse (or opposite) of the underlying indices or even move in the opposite direction of how they were expected to perform, as depicted in the charts.  ¶ 16, 18, 20. *See also* ¶ 261-72 Defendants' disclosures as a whole did not warn of the specific risks of catastrophically high index volatilities which already existed and which were likely to and did continue, throughout the Class Period, let alone of the extreme magnitude and the imminent likelihood of large rapid risks of loss from an investment in Defendants' Bear Funds.

In sum, the Prospectus, the First Supplement, and the Second Supplement in effect were so vague, general, and ambiguous as to be meaningless. Compare Def. Br. at 14 (mischaracterizing Defendants' changes on April 10 as "minor language changes") *with* ¶ 5-9, 53-60, 227-39, 245-49; and Defendants' April 10, 2009 statements; Gilman Dec. Ex. H. Thus, Defendants did not disclose the specific risks that are the subject of this action. And the so-called "disclosures" that Defendants did include in the Prospectus and Supplements were demonstrably inaccurate or materially misleading. The Bear Funds were not suitable for holding after 3:30 p.m. on the same day they were purchased, *not even for a holding period as short as a full day* – the time period of the Funds' stated investment objective. ¶¶ 322, 325-9.[14]

When the *specific* risks alleged in the Complaint materialized, the harm caused to Plaintiffs and the other members of the Class was catastrophic. During the entire short five-month Class Period, the indices underlying each Bear Fund declined. Thus, having *correctly* predicted the direction in which those indices would move, Plaintiffs reasonably expected large *profits* from their Bear Fund investments. Far from earning three times the opposite of the returns of the underlying indices, however, over the short five-month Class Period, Plaintiffs and the Class suffered billions of dollars in losses because of those undisclosed risks:

- Although the Russell 1000 Energy Index declined 3.8% from November 6, 2008, to April 9, 2009, the associated ERY Fund experienced, not the expected 11.3% gain, but a *decline* of 55.2% (¶ 18)
- Although the Russell 1000 Energy Index fell 17.9% from November 6, 2008, to April 9, 2009, the associated FAZ Fund experienced, not the expected 53.8% gain, but a *decline* of 85.3% (¶ 16)
- Although the Russell 1000 Index fell 9.1% from November 5, 2008, to April 9, 2009, the associated BGZ Fund experienced, not the expected 27.3% gain, but a *decline* of 29.8%
- Although the Russell 2000 Index fell 9.0% from November 5, 2008, to April 9, 2009, the associated TZA Fund experienced, not the expected 27% gain, but a *decline* of 48.3% (¶ 20).

---

[14] In addition, the Bear Funds did not give investors the opportunity to *profit* from the then-current market volatility, but rather exposed investors to huge and rapid risk of losses as a result of the existing high market volatility at the time. ¶¶ 121-22, 127-30, 197-201.

## II.   **LEGAL ARGUMENT**

Plaintiffs have alleged *prima facie* claims under Section 11 of the Securities Act[15] by pleading that the Registration Statements contained material misrepresentations and omissions of important risks of large, rapid losses.  The Complaint alleges that the material omissions (i) violated the SEC's "affirmative legal disclosure" requirements, including those mandated under Form N-1A, Item 4(c)[16] and (ii) were necessary to prevent statements in the Registration Statements regarding the investment objectives and behavior of the Bear Funds, the holding period of one day or longer, and incomplete discussions of the risks of investing in Bear Funds from being misleading.   ¶ 112. The many material facts which Defendants omitted to disclose included but were not limited to the fact that investors could rapidly suffer large losses, even if they were correct in their judgment about the direction of the market.[17]

---

[15] As the Supreme Court has explained, Section 11 of the 1933 Act imposes "a stringent standard of liability on the parties who play a direct role in a registered offering.  If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  The Second Circuit has held that Section 11 liability is strict:

> So long as a plaintiff establishes one of the three bases for liability under these provisions – (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading – then, in a Section 11 case, the general rule [is] that an issuer's liability . . . is absolute."

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715-716 (2d Cir. Feb. 10, 2011) (citations omitted).

[16]   By failing to disclose "clearly" in the "principal risks" portion of the Prospectus the "fundamental . . . investment risks of the Fund using concise, straightforward and easy to understand language," Defendants also violated the requirements of SEC Form N-1A (Registration Statement of Open-End Management Investment Companies), General Instructions, p. 6. *See* 17 C.F.R. § 230.421 ("Plain English"). *See* ¶ 112.

[17]   Defendants claim that Plaintiffs' claims sound in fraud and are, therefore, subject to the heightened pleading requirements of F.R.C.P. 9(b). Determining whether Section 11 claims sound in fraud necessarily requires a case by case analysis.  *In re Citigroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010).  "[O]nly where "the gravamen of the complaint is plainly fraud" should the heightened pleading requirements of Rule 9(b) be applied.  *Id* (citing *Rombach v. Chang*, 355 F. 3d 164, 172 (2nd Cir. 2004)); *In re IAC-Interactive Corp. Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010). In the present case, plaintiffs have not alleged any Exchange Act claims against the defendants, *see In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 501 (S.D.N.Y. 2004), and when considered as a whole the gravamen of the Complaint certainly is not fraud. *Citigroup*, 723 F. Supp. 2d at 587; *see also Atlas Air*, 324 F. Supp. 2d at 503.  In any event Plaintiffs have alleged the who, what, when and why with respect to their allegations of material misrepresentations and omissions which is all that is required under Rule 9(b).

In seeking to dismiss the Complaint and avoid liability for billions of dollars in statutory damages, Defendants argue they had no legal duty to disclose these fundamental and meaningful facts that reasonable investors would necessarily consider important to their decision to invest in the Bear Funds. Defendants further contend, without any reasonable basis, that reasonable investors somehow could have figured out all of these extraordinarily complex issues by themselves. In short, Defendants argue that "[n]o more was required" to be disclosed to fully inform investors of the enormous risk inherent in these extremely complex investments than some vague and ambiguous statements about investment objectives and generalized references to risks. Def. Br. at 12. Defendants could not be more wrong.

### A.    The Offering Documents Failed To Disclose, Or Adequately Disclose, The Risks Of Investing In The Bear Funds

Defendants' argument mischaracterizes or ignores the specific allegations of risk and injury in Plaintiffs' Complaint. For instance, they argue that the "Complaint principally asserts that the Trust did not adequately disclose that the Bear Funds tracked their benchmarks only on a daily basis rather than over longer investment horizons." Def. Br. at 8. That is simply not the case. Plaintiffs' Complaint includes detailed allegations about the specific material risks of investing in the Bear Funds that the Prospectus and First and Second Supplements did not, or did not adequately or meaningfully disclose, and which Defendants have ignored in their Motion to Dismiss. As alleged in the Complaint, Defendants failed to disclose, or adequately, disclose rebalancing and volatility risk, price pressure risk, timing risk, holding period risk, and hedging risk. Ultimately, those risks materialized when investors held Bear Fund shares for longer than a single trading session, causing them to suffer billions of dollars of losses.

Defendants cite to SEC Form N-1A in an attempt to avoid liability for their omissions of material facts. Def. Br. at 15. Despite Defendants' contrary argument, Item 4(c) of Form N-1A actually places an *affirmative* duty upon an issuer to disclose the principal risks of investing in each

open-ended fund.  Def. Ex. H.  In addition, Section 11 of the Securities Act and SEC Rule 408 "call for the disclosure of information that is necessary to avoid rendering misleading the representations in the registration statement and prospectus."  *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010); 17 C.F.R. §230.408(a).  Defendants have omitted material facts concerning principal risks that were ***required*** to be disclosed under Form N-1A and material facts necessary to make other statements in the Prospectus and First and Second Supplements not misleading.  *Id*; *See also, IAC/InterActiveCorp,* 695 F. Supp. at 117 ("misrepresentation is material if there is a substantial likelihood that a reasonable investor would 'consider it important' in making an investment decision").

**B.    Defendants Did Not Disclose The Risks Of Holding Bear Funds Beyond A Single Trading Session**

In *In re Lehman Bros. Sec. and ERISA Litig.*, No. 09 MD 2017 (LAK) (S.D.N.Y. July 27, 2011), Judge Kaplan recently held that cautionary statements "must expressly warn of and relate ***directly to the risk that allegedly brought about the plaintiffs' loss***."  *Id*. at 33 (emphasis added) (citing *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002)).[18]  The Prospectus and First and Second Supplements were vague, general, and ambiguous and did ***not*** provide a reasonable investor the information necessary to make an informed decision about Defendants' Bear Funds.  ¶¶ 113-15, 137-8, 300. Defendants failed to disclose the specific risks that Plaintiffs

_____

[18] *See also P. Stolz Family Partnership L.P. v. Daum*, 355 F. 3d 92, 97 (2d Cir. 2004) (prospectus must "warn [ ] of the ***specific contingency*** that lies at the heart of the alleged misrepresentation.") (emphasis added); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("cautionary language . . . must relate ***directly*** to that by which plaintiffs claim to have been misled") (emphasis added); *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 2011 WL 223540 at *56 (S.D.N.Y. Jan. 19, 2011 ("cautionary language must warn [ ] investors of ***exactly*** the risk that plaintiffs claim was not disclosed") (emphasis in original) (*quoting Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).  The cases Defendants cite are inapposite.  In *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996), the Second Circuit affirmed dismissal because the "prospectuses warn[ed] investors of ***exactly the risk plaintiffs claim was not disclosed***."  *See also In re AES Corp.*, 825 F. Supp. 578, 587 (S.D.N.Y. 1993) (defendants warned of the specific risk at issue).  In *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed dismissal of a complaint where the defendants had not disclosed the specific risks that the plaintiffs alleged caused them injury.  *Id.* at 724-25 (defendants "warned investors of a ***different contingency than that which plaintiffs allege was misrepresented***") (emphasis added).

allege in the Complaint – rebalancing and volatility risk, price pressure risk, timing risk, holding period risk, and hedging risk – and Defendants do not effectively argue otherwise in their Motion to Dismiss. Defendants' statements were so utterly inadequate as to patently mislead investors.  For example, the Prospectus and the First and Second Supplements contained **no meaningful information** whatsoever about hedging risk, which was the risk that the Bear Funds would have to incur substantial transaction and other costs when Defendants hedged investments overnight because investors held Bear Funds for longer than a single trading period. [19] ¶¶ 207-20, 334-5. Likewise, the Prospectus and the First and Second Supplements contained **no information** that related directly to price pressure risk, which resulted from the need to rebalance the Bear Fund portfolios within the last 30 minutes of each trading day, thus forcing Defendants to buy or sell derivative securities at prices that were not favorable for Bear Fund investors.  ¶¶ 308-9.  Nor did the Prospectus or First or Second Supplements provide any meaningful information that related directly to timing risk, that as Defendants bought or sold large amounts of the securities to implement the Bear Funds' investment strategies, their own trades drove the market prices up (as they bought securities) or down (as they sold them), thus raising the prices which Defendants were required to pay or depressing the prices Defendants received when they were required to sell.  ¶¶ 311-2.

At most, in their motion to dismiss, Defendants point to some vague and generalized statements in the Prospectus or in the Supplements where they merely referred to the Bear Funds' daily investment objectives, or generally to the risks of volatility, rebalancing, compounding, or

---

[19] There is **nothing** in the Prospectus or in the First or Second Supplement that describes or quantifies hedging risk, which was akin to a daily "tax" of approximately 200 basis points throughout the Class Period, that assured that the Bear Funds would not achieve their daily investment objectives.  ¶¶ 334-35.  A systematic flaw existed that resulted in the bleeding of the portfolio of approximately 2% a day and virtually single-handedly prevented the Funds from achieving their stated objectives, in addition to all of the other specific reasons set forth in detail in Plaintiffs' Complaint.

liquidity. But Defendants omitted meaningful disclosures of these material risks necessary for an investor to make an informed decision.[20]  ¶¶ 24-29, 41-2, 113, 138, 165-8, 191.

More specifically concerning the combined effect of compounding, volatility, and holding period risk, Plaintiffs have alleged that the mathematical formula Defendants used to attempt to achieve the Bear Funds' daily investment targets clearly demonstrated that the Bear Funds' results would correlate with market volatility and the length of the holding period, ***not*** the direction in which the underlying indices moved over time, which Defendants ***never*** disclosed in either the Prospectus or the First or Second Supplement.  ¶¶ 269, 272.  In addition, Defendants' undisclosed mathematical formula told them the exact scenario under which the large losses from investors' correct judgment about the direction of the market would occur.  Defendants ***never*** meaningfully or adequately disclosed that as market volatility and the holding period increased, the risk also increased that the Bear Funds' results would significantly and rapidly deviate from the inverse (or opposite) of the underlying indices or move in opposite direction. Defendants never disclosed that when the volatility of the underlying index significantly exceeded its performance over time, then the use of leverage in Defendants' mathematical formula would cause the performance of the Fund to be not only less than what was expected, it caused the performance to move in the ***opposite direction*** of what was expected. ¶¶ 16, 18, 20, 261-3.  The inherent risk of loss in Defendants' underlying mathematical formula not only involved rapid and unexpected, indeed paradoxical, loss,

---

[20] In *Lehman*, however, Judge Kaplan concluded that a complaint may not be dismissed unless the disclosure of the risk in question is ***sufficiently specific and prominent*** to support a conclusion as a matter of law that no reasonable investor would have found it important to know more detailed information about the magnitude of the particular risk in question.  No. 09 MD 2017, at 33.  "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described."  *Bear Stearns,* 2011 WL 223540 at *56 (quoting *In re American Intern. Group, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y. 2010), *in turn quoting Credit Suisse First Bank Corp. v. American Fin. Grp., Inc.*, No. 99 Civ. 12046, 2001 WL 300733 at *8 (S.D.N.Y. May 28, 2001)); *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288 at *5 (S.D.N.Y. Mar. 29, 2010) ("disclosures fail to make clear the ***magnitude*** of the risk") (emphasis added).

but it also involved potentially a very large *magnitude* of loss. ¶¶ 49, 137, 189-90, 201-3. Compare Defendants' April 10, 2009 disclosures. Gilman Dec. Ex. H.

Defendants' vague and generalized statements about daily investment objectives, volatility, compounding, or liquidity to which Defendants point failed to disclose to investors that, under the extremely high market and index volatility conditions throughout the Class Period, it was virtually certain that the Bear Funds would fail to achieve their intended investment objectives, and in fact would suffer huge rapid losses, over holding periods longer than a single trading session. Because those losses were all but certain over longer holding periods, Defendants' vague and generalized statements were inadequate as a matter of law. *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (Koeltl, J) (same).

To be clear, the indexes underlying the Bear Funds experienced exceptionally high volatility prior to and throughout the Class Period.[21]  ¶¶ 121, 185-94.  Despite those extraordinarily high volatilities, for a portion of the Class Period Defendants illustrated returns based on an arbitrarily assumed volatility rate of 15%, which they falsely described as an "*approximate rate for a major domestic index*."[22]  ¶ 122.

---

[21] For example, in October 2008 when the base Prospectus was issued, historical 1-, 2-, and 3-month volatilities for the FAZ Fund benchmark, RGUSFL, were 100.1%, 78.0%, and 75.2% respectively. ¶¶ 30, 33, 122, 139, 187. A month later, the volatility rates were substantially the same: 95.02%, 99.38%, and 85.24%. ¶¶ 30, 33, 121-2. The volatility rates for the benchmarks underlying the other Bear Funds were similarly high throughout the Class Period. ¶¶ 121, 182-84. Defendants had access to and knew these facts, while most reasonable investors did not. ¶¶ 116, 117 n.6, 119, 185.

[22] The 15% assumed volatility rate did not approximate actual market conditions throughout the Class Period, and it distorted the illustrated returns to misrepresent the real risk to investors of holding Bear Fund shares for longer than a single trading session. When Defendants illustrated returns in the Second Supplement, they assumed a 12-month volatility rate of 40%, which still understated the actual volatility by *more than one-half*. For example, by the time the Defendants issued the Second Supplement on December 9, 2008, the volatility rates of the indexes underlying FAZ and ERY, were *in excess of 107% and 99%*, respectively. ¶¶ 121, 182-83, 187-88.

Defendants assert that the volatility matrices in their SAI adequately disclose the extent of the losses that could result from investments in Direxion's Bear Funds when held over extended periods of high volatility.  Def. Br. at 10.  However, as alleged in the Complaint, ¶¶ 109-12, 126-6, and all but conceded by Defendants, Def. Br. at 10 n. 7, the heading under the section in which these matrices appear states that such section only applies to "Bull Funds."[1]  Moreover, the matrices can in no way correct the plain misstatements concerning their application only to the materially different "Bull Funds."[23]

Moreover, neither the Prospectus nor the Supplements disclosed any information concerning the effect of volatility over periods shorter than one year.  ¶¶ 128, 131, 133, 202.   These offering documents misleadingly represented that the volatility risks were minimal when in fact they were not.  For example**,** using a modest volatility level of 70% an investor could expect to lose more than 5% of his investment in just one week and 50% of his investment within one fiscal quarter (13 weeks), due only to rebalancing and volatility.  ¶¶ 129-30. Over a one year period virtually the entire investment would be lost.  ¶ 129. With volatility rates at 100%, like those of the indices underlying ERY and FAZ as of December 8, 2008, an investor would lose 16% of his investment in a two week period and 30% over a four week period.  ¶¶ 121, 200-201.   With volatility rates at 100%, an

---

[23] "Information is not "reasonably available if it "is 'buried' in unrelated discussions.'" *In re Bank of America Corp. Sec. Der., and ERISA Litigation*, 757 F.Supp.2d 260, 290 (2d Cir. 2010) (citations omitted). Further, the matrices are buried in the Defendants' SAI, not cross-referenced in the Principal Risk section of the Prospectuses and the charts grossly understate the realistic index volatility rates, which were, in and of themselves, misleading to investors. *United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d 1190, 1198-99 (2d Cir. 1993) ("[E]ven information actually sent to shareholders need not be considered part of the total mix reasonably available to them if 'the true' is 'buried…'"); *Yu v. State Street Corp.*, 2010 WL 2816259 at *3 (S.D.N.Y. July 14, 2010) (although the annual reports listed every security in the portfolio, therefore regardless of the inaccuracy in the percentage table of the registration statement plaintiff could ascertain the exact composition of the fund's holdings, these arguments are better made at the summary judgment stage -- the standard for pleading materiality is low); *Charles Schwab Corp., Sec. Litig.*, 2010 WL 1463490 at *4 (N.D. Cal. April 8, 2010).  Even if these disclosures could be considered part of the mix of information available to Bear Fund investors, and they cannot because they are not accessible to investors, the tables only provided examples of the effect of volatility ranges up to 50%, far less than those that actually existed at the time, and only with respect to one year periods and no data concerning specific fund benchmark indexes. Defendants now even concede that prospective investors did not even automatically get the Defendants' SAI but had to make a specific request to obtain them. Def. Br. at 6, FN 5.

investor *would lose 8.5% of his investment in just one week.*  ¶¶ 200-201.

None of Defendants' volatility "disclosures" were sufficient to convey the enormity of the risk to reasonable investors.[24]   *New Jersey Carpenters Health Fund*, 2010 WL 1473288 at *5 ("disclosures fail to make clear the ***magnitude of the risk***") (emphasis added).[25] Moreover, even if Defendants' vague, generalized and ambiguous statements about volatility, compounding, or liquidity risks were literally true, they were nonetheless so incomplete to mislead investors about the risk of holding Bear Fund shares for longer than a single trading session.[26]  Courts in the Second

---

[24] Defendants also argue that "plaintiffs fail to allege why inclusion of higher volatility levels was needed to avoid misleading investors" since "[n]othing in the Funds' disclosure documents purported to be a prediction of future volatility rates." Def. Br. at 11, 12 n.9.  That argument misses the point.  Realistic illustrations based on ***actual*** volatility rates at the time would have "provide[d] an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Public Empl. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. 2010) (investors "interested in issuer statements only insofar as those statements bear upon the future").  The arbitrary, unrealistically low volatility rates assumed in Defendants' illustrations denied investors the opportunity to understand the magnitude of the risk of holding Bear Fund shares for periods longer than a single trading session.

[25] *See also, In re AIG*, 2010 WL 3768146, at *15 (S.D.N.Y. Sept. 10, 2010) (disclosures inadequate "if they fail to disclose ***hard facts critical to appreciating the magnitude of the risks*** described") (emphasis added); *Freidus v. ING Group N.V.*, 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010) (even "extensive" and "detail[ed]" risk disclosures insufficient "where they were undercut by other statements and where other risks were accentuated"); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 589 (S.D.N.Y. 2010) (Section 11 liability for "under-represent[ing] the ***full scope of risk***" -- "while defendants began disclosing some exposure to subprime-backed CDOs in July 2007, those disclosures materially misstated and underrepresented the full scope of risk.") (emphasis added).

[26] The Second Supplement failed to adequately or meaningfully address the specific volatility risks at issue. ¶ 104.  Defendants did not even attempt to disclose the potential magnitude of those risks. ¶¶ 104, 179, 204, 279.   Instead of disclosing these material risks, Defendants used practically meaningless, vague and equivocal language which misleadingly understated and misrepresented the significance of the risks:

- "[A] Fund that meets its daily target over a period of time ***may not necessarily*** produce the returns that might be expected in light of the returns of its index or benchmark for that period." ¶ 103 (emphasis added).
- "[T]he return of an index over a period of time greater than one day multiplied by a Fund's daily target or inverse daily target (*e.g.*, 300% or -300%) ***will not generally equal*** a Fund's performance over that same period."  ¶ 103 (emphasis added).
- "The graphs demonstrate that, for periods greater than one day, a leveraged Fund ***is likely to underperform or over-perform*** (but not match) the index performance times the stated multiple in the Fund objective." ¶ 104 (emphasis added).
- "[F]or periods greater than one day, the use of leverage ***tends*** to cause the performance of a Fund to be ***either greater than or less than*** the index performance times the stated multiple in the fund objective." ¶ 104 (emphasis added).
- "[A] Fund that meets its daily target over a period of time ***may not necessarily*** produce the returns that might be expected in light of the returns of its index or benchmark for that period."  ¶ 104 (emphasis added).

Circuit agree that a statement may be literally true but still may be materially misleading or incomplete because of its context or manner of presentation.  *McMahan & Co. v. Wherehouse Entertainment*, 900 F.2d 576, 579 (2d Cir. 1990); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F.Supp. 2d 311, 320 (S.D.N.Y. 2009).[27]

In *Rydex*, the Northern District of California recently denied a motion to dismiss a complaint substantially identical to the Complaint in this action.  There, the plaintiffs purchased shares of the Rydex Inverse Government Long Bond Strategy Fund ("Rydex Fund"), an ETF designed to deliver "the inverse price of the 30-Year U.S. Treasury Bond.  *Rydex,* 2011 U.S. Dist. LEXIS 707, *2.  The plaintiffs alleged that defendants misrepresented "who was an appropriate investor" in the Rydex Fund and failed "to adequately disclose a 'mathematical compounding effect' that would cause the Fund to deviate from its benchmark."  *Id*.  Despite finding that the defendants had included some "general and ambiguous" disclosure of the alleged compounding effect, the district court held that the plaintiffs adequately alleged that the defendants "failed to disclose the magnitude of the risk they faced by holding the [Fund] for longer than a single day because of the inevitable effect of compounding."  [28]  *Id*. at *23-*24.

For the same reasons that the Northern District of California denied the defendants' substantially identical motion to dismiss in *Rydex*, this Court should deny Defendants' motion to dismiss the Complaint in this case.  Here, Defendants used the exact same general and ambiguous, conditional statements about the compounding effect in the Prospectus and the Supplements that the

---

[27] *See also, In re GeoPharma, Inc.*, 411 F. Supp. 434, 437 (S.D.N.Y. 2006).  Therefore, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  (citing *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004)). ["T"]he statutory language [of Section 11] and well-established case law make clear that once an entity opts to include information in its registration statement … it has a duty to disclose any additional fact" necessary to make the statements contained therein not misleading. *CitiGroup,*  723 F. Supp. at 590 (citing *Caiola v. Citibank, N.A.,* 295 F.3d312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not … a defense to … liability because upon choosing to speak, one must speak truthfully and accurately.")).

[28] In particular, the district court noted that the defendants used "conditional language that mathematical compounding 'may' prevent a Fund from correlating with the benchmark."  *Id*. at *23.

district court rejected in *Rydex*, and the statements here were no more informative to Bear Fund investors than the statements were in *Rydex*. There is no principled reason why the motion to dismiss in this case should not be denied just as it was in *Rydex*.

Defendants also argue that Prospectus and First and Second Supplements were not misleading because they adequately disclosed that the Bear Funds pursued daily investment objectives. [29]   Disclosing a fund's investment objective, however, is significantly different from disclosing the fund's principal risks and the magnitude of those risks in pursuit of that investment objective. *See Id.* at *29.

In addition, other statements in the Prospectus and First and Second Supplements implied that the Bear Funds could be held for longer than a single trading session – in fact, for much longer than that.[30] ¶¶ 108, 145-51, 205-06.  For example, on the Cover Page and on page 4 of the Second Supplement, Defendants *twice* said that "the pursuit of daily leveraged investment goals means that the return of a Fund *for a period longer than a day* will be the *product* of a series of daily leveraged returns for each day during the relevant period."  ¶ 59 (emphasis added).  Not only did that statement falsely imply that Bear Fund shares could be held "for a period longer than a day," but

---

[29]  Again it should be noted that in *Rydex*, a case substantially similar to the present case, the court rejected this argument as insufficient many of the same or similar disclosures (*see* Def. Br. at 8-10) that Defendants rely on here.  *Id.* at *3-5.

[30]  The offering documents provided examples, in unqualified language, including hypothetical performance and expense data over one year, three year and longer periods, that suggested that Direxion's Funds, including the FAZ, ERY, BGZ and TZA Funds, were appropriate for retail investors and investors that intended to hold positions over extended periods of time.  ¶¶ 145-51, 205-206. Defendants contend Direxion was "scrupulously adhering to the SEC regulations in Form N-1A." Def. Br. at 17 and n. 14.  In other words, Defendants argue, "because the SEC made us put it in there we can't be held liable if it is materially misleading." However, SEC Rule 408 provides:

> In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make *the required statements,* in the light of the circumstances under which they are made, not misleading.

17 C.F.R. § 230.408(a) (emphasis added); *In re Morgan Stanley Information Fund Sec. Litig.,* 592 F.3d at 365.

also that the risk of holding the shares was *reduced* over time until it eventually became zero when, in fact, risk rose dramatically over time.[31]

Except in the most extraordinary market conditions (such as when the underlying index has zero volatility or experiences a series of returns all in the same direction) – which were not present during the Class Period – it was arithmetically *impossible* for the Bear Funds to earn returns over an extended holding period that equaled or exceeded three times the inverse of the return for the benchmarks over that period.   ¶¶ 137, 176, 178, 203.   Thus, for periods longer than a day, Bear Funds *will* underperform their benchmarks whether the indices move up or down.   ¶¶ 137, 176, 178, 203, 256-62.   Defendants never provided a straight-forward and understandable disclosure of that material risk.   Instead, they used imprecise, equivocal language which understated and misrepresented the significance of the risk, leaving investors with the false impression that over extended periods the Bear Funds were more likely to over-perform than underperform their targets. ¶ 108.   *Prudential*, 930 F. Supp. at 72 (disclosures must describe known risks); *Cogent Inv. Strategies Fund*, 551 F. Supp. 2d at 226.   (same).

Defendants also argue repeatedly that they adequately disclosed that the Bear Funds might be unable to meet their daily investment objectives, rendering the alleged omissions immaterial. Def. Br. at 2, 18-19.   Defendants state that Plaintiffs only "suggest that the funds did not adequately track their benchmark indices on a daily basis." Def. Br. at 18. In fact, the Complaint alleges with specificity and in detail that the Bear Funds systematically under-performed their underlying indices on a daily basis.   ¶¶ 207-20.   The data specifically alleged by Plaintiffs reveals -- and Defendants

---

[31] The SAI included a statement under the heading "Tracking Error" falsely implying that if a Bear Fund were held over an extended period, it would produce gains that were *greater* and losses that were *less* than three times the inverse of its target index, suggesting that holding Bear Fund shares over multiple days added value and reduced risk.   ¶ 108.

have not denied -- the daily "tracking error" of the returns of the Bear Funds was and is substantial and almost always moved against the investor. [32] ¶¶ 36-37, 40, 208-15.

Defendants failed to disclose this pronounced and consistent daily underperformance of the returns of the Bear Funds, or the empirical performance data evidencing it. ¶¶ 207-20, 334-35. Defendants' vague statements that a "Fund may have difficulty achieving its daily target," "[s]everal factors may affect a Fund's ability to achieve its daily target," and a "failure to achieve a daily target may cause a Fund to provide returns for a longer period that are worse than expected," Comp. ¶ 218, are insufficient to convey concrete information about the nature and magnitude of the risks and are materially misleading. *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998). "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Bear Stearns,* 763 F.Supp.2d at 495.

### C.   Plaintiffs Were Harmed When The Undisclosed, Unique Risks Of Investing In Bear Funds Materialized

Under Section 11 of the Securities Act, a plaintiff who alleges and proves any misstatement or omission of material fact in a registration statement is entitled to recover statutory damages equal to the difference between the price he paid for the security minus either the price he received when he sold the security or the price at which the security was trading when he commenced the action if he did not sell. 15 U.S.C. § 77k(e)(3). Under Section 11, a plaintiff need *not* plead or prove loss causation. *MF Global*, 620 F.3d at 145 ("Loss causation is *not an element of a plaintiff's prima*

---

[32]   Defendants fact-based argument that "the Funds have been highly successful in meeting their daily targets," Def. Br. at 18, is an improper attempt to contradict Plaintiffs' well-pled allegations.  More importantly, it is clearly contrary to the facts. ¶¶ 207-20. For example, the Complaint alleges that during the month immediately prior to the Second Supplement, the FAZ Fund underperformed its daily benchmark on 19 of 22 days (*i.e.*, 86% of the time). ¶ 208. Over that month, the FAZ Fund underperformed its target on average by 3.52% *per day*, which equals massive losses over a longer holding period. ¶ 209. Plaintiffs allege that at that rate of under-performance, an investor would lose half his investment if he held FAZ Fund shares for the month. ¶ 209.

*facie case*; rather, the absence of loss causation is an affirmative defense.") (Emphasis added). *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.  Rather, a defendant who is liable for making an untrue or misleading misstatement or omission of material fact in a registration statement may limit the amount of his liability by proving that some or all of the plaintiff's loss was not caused by the misstatement or omission in question. 15 U.S.C. § 77k(e)(3)  Under Section 11, loss causation – or more accurately, "negative loss causation" – is in the nature of an affirmative defense. *In re Fuwei Films Sec. Litig.,* 634 F.Supp.2d 419, 444 (S.D.N.Y.2009); *MF Global*, 620 F.3d at 145 (Section 11 claim may be dismissed only when defendant proves from facts alleged in complaint "that an otherwise recoverable loss was not caused by the alleged misstatement or omission").

Therefore, the Complaint may not be dismissed unless Defendants establish with certainty as a matter of law that, under the facts alleged in the Complaint, ***none*** of the losses Plaintiffs suffered can be attributed to any of the undisclosed or inadequately disclosed risks – alleged in this action.[33] Defendants' argument that Plaintiffs cannot establish loss causation in no way establishes with certainty as a matter of law that there can be no loss causation in this case.

### D.    Defendants Cannot Prove "Negative Loss Causation" Under The Facts Alleged In The Complaint

In *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010), the Second Circuit held that loss causation may be established ***either*** by (1) a corrective disclosure ***or*** (2) a materialization of the concealed risk.  In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), the Second Circuit held that loss causation is satisfied where (i) "the loss is foreseeable" and

---

[33] Whether those particular undisclosed risks, as opposed to the ordinary risk that the value of the underlying assets might not move as expected on any given day or even over a longer period of time, caused any of the losses that Plaintiffs seek to recover in this action is a highly technical question only appropriate for resolution on the basis of a fully-developed factual record, including expert testimony, not on a motion to dismiss.[33] *Fuwei Films*, 634 F.Supp.2d at 444 (because "analysis of loss causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial" rather than a motion to dismiss).

(ii) "the loss is caused by the ***materialization of the concealed risk***."[34]   396 F.3d at 173 (expressly adopting the "materialization of risk" approach to pleading and proving loss causation) (emphasis added).    Thus, to prevail on their "negative loss causation" affirmative defense, based only upon the facts alleged in the Complaint, Defendants must prove either that Plaintiffs' losses were not foreseeable or that their losses were not caused by a materialization of the risks alleged in the Complaint.   Defendants have done neither.

Nothing alleged in the Complaint proves Defendants' "negative loss causation" affirmative defense, and Defendants have not shown otherwise.   *First*, there is no question that Plaintiffs' losses were foreseeable.   Indeed, while Plaintiffs vigorously oppose their argument, Defendants argue at length that Plaintiffs were warned in advance of the risk that resulted in Plaintiffs' losses. It is logically impossible for Defendants to argue on the one hand that the risk of loss was adequately disclosed to Plaintiffs and on the other hand that Plaintiffs' losses were not foreseeable; thus Defendants are foreclosed from doing so.

*Second*, Defendants have done nothing to prove – or even attempt to prove – that Plaintiffs' losses were not caused by the materialization of the specific risks that Plaintiffs allege were not disclosed.   Indeed, they do not effectively address any of the risks set forth in the Complaint, in their motion to dismiss, and they fail to show that none of the risks contributed in any way to the huge losses suffered by Plaintiffs and the other Bear Fund investors.

Rather than proving (or even trying to prove) that Plaintiffs' losses were not caused by the materialization of the specific risks alleged in the Complaint, Defendants rely heavily upon the Court's recent decision in *In re State Street Bank and Trust Co. Fixed Income Funds Investment*

---

[34] In *Lentell*, the Second Circuit held that loss causation is met when there is a causal relationship between the plaintiff's loss and the concealed risk. 396 F.3d at 174 (citing cases).   While there must be some relationship "between the plaintiff's investment loss and the information misstated or concealed by the defendant," *id.*, loss causation does not require that the ***defendant's own words*** – rather than the circumstances misrepresented or concealed – cause the plaintiff's loss.   The risk that caused the loss must be within the zone of risk concealed by the alleged misrepresentations or omissions.   *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 238 (2d Cir. 2000) (Winter, J., dissenting).

23

*Litig.*, No. 08 Civ. 8235 (RJH), 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011), to support their argument that the Complaint must be dismissed because, they argue, "it is apparent that there can be no loss causation in this case." Def. Br. at 21. Defendants argue that since ETFs, like mutual fund shares, trade at or near their NAV, Plaintiffs were harmed simply because the value of the underlying assets in the inverse leveraged ETFs declined, not because of anything Defendants said or failed to say about them inflated their market prices at the time of the sale, which then declined upon a subsequent disclosure. *See* Def. Br. at 21 ("securities held in each Fund's portfolio would have experienced the same market value losses, causing the same depreciation in the Fund's NAV, ***regardless of what was disclosed***") (emphasis added).

Despite controlling Second Circuit precedent permitting Plaintiffs to plead and prove loss causation by other means, *i.e.*, the materialization of a concealed risk, Defendants' argument is an ill-conceived attempt to squeeze this case into the so-called "corrective disclosure-price drop" paradigm, implying that the loss causation requirement can be met ***only*** where the plaintiff alleges a false or misleading statement causing price inflation, followed by a corrective disclosure and a resulting price drop.[35]

---

[35] In fact, the law has ***never*** required plaintiffs to meet the "corrective disclosure-price drop" paradigm as the only way to plead or prove loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("need not, and do not, consider other proximate cause or loss-related questions"). Defendants' argument is directly contrary to the Second Circuit's decisions in *Lentell* and *Omnicom*. In discussing loss causation in *Lentell*, the Second Circuit held:

> A foreseeable injury at common law is one proximately caused by the defendant's fault, but it cannot ordinarily be said that a drop in the value of a security is "caused" by the misstatements or omissions made about it, as opposed to the underlying ***circumstance*** that is concealed or misstated.
> . . . Thus to establish loss causation, "a plaintiff must allege . . . that the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered."

*Lentell*, 396 F.3d at 173 (emphasis original); quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). Thus, as the Second Circuit held in *Lentell*, the proper inquiry is whether what the defendant said (or failed to say) concealed or misstated some ***circumstance that caused harm to the plaintiff***, not whether what the defendant actually said (or failed to say) caused the harm. *See also, In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), which demonstrates clearly that loss causation can be shown even without a disclosure followed by share price decline. There, the plaintiffs alleged that Parmalat had engaged in a complex scheme involving off-shore entities and misleading transactions to conceal massive debt, thus creating a false appearance that the company was financially sound so that it could raise capital during a period when it had, in fact, been losing money. The scheme eventually failed,

Under Defendants' exaggerated interpretation of *State Street*, a plaintiff can never recover for damages under Section 11 of the Securities Act unless his injury was caused ***by the actual words*** uttered by the defendant.   The defendants made a similarly broad argument in *Rydex*, 2011 U.S. Dist. LEXIS 707 at *29, that since "only the [mutual f]und's investments (its assets and liabilities) can affect its price, not the mutual fund's disclosures," the defendants' misrepresentations could not affect the Fund's price.   Noting that the defendants' sweeping argument – the same as Defendants make here – has been rejected before, the district court held:

> If Defendants are correct that disclosures are immaterial to mutual funds/exchange traded funds, then there can never be a Section 11 or Section 12(a)(2) claim of misrepresentation or material omission against such funds. That would lead to the absurd result that such funds could even intentionally misrepresent material facts with impunity.

*Id*. at *30 (emphasis added) (citing *In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009)).

The facts in *Rydex* are substantially identical to the facts in this case.   There, like here, the plaintiffs purchased shares in a fund "like an ETF" that were designed to "track a particular benchmark, and specifically to track the ***inverse*** price movements of the 30-Year U.S. Treasury Bond."   2011 U.S. Dist. LEXIS 707 at *4.   There, like here, the plaintiffs alleged that the fund was intended to track the benchmark on a daily basis, thus exposing the investment to a "'mathematical compounding effect' that leads a fund's price to deviate from the inverse movement of the benchmark for periods beyond a single day."   *Id*.   Thus, the plaintiffs alleged they suffered harm when their fund investment declined even though the benchmark also declined.   *Id*. at *4-*5.   After

---

and the collapse of Parmalat followed immediately thereafter.   However, as the Court noted, "the true extent of the fraud was not revealed to the public until . . . ***after Parmalat shares were worthless***."   *Id*. at 307 (emphasis added).   The Court found the timing of the disclosure – subsequent to the collapse of the stock – to be "immaterial," holding that the plaintiffs had alleged loss causation because "the ***risk*** allegedly concealed by defendants materialized [before the subsequent disclosure] and arguably caused the decline in shareholder and bondholder value."   *Id*. (emphasis added); *In re Mutual Funds Inv. Litig.*, 590 F. Supp. 2d 741, 747-48 (D. Md. 2008) (rejecting defendants' argument that loss causation may only be met by inflation-disclosure-deflation scenario).

rejecting the defendants' argument (identical to the arguments Defendants make here) that they adequately disclosed the fund's "daily investment objective" and the "potential effects of compounding over time," *id.* at *21-*23, the district court then rejected the defendants' loss causation argument (also identical to the arguments Defendants make here) that whatever they said or omitted to say about the risks of investing in the fund was immaterial because the fund's shares were priced solely on the NAV of the underlying assets, which were not and could not have been affected by anything they said. *Id.* at *28-*29 (quoting *Charles Schwab*, 257 F.R.D. at 550).[36]

To support their argument, Defendants appear to cite *Charles Schwab* for the proposition that this Court has "soundly rejected" the "'materialization of the risk' view of loss causation." Def. Br. at 22. The district court said no such thing in *Charles Schwab*, and in fact, quoting *Lentell*, **held exactly the opposite**:

> . . . . Loss causation, however, is **not limited to the common "corrective disclosure-price drop" scenario**. . . .
>
> As courts in other circuits have explained, a plaintiff may establish loss causation by alleging "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that **materialized and played some part in diminishing the market value of**" the security. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005) (citation omitted; emphasis in original).

*Charles Schwab*, 257 F.R.D. at 547 (emphasis original and emphasis added). Thus, the *Charles Schwab* decision expressly recognizes that the Second Circuit has endorsed materialization of the risk as a means of doing so. More to the point, this Court can **not** soundly reject the Second Circuit's decisions in *Lentell* and *Omnicom* expressly adopting the "materialization of the risk" method of pleading and proving loss causation.

---

[36] The district court rejected the defendants' negative loss causation defense in *Rafton* because, *inter alia*, the plaintiffs adequately alleged "that their loss in this case was caused, or exacerbated by, the 'materialization' of the concealed/undisclosed risk that holding the Fund for longer than one day would inevitably lead to a failure of the Fund to track the inverse performance" of its index. 2011 U.S. Dist. LEXIS 707 at *31. That is exactly what Plaintiffs allege in this case as well.

*State Street* and this case are fundamentally different. *State Street* involved claims by purchasers of mutual fund shares that the fund's investment adviser (a) misrepresented the percentage of fund assets invested in mortgage-backed securities, (b) over-stated the value of the mortgage-related securities, and (c) failed to meet the fund's stated investment objectives by over-concentrating in mortgage-backed or mortgage-related securities. *State Street*, 2011 U.S. Dist. LEXIS 35857, at *3-*4. Plainly, each of those allegations addressed, one way or another, the composition and valuation of the fund's investment portfolio. In sharp contrast, this case does not concern the composition or valuation of the Bear Funds in the least.[37]

Leveraged ETFs, like the Bear Funds in this case, are quite unlike mutual funds in at least four material respects. *First*, mutual funds are intended to be long-term investments, while the Bear Funds, according to Defendants' post-class period disclosures, had an intended holding period of less than one trading day. *Second*, mutual funds give long-term investors the ability to acquire professionally-chosen securities, while Bear Funds investors were investing in market movements.[38] *Third*, while passively managed mutual funds are rarely rebalanced and even actively managed mutual funds *may* be rebalanced from time to time (for stock picking purposes) at the adviser's discretion, the Bear Funds *must* be rebalanced at least daily in order to attempt to meet their daily leveraged objectives. *Fourth*, rebalancing of the Bear Funds was a mechanical process based on complex mathematical models, not as a result of any "economic" or qualitative judgment by the fund manager.[39] Moreover, unlike the plaintiffs in *State Street*, here Plaintiffs allege that their

---

[37] Plaintiffs have not alleged that the investment portfolios were anything other than what Defendants said they were, and they have not alleged that their losses resulted from an over-concentration of any particular assets or class of assets. Nor have Plaintiffs alleged that Defendants misrepresented the value of any investments in the ETFs' portfolios at any time, or that their losses resulted from any erroneous valuation of any particular assets or class of assets. Defendants do not – and cannot – argue otherwise.

[38] In fact, Plaintiffs know practically nothing about the composition of the leveraged ETFs' investment portfolios other than that they include exotic derivative securities, as Defendants described them in the registration statements.

[39] What Plaintiffs allege in this case, unlike the allegations in *State Street*, is that Defendants misrepresented or concealed five particular risks specific to investing in Bear Funds: (i) rebalancing and volatility risk, (ii)

losses were caused by the materialization of those five specific undisclosed or misrepresented risks.[40]  Defendants have done nothing to prove that all of Plaintiffs losses were caused by anything other than the materialization of those five risks, and for that reason the Court must reject their "negative loss causation" defense.

For all these reasons, Defendants cannot establish their affirmative defense of "negative loss causation," and the motion to dismiss should be denied.

### E. Plaintiffs Unquestionably Allege *Some* Injury When The Unique Risks Of Investing In Bear Funds Materialized

Section 11 does not require Plaintiffs to plead damages.  *Citigroup*, 723 F. Supp. 2d at 588 n. 5.  Implicitly conceding that Plaintiffs have *alleged* injury in the Complaint, Defendants argue that Plaintiffs "simply did not suffer the supposed *injuries of which they complain*" and that the "alleged misrepresentations cannot be said to have caused plaintiffs' *alleged losses*. . . ."  Def. Br. at 22 (emphasis added).  Defendants thus explicitly concede that Plaintiffs have alleged financial harm in the Complaint, but nonetheless make an intensely fact-based and absurd argument that Plaintiffs suffered *fewer* losses because of their investments in the Bear Funds.  *Id*.

---

price pressure, (iii) timing risk, (iv) holding period risk, and (v) hedging risk.  None of those risks are present in mutual fund investments, and certainly they were not alleged in *State Street*.

[40] For example, the Complaint alleges that when Defendants attempted to implement the Bear Funds' investment strategies at or near the end of each day, they did so by rapidly executing large purchases or sales of illiquid derivative securities, which trades caused disadvantageous movements in the market prices for the securities.  Thus, as Plaintiffs allege, price pressure and timing risk inevitably caused the trading prices to move in the wrong (*i.e.*, exact opposite) direction and caused the funds to pay more for the securities they purchased or receive less for securities they sold.  ¶¶ 317 & 318.

The Complaint also alleges that price pressure and timing risk were so great that the Bear Funds could not achieve their investment objective even if they were sold after 3:30 p.m. on the *same day they were purchased*, regardless of the time of day they we purchased.  Thus, Plaintiff further allege that they and other members of the Class were injured whenever they held Bear Fund shares after 3:30 p.m. on any day in the Class Period.  ¶¶ 326 & 328.

The Complaint alleges that, even with complete knowledge of the Bear Funds' less-than-a-day holding period and with perfect 20/20 hindsight, the Bear Funds could not achieve their expected three times inverse returns because of the costs incurred when Defendants were required to hedge or rebalance open positions each night.  In effect, as Plaintiffs allege, hedging risk bled off a certain small but unavoidable percentage – approximately 2% – of the Bear Funds' daily return, thus making it *impossible* for the Bear Funds to achieve their expected return over *any* holding period.  ¶¶ 207-15, 334-38.

Finally, the Complaint alleges that as investors held their Bear Fund investments over multiple periods, the undisclosed, or adequately disclosed risks of rebalancing and volatility associated with holding over time materialized causing Plaintiffs and investors losses.  *See, e.g.*, ¶¶ 15-20.

As a matter of law, it is not necessary that the five specific risks alleged in the Complaint –

rebalancing and volatility risk, price pressure, timing risk, holding period risk, and hedging risk –

caused *all* of the losses that Plaintiffs suffered.  Indeed, as the Second Circuit held in *Lentell*, the

concealed risk that eventually materialized need only have "***played some part***" in causing the

plaintiff's harm to establish loss causation.    *Lentell*, 396 F.3d at 177 (emphasis added).[41]

Therefore, to prevail on their motion to dismiss, Defendants must convince the Court that *all* of

Plaintiffs' losses were caused by factors other than those five specific risks – *not one of which*

*Defendants effectively discuss in their brief*.

Moreover, there is no substance to Defendants' argument that Plaintiffs' losses were

"limited" by their Bear Funds investments.  *See* Def. Br. at 22.  Incredibly, Defendants deliberately

misconstrue the Complaint, arguing that "Plaintiffs simply made erroneous bets on the direction of

the market," and their losses were caused by those "erroneous bets."[42]   Def. Br. at 22.  In fact,

Plaintiffs allege precisely the opposite: they correctly anticipated the underlying markets would

*decline* and they expected their Bear Fund investments – which should have returned three times the

*inverse* of the market movement –to *increase* as the markets fell:

- Plaintiffs suffered "large losses" during periods in when their "predictions about the direction of the market *were correct*" (¶ 2) (emphasis added)
- when the Russell 1000 Financial Services Index ("RGUSFL") *fell* approximately 12.6%, the linked FAZ Fund, which was to deliver triple the *inverse* of the RGUSFL, should have gained approximately 38%, but actually *declined* by a staggering 92% (¶ 15)[43]
- when the Russell 1000 Energy Index ("RGUSEL") *fell* approximately 3.8%, the linked ERY Fund, which was to deliver triple the *inverse* of the RGUSEL, should have gained approximately 11.3%, but actually *declined* by 55.2% (¶ 18)[44]

---

[41] *See also In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation") (emphasis added).

[42] Despite making this absurd argument, Defendants provide no support whatsoever for their bald factual assertion that Plaintiffs simply made the wrong "bets" on the direction of the underlying markets.

[43] Plaintiffs allege, more specifically, that Plaintiffs Stoopler, Remmells, Haas, Behnken suffered losses in the FAZ Fund despite correctly anticipating the movement of the RGUSFL.  ¶ 17(a) – (d).

[44] Plaintiffs allege, more specifically, that Plaintiffs Schwack and Killmon suffered losses in the ERY Fund despite correctly anticipating the movement of the RGUSEL.  ¶ 19(a) and (b).

- when the Russell 2000 Index ("RTY") *fell* 9.0%, the linked TZA Fund, which was to deliver triple the *inverse* of the RTY, should have gained 27%, but actually *declined* by 48.3% (¶ 20)
- the "undisclosed risks to Plaintiffs and Class members resulted in enormous losses (rather than the expected gains) even following *correct judgments* about the direction of the index levels" (¶ 49) (emphasis added)

As these examples illustrate, the Complaint bristles with allegations that Plaintiffs correctly predicted the direction of the underlying markets or indices, but suffered huge losses in the Bear Funds when they should have earned substantial gains from their correct assessments about the underlying market movements. Finally, consideration of the declaration of Defendants' expert at this motion to dismiss stage would require the weighing of evidence and is inappropriate. The Court should reject Defendants' desperate – and blatantly erroneous – loss causation argument out of hand.

### F.    Plaintiffs Have Article III Standing And Should Be Allowed To Represent Investors In All Four Bear Funds

Defendants argue that Plaintiffs do not have standing to sue on behalf of purchasers who acquired funds other than the two they purchased: ERY and FAZ. Def. Br. at 24-25. Defendants' argument is premature, and it is legally incorrect in any event. There is no dispute that Plaintiffs are "entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (describing Article III standing). Thus, for purposes of Article III, "each of the named plaintiffs has standing to bring *at least some claims*" against Defendants. *Blessing v. Sirius XM Radio Inc.*, No. 09 CV 10035 (HB), 2010 WL 4642607 at *3 (S.D.N.Y. Nov. 17, 2010) (emphasis added). No further standing need be shown at this time.

The question whether Plaintiffs may represent purchasers of TZA and BGZ Fund shares in the same class action is not a question of Article III standing, but rather a distinct question of representative capacity under Federal Rule of Civil Procedure 23. As such, the Court should not consider Plaintiffs' Rule 23 representative capacity at this time. In *La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 439 n.1 (S.D.N.Y. 2010) (citing *Ortiz*, 527 U.S. at 830, and quoting

30

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997), the Court held that "class certification issues are 'logically *antecedent'* to Article III standing:

> courts have held that an objection [to standing] is more properly dealt with in the class certification inquiry than as a matter of Article III standing. *See In re Dynex Capital, Inc. Secs. Litig.*, No. 05 Civ. 1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006), *vac'd in part on other grounds*, 531 F.3d 190 (2d Cir.2008); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071, 2003 WL 21672085, at *5-6 (S.D.N.Y. July 16, 2003).[45]

The Court also found there was no need to consider the plaintiffs' capacity to sue for purchasers of other fund shares at the motion to dismiss stage in that case because, as here, "the plaintiffs unquestionably have standing to sue against the defendants' conduct as it relates to [one fund], and because the allegations against each Fund are the same." *Id.* (citations omitted).[46]

Deferral of the standing issue is particularly appropriate here. As Plaintiffs allege, all of the Bear Funds were sold pursuant to the *same* Registration Statement and base Prospectus and First and Second Supplements. Thus, Plaintiffs allege the exact same misrepresentations and omissions for all of the Bear Funds. When plaintiffs have pled such common source of injury based upon material misrepresentations and omissions regarding all charged ETFs, such general factual allegations of injury from Defendants' common conduct will suffice, even at the class certification stage.[47] ¶¶ 61-2, 81-5, 347-8, 352.

---

[45] In any event, standing questions may be deferred until *after* a class has been certified, because class certification issues are "'logically *antecedent'* to Article III concerns." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 830, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

[46] *See also New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 5222127, at *6 (S.D.N.Y. Dec. 22, 2010) ("growing consensus among district courts in this circuit that, where the answer to standing challenges could depend upon the outcome of a class certification motion, such challenges may be deferred until after a decision on class certification").

[47] *See In re CitiGroup Inc. Bond Litigation*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010) (plaintiffs who alleged Section 11 violations had standing to represent shareholders in 48 offerings where plaintiffs bought in 19); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (appointing class representative for two mutual funds who only bought in one of the funds); *In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS), 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all securities because "[t]here need not be a class representative for every Blech security, as long as the securities are part of a common fraudulent or manipulative scheme"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509 (S.D.N.Y.

Defendants also argue that the Court authorized Lead Plaintiffs and counsel to litigate only on behalf of Financial Bear (FAZ) and Energy Bear (ERY) purchasers.  This, too, is pertinent only to class certification, not to whether Plaintiffs have stated their own claims against Defendants. Moreover, courts routinely permit investors to represent multi-fund classes where, as here, there is a common course of conduct affecting every single fund. For over two years, Plaintiffs' Counsel have diligently undertaken their duties to the investors in the four Bear Funds and represent investors in each of the Funds.

### G.    Defendants' Argument that Plaintiffs' Claims are Barred by the Statute of Limitations is Without Merit

Defendants assert that Plaintiffs have failed to allege their compliance with the one-year and three-year statutes of limitations applicable to Section 11 claims.  Plaintiffs claims are based on two effective registration statements (in the form of supplemental prospectuses) dated November 3, 2008 and December 9, 2008. *See* ¶ 96. This action was commenced on September 18, 2009, *less than one year after the first amendment* and unquestionably within both the one- and three-year limitation periods.   Moreover, Plaintiffs allege throughout the Complaint they did not know that Defendants made material misrepresentations, omissions, and misleading statements before April 10, 2009, when Defendants belatedly began to disclose some of the extreme risks of investing in Bear Funds.   Before then, the Complaint alleges that Defendants did not disclose that Bear Fund shares were suitable only for investors who would both buy and sell during the same trading session, and in no way disclosed the nature or magnitude of the risk of holding longer than that. Thus, Plaintiffs had no reason to make inquiry, much less discover enough facts about the true nature and extent of the specific risks of investing in Bear Fund shares to plead sustainable claims

---

Sept. 20, 2000) (named plaintiffs certified class representatives of investors in two different mutual funds); *In re Prudential Sec. Inc.. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) (certifying class who invested in series of partnerships all sponsored by the same defendants although named plaintiffs only invested in small subset of over 700 partnerships); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988).

against Defendants.  The statute of limitations did not begin to run until, in exercise of reasonable diligence, Plaintiffs should have discovered enough information *to plead a sustainable claim* that the statements and omissions at issue were materially false or misleading when they were made.  *See City of Pontiac Gen. Emps.' Ret. Sys v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) (discussing similar Section 12(a)(2) claim).  Defendants have no genuine argument that Plaintiffs have not alleged compliance with the statute of limitations.

Moreover, pursuant to Fed. R. Civ. P. 15(c), the amendment of the operative complaint to add Haas, Beknman and Killmon as additional named plaintiffs relates back to the filing of the original Complaint for statute of limitations purposes.  Rule 15(c)(1)(b) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  When an amendment merely adds party, Rule 15(c)(1)(C) requires that the defendant have "received such notice of the action that it will not be prejudiced in defending on the merits. . . ." Fed. R. Civ. P. 15(c)(1)(C)(i). The proposed additions to the Complaint do not add any new defendants or causes of action, nor do they change the substance of any of the claims previously asserted; they simply add three more named plaintiffs with standing as to the already included FAZ and ERY Funds. As Defendants were clearly on notice of Lead Plaintiff Stoopler's and Schwack's claims, the proposed amendments relate back to the filing of the Complaint and the claims are timely.

### H.   The Failure to File Certifications For The New Plaintiffs Was Inadvertent and An Oversight That Has Been Corrected

Plaintiffs' failure to file certifications of each of the new named plaintiffs together with the Complaint was an inadvertent mistake.  Defendants rely on *In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 42 (D. Mass. 2003), to argue that the named plaintiffs do not have standing because they failed to file a certification with the current complaint.  That argument is unavailing for two

different reasons.  *First*, the certifications of Lead Plaintiff Stoopler and Schwack, along with the additional named plaintiff Remmells, were originally filed with the First Amended Complaint, as were the certifications for the BGZ and TZA class representatives.  The PSLRA does *not* require a class representative to file a new certification each time an amended complaint is filed in their case. *In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F.Supp.2d 474, 500 (S.D.N.Y. 2004).   Defendants have not cited any authority to support their argument that the Complaint should be dismissed because each of those Plaintiffs filed only an original certification.  *Second*, Plaintiffs attached Exhibits A-D, but inadvertently failed to attach Exhibit A-1. The certifications of new Plaintiffs Behnken, Haas, and Killmon, which inadvertently were not filed with the Complaint, have now been filed, thus remedying any technical deficiency.   Accordingly, Defendants' argument should be rejected. *See*, Declaration of Kenneth G. Gilman.  Moreover, Defendants have not been prejudiced and can respond to the certifications in their reply brief.

## I.   Plaintiffs' Allegations Of Post-Class Period Statements Are Proper

Plaintiffs have alleged certain post-Class Period statements in the Complaint to show serious problems that existed during the Class Period that Defendants knew or should have known during the Class Period.  The facts pled in the Complaint created high risks of very substantial losses that existed throughout the Class Period and should have been clearly disclosed.   Defendants' mathematical formula gave them full knowledge.  The undisclosed risks are simply the inherent perils of Defendants undisclosed mathematical equation and the awareness by Defendants of critical information during the entire Class Period. ¶¶ 256-262. Importantly, nothing changed after the Class Period ended either to increase the risks associated with Bear Fund shares or to inform Defendants of those risks.  "The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period." *Lapin*

*v. Goldman Sachs Group, Inc.*, 506 F. Supp.2d 221, 237 (S.D.N.Y. 2006).[48]  Accordingly, the Court should consider these allegations to show what Defendants knew or should have known during the Class Period about the material risks that were crucial for a reasonable investor to know before deciding to purchase Bear Fund shares.

**III.      CONCLUSION**

For all the foregoing reasons, Defendants' motion to dismiss should be denied in all respects.  However, if, for any reason, the motion is granted in any respect, Plaintiffs respectfully suggest that they should be allowed leave to re-plead.

Dated: August 15, 2011                                    Respectfully  submitted,

/s/ Mark C. Rifkin
Mark C. Rifkin
rifkin@whafh.com
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison  Avenue
New York, NY  10016
Phone:  (212) 545-4600
Fax:  (212) 545-4653

Kenneth G. Gilman
kgilman@gilmanpastor.com
Rene Potkay Moniz
rpotkay@gilmanpastor.com
**GILMAN AND PASTOR, LLP**
16 14th Avenue
Wareham, MA  02571
Phone: (508)  291-8400
Fax: (508)  291-3258

---

[48] Such subsequent disclosures are "relevant to determining what a defendant knew or should have known during the class period." *See In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001) (pre- and post-class period data may be relevant to shed light on whether class period statements were false or materially misleading at the time); *In re Vivendi Universal, S.A. Sec. Litig.,* 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (permitting the use of post-class period data to confirm circumstances that existed during the class period); *Fadem v. Ford Motor Co.,* 352 F. Supp. 2d 501, 509 (S.D.N.Y. 2005), *aff'd on other grounds,* 157 Fed. Appx. 398 (2d Cir. 2005) (plaintiffs may allege subsequent changes in disclosures as evidence of inadequacy of class period disclosures); *In re TCW/DW N. Am. Gov't Income Tr. Sec. Litig.*, 941 F. Supp. 326, 331 n.7 (S.D.N.Y. 1996) (post-class period SEC filing may be used "as a tool to help explain the consequences of . . . risk in the context of this lawsuit").

*Co-Lead Counsel for the ERY Plaintiffs and Proposed Class*

William  B. Federman
wbf@federmanlaw.com
Stuart W. Emmons
swe@federmanlaw.com
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania  Avenue
Oklahoma  City, OK 73120
Phone: (405)  235-1560
Fax: (405)  239-2112

*Lead  Counsel  for  the  FAZ  Plaintiffs  and Proposed Class*

36