USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 2 7 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                         :

IN RE DIREXION SHARES ETF TRUST    :

                                         :
------------------------------------X

09 Civ. 8011 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

    Lead Plaintiff Evan Stoopler ("Stoopler") and named plaintiffs David Remmells, Jason Haas, Joel Behnken, Howard Schwack, and James Kilmmon (the "named plaintiffs") bring this putative class action against defendants Direxion Shares ETF Trust ("Direxion"), Rafferty Asset Management, LLC ("Rafferty"), and various Direxion and Rafferty officers and directors, alleging violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

    In their Second Amended Consolidated Complaint ("SAC"), filed April 8, 2011, plaintiffs, purchasers of shares in the Financial Bear 3X ETF ("FAZ") and Energy Bear 3X ETF ("ERY"), purport to bring claims on behalf of purchasers in FAZ and ERY as well as purchasers in the Large Cap Bear 3X ETF ("BGZ") and Small Cap Bear 3X ETF ("TZA"). See, e.g., SAC ¶¶ 13, 85.

    Defendants have moved to dismiss the SAC--or, at a minimum, certain claims therein--on various grounds, including that plaintiffs (i) do not have standing to bring claims for funds in which they did not purchase shares; (ii) fail to plead adequately compliance with the statute of limitations; and

1

(iii) fail to plead adequately actionable misstatements and omissions.

On November 9, 2011, Barton Booth ("Proposed Intervenor" or "Booth"), a purchaser of shares in BGZ and TZA, moved to intervene in this action.  Booth seeks intervention pursuant to Federal Rule of Civil Procedure 24(a)(2) as a matter of right, and permissive intervention under Rule 24(b)(1)(B).  If this Court were to grant Booth's motion, his presence would cure the asserted standing deficiencies with respect to BGZ and TZA.

Defendants' motion to dismiss was fully submitted on September 28, 2011.  Booth's motion to intervene was fully submitted on December 19, 2011.  The Court held oral argument on both motions on January 6, 2012.  At oral argument, the Court requested (and subsequently received) a supplemental letter from Booth's counsel regarding the date on which Booth learned of the instant litigation.

For the reasons set forth below, defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART; Proposed Intervenor's motion is DENIED.

## FACTS

For purposes of ruling on the motion to dismiss, the Court accepts as true all well-pleaded allegations in the SAC and draws all reasonable inferences in plaintiffs' favor.  See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).

The Court also considers the documents publicly filed with the Securities and Exchange Commission ("SEC") as well as documents referenced in the SAC and/or incorporated by reference therein. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

Direxion is an open-ended, investment company registered with the SEC under the Investment Company Act of 1940.[1] SAC ¶¶ 74, 93. Rafferty is the investment advisor to Direxion's funds. Id. ¶ 80. The Direxion and Rafferty officers and directors named in the SAC allegedly signed the Registration Statement. Id. ¶¶ 75-79.

Pursuant to a September 17, 2008 registration statement (the "Registration Statement") and a Prospectus filed with the SEC on October 3, 2008 (the "Prospectus"), Direxion offered to the public shares in certain triple-leveraged exchanged traded funds ("ETFs"), including FAZ, ERY, BGZ and TZA (the "Funds"). Id. ¶¶ 10, 23, 74. The Registration Statement also comprised a statement of additional information ("SAI"). Id. ¶ 106. The SAI, incorporated by reference into the Prospectus, is legally part thereof. Id.; see also White v. Melton, 757 F. Supp. 267, 269 (S.D.N.Y. 1991) (citing 48 Fed. Reg. 37928, 37930 (Aug. 22,

---

[1] Companies registered under the Investment Company Act must comply with the Securities Act's registration requirements to sell securities to the public. 15 U.S.C. § 77j; see also SAC ¶ 94.

1983)).  For that reason, the Court discusses the Prospectus and its supplements without specific reference to the SAI.

As described on the website for Russell Investments (i.e., the parent company of the index to which the Funds are benchmarked, see SAC ¶ 12), "Exchange-traded funds are index-based products that allow investors to buy or sell shares of entire portfolios of stock in a single security."  Russell Investments, http://www.russell.com/indexes/investing/exchange_traded_funds.asp (last visited Jan. 9, 2012); see also SAC ¶ 87; Declaration of Nicholas G. Terris in Supp. of Defs. Mot. to Dismiss ("Terris Decl.") (Dkt. No. 63) Ex. C at 1.  ETFs differ from traditional mutual funds in certain ways, see SAC ¶ 87, but, like traditional mutual funds (and other open-ended funds), ETFs price their shares based upon their net asset value ("NAV"), Terris Decl. Ex. C at 39.  See also Terris Decl. Ex. G (Exchange-Traded Funds, Securities Act Release No. 33-8901, Investment Company Act Release No. 28193, 73 Fed. Reg. 14618, 14624); McGraw-Hill Cos., Inc. v. Vanguard Index Trust, 139 F. Supp. 2d 544, 546 (S.D.N.Y. 2001) ("shares of an open-ended fund are continuously issued and redeemed at prices determined by the fund's net asset value").

The Funds, part of Direxion's "Bear Funds," are relatively complicated ETFs that generally seek to achieve a daily return

of a multiple of the inverse performance of the index it tracks. Id. ¶¶ 1, 92. The Funds seek a daily investment return of three times (i.e., 300%) the inverse of the daily performance of the Russell 1000 Financial Services Index. Id. ¶ 12.

The Funds were sold pursuant to the Registration Statement and Prospectus, as supplemented on November 3, 2008 (the "November 3 Supplement"), and again on December 9, 2008 (the "December 9 Supplement" and collectively with the November 3 Supplement, the "Supplements"). SAC ¶¶ 103, 152. As agreed by the parties and Proposed Intervenor at oral argument, the Funds were first "bona fide offered to the public" on November 8, 2008, when Direxion filed with the SEC the November 3 Supplement. See 15 U.S.C. § 77m; 17 C.F.R. § 230.430B(f)(2); see also SAC ¶¶ 23, 38, 208. However, the Funds were also "bona fide offered to the public" pursuant to the December 9 Supplement. See 15 U.S.C. § 77m; 17 C.F.R. § 230.430B(f)(2); 17 C.F.R. § 229.512(a)(2) ("each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof").

The Supplements[2] both contained the following language (in bold) on their cover pages (and elsewhere):

**The Funds are exchange-traded funds that seek *daily leveraged* investment results. The Funds are intended to be used as short-term trading vehicles. The pursuit of leveraged investment goals means that the Funds are riskier than alternatives which do not use leverage. Further, the pursuit of *daily* leveraged investment goals means that the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period. As a consequence, especially in periods of market volatility, the path of the benchmark during the period may be at least as important to the Funds return for the period as the cumulative return of the benchmark for the relevant period. The Funds are not suitable for all investors. The Funds should be utilized only by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results and (c) who intend to actively monitor and manage their investments.**

A critical issue in this action is whether the above language, repeated in various ways throughout the Supplements, adequately disclosed the nature and magnitude of the risks to which investors were exposed. Plaintiffs allege that although the Supplements disclosed some risk, they did not disclose that holding shares in the Funds for longer than a single day could result in significant loss. E.g., SAC ¶ 3. Defendants contend that the repeated use of the word "daily," along with the other

---

[2] Although there are slight differences between the November 3 and December 9 Supplements, defendants concede that the two "contained generally similar relevant disclosures." Defs. Mem. of Law In Supp. of Mot. to Dismiss (Dkt. No. 65) ("Defs. Mem.") at 7. On that representation, the Court addresses the Supplements collectively, unless otherwise noted.

disclosures on expenses, and references to the Funds as "short-term trading vehicles," provided adequate disclosure about the proper holding time for the Funds' shares.  Defs. Mem. of Law In Supp. of Mot. to Dismiss (Dkt. No. 65) ("Defs. Mem.") at 7-12.

The Supplements indeed contained numerous references to the Funds as "daily" investment vehicles, but also contained references to holding for periods of longer than one day, and examples of and discussions about holding for periods of one to three years.  E.g., Terris Decl. Ex. C at 11, 29.  The Supplements also discussed the returns the Funds would provide to investors "before fees and expenses."  See, e.g., id. at 1, 3, 4, 7, 11.  The Supplements additionally disclosed risks associated with specific expenses--in particular, those associated with "rebalancing" (that is, seeking to adjust the portfolio to correspond with investment objectives, often--or even always--on a daily basis).  See Pls. Mem. of Law In Opp'n to Defs. Mot. to Dismiss (Dkt. No. 67) ("Pls. Opp'n") at n.4.  As for those risks, the Supplements explained (with graphical illustration) that "[d]aily rebalancing will impair a Fund's performance if the benchmark experiences volatility."  Terris Decl. Ex. C at 8.

On April 10, 2009, Direxion issued a further supplement to the Prospectus (the "April 10 Supplement") which, plaintiffs

7

allege, disclosed clearly and for the first time, the "truth":
that the Funds were "not appropriate for investors who intend to
hold positions" for longer than a single trading day.   SAC ¶ 227;
see also id. ¶¶ 55, 233.   This new supplement contained the
following warning on its cover page:

> **The Funds offered in this Prospectus are exchange-traded funds but they are very different from most exchange-traded funds.   First, all of the Funds pursue leveraged investment goals, which means that the Funds are riskier than alternatives that do not use leverage because the Funds magnify the performance of the benchmark on an investment.   Second, each of the Bear Funds pursues investment goals which are inverse to the performance of its benchmark, a result opposite of most exchange-traded funds.   Third, each Fund offered in this Prospectus seeks *daily leveraged* investment results.   The return of each Fund for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for such longer period.**

> **The Funds are intended to be used as short-term trading vehicles for investors managing their portfolios on a daily basis.   The Funds are not intended to be used by, and are not appropriate for, investors who intend to hold positions. The Funds should be utilized only by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results, (c) understand the risk of shorting; and (d) intend to actively monitor and manage their investments on a daily basis. Investors who do not understand the Funds or do not intend to manage the funds on a daily basis should not buy the Funds.**

Direxion Shares ETF Trust, Prospectus (Form 497) (April 1, 2009
as Supplemented on April 10, 2009) ("April 10 Supp.") at 1.
That cautionary language, and/or parts thereof, is reiterated

throughout the April 10 Supplement.  The April 10 Supplement's cautionary language provides additional detail and discussion of the magnitude of risks associated with investing in the Funds not contained, but able to be known, in the Supplements.

The April 10 Supplement also clarified the disclosures regarding the risks associated with rebalancing expenses, stating, "At higher rates of volatility, there is a chance of near complete loss of Fund value even if the benchmark is flat." April 10 Supp. at 8 (emphasis added).  The April 10 Supplement provided two tables--one showing the Funds' impaired performance as compared to benchmark volatility, and one showing the "range of volatility for each of the indexes to which one of the funds is benchmarked . . . ."  Id. at 8-10.  In the section on volatility and rebalancing, the April 10 Supplement reiterated (in bold, underlined language) that the tables were "**intended to simply underscore the fact that the Funds are designed as short-term trading vehicles for investors managing their portfolios on a daily basis. They are not intended to be used by, and are not appropriate for, investors who intend to hold positions in an attempt to generate returns through time**."  Id. at 9.

According to plaintiffs, the disclosures in the April 10 Supplement that revealed to investors that Direxion ETF shares should not be held for more than one day differ materially from the disclosures in the Supplements which, despite references to

"daily," acknowledged the propriety of holding for longer periods.  See SAC ¶¶ 6, 141-51.  Although the SAC alleges that the Supplements did not disclose certain specific risks, see, e.g., id. ¶¶ 3, 21, 113(e)-(k), 243, 285, 308, 309, 311-12, 315-22, 324-30, 334-39; see also id. ¶¶ 207-15, at bottom, plaintiffs allege that the Supplements contained material misstatements and omissions because the Supplements failed to disclose adequately that the Funds would, because of, inter alia, compounding, be prevented from achieving their return objectives if held for longer than a single day, see id. ¶¶ 3, 22, 24-25, 36, 53.

PROCEDURAL HISTORY

On September 18, 2009, Stoopler commenced a putative class action against Direxion and certain of its officers and directors, based upon alleged losses stemming from purchases of shares in FAZ (the "Stoopler action").  See Compl. (Dkt. No. 1) ¶ 1.  That same day, Stoopler published notice pursuant to the Private Securities Litigation Reform Act ("PSLRA"), informing the public (and ergo, putative class members) of claims brought on behalf of purchasers in FAZ.  Dkt. No. 17-3.  That notice referenced the Registration Statement pursuant to which all Funds were offered.  Id.  Shortly thereafter, two FAZ purchasers filed putative class actions on behalf of FAZ acquirers.  See Pfeiffer v. Direxion Trust et al., 09 Civ. 08375, Dkt. No. 1

(filed Oct. 2, 2009); Longman v. Direxion Trust et al., 09 Civ.
0849, Dkt. No. 1 (filed Oct. 5, 2009) (collectively with the
Stoopler action, the "FAZ actions").

On January 13, 2010, two individual putative class actions
were filed on behalf of investors in ERY, a Fund not included in
the FAZ actions (the "ERY actions").  See Dkt. No. 44 at 2.
Plaintiff in the first-filed ERY action, Howard Schwack,
published notice pursuant to the PSLRA on January 13, 2010,
informing putative class members of claims brought on behalf of
purchasers in ERY.  Schwack v. Direxion ETF Trust, 10 Civ. 271,
Dkt. No. 7-2.  That notice referenced the Registration Statement
and Prospectus to which the Funds were offered.  Id.

Stoopler's and Schwack's notices (the "Notices") both set
forth the date by which to move for lead plaintiff status.
Thereafter, several putative lead plaintiffs filed motions
seeking appointment as lead plaintiff and consolidation of the
FAZ and ERY actions.  Dkt. Nos. 7, 9, 12, 14.  On April 1, 2010,
defendants also sought consolidation of the three FAZ and two
ERY actions.  Dkt. Nos. 36, 37.

Just prior to defendants' filing that motion, in "mid-March
2010," Booth "first became aware of the pendency of litigation
regarding Direxion ETFs."  Dkt. No. 84 at 1.  At that time, he
sought legal advice from his current counsel, a law firm that

11

regularly represents plaintiffs in securities class actions.
See id.

On August 12, 2010, the Court consolidated the FAZ and ERY
actions and appointed lead plaintiff and lead counsel for
purchasers in FAZ and ERY, respectively.  Dkt. No. 44.[3]

On November 23, 2010, the First Amended Class Action
Complaint ("Amended Complaint") was filed, asserting claims
under the Securities Act for alleged losses stemming from
purchases in FAZ and ERY, and, for the first time, alleged
losses stemming from BGZ and TZA.  Am. Compl. (Dkt. No. 46) ¶ 1.

On January 25, 2011, defendants submitted a pre-motion
letter, setting forth grounds for dismissal of the Amended
Complaint.  See Dkt. No. 53.  Defendants argued, inter alia,
that (i) plaintiffs failed to plead adequately compliance with
the Securities Act's one-year statute of limitations; (ii) the
Court's August 12, 2011 consolidation order authorized
plaintiffs to litigate only on behalf of purchasers in FAZ and
ERY; and (iii) plaintiffs did not have standing to assert claims
for funds in which they did not purchase shares.  Dkt. No. 53 at
3-5.  In response, plaintiffs informed the Court that they
intended to file a second amended pleading.  Dkt. No. 55.

---

[3] The Court filed its original Memorandum Opinion & Order consolidating the
FAZ and ERY actions on August 12, 2010, see Dkt. No. 43, but entered a
corrected version on August 16, 2010, see Dkt. No. 44.  The Court cites to
the latter in this Opinion.

On April 8, 2011, plaintiffs filed the SAC.  In that
pleading, they conceded that they "individually invested in FAZ
and ERY Funds," SAC ¶ 67, but continued to assert claims
stemming from purchases in all four Funds--i.e., FAZ, ERY, BGZ,
and TZA, id. ¶ 2.  They did not amend their statute of
limitations allegation from that in the Amended Complaint,
however.  Compare SAC ¶ 352 with Am. Compl. ¶ 227.

On June 10, 2011, defendants filed a motion to dismiss the
SAC.  See Dkt. No. 62.  Plaintiffs filed their opposition on
August 15, 2011, and defendants filed a reply on September 28,
2011.  See Dkt. Nos. 65, 69.

On November 9, 2011, Booth filed a motion to intervene
arguing, inter alia, that his claims are identical to those in
the SAC and that his proposed intervention satisfies the
requirements of Rules 24(a) and 24(b).  Dkt. No. 70.  Defendants
opposed that motion on December 9, 2011, and the motion was
fully submitted as of December 19, 2011.  See Dkt. Nos. 77, 78.

The Court held oral argument on both the motion to dismiss
and the motion to intervene on January 6, 2012.

DISCUSSION

I.   DEFENDANTS' MOTION TO DISMISS

A.   STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "the
plaintiff must provide the grounds upon which [its] claim rests

13

through factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 98 (quoting <u>Bell Alt. Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (quoting <u>Twombly</u>, 550 U.S. at 570). <u>See also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 129 S.Ct. at 1949.  In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." <u>Id.</u> If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate.  <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 129 S.Ct. at 1950).[4]

---

[4] Defendants argue that the SAC "sounds in fraud" triggering Rule 9(b)'s heightened pleading standard. Defs. Mem. at 7.  The SAC principally tracks the language of the Securities Act, but does make three references to "purposeful" conduct.  <u>See</u> SAC ¶¶ 138, 216, 36.  Defendants rely on those references to support their "sounds in fraud" argument.  <u>See</u> Defs. Mem. at 7 n.6.  Three errant references do not amount to allegations of a "unified fraudulent scheme." <u>Rombach v. Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004). Indeed, three references in a 356-paragraph complaint in no way indicate that the "gravamen of the [SAC]" is "plainly fraud." <u>See</u> <u>id.</u>

B.   STANDING TO BRING CLAIMS ON BEHALF OF PURCHASERS IN
     BGZ AND TZA

Defendants move to dismiss for lack of standing the claims that arise out of the Funds in which plaintiffs did not purchase shares--<u>i.e.</u>, BGZ and TZA.  Defs. Mem. at 24-25.  In ruling on a motion to dismiss for lack of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." <u>Warth v. Seldin</u>, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Standing is "the threshold question in every federal case." <u>Id.</u> at 498.  Article III of the Constitution limits the jurisdiction of federal courts to the resolution of actual "cases" and "controversies," U.S. CONST. art. III, § 2--<u>i.e.</u>, a justiciable action in which the plaintiff has standing, <u>Warth</u>, 422 U.S. at 498.  The law of Article III standing is clear:  a plaintiff must assert an injury traceable to the conduct of which the plaintiff complains.  <u>Allen v. Wright</u>, 468 U.S. 737, 750, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

Plaintiffs argue that the standing inquiry is not one related to Article III, but rather to Rule 23 and thus, should be addressed at the class certification stage.  Pls. Opp'n at 30.  A rule of procedure, like Rule 23, cannot, however, create standing where standing simply does not exist.  <u>See</u> 28 U.S.C.

15

§ 2072(b) (procedural rules "shall not abridge, enlarge, or modify any substantive right"); see also Fed. R. Civ. P. 82 (Federal Rules "do not extend or limit the jurisdiction of the district courts . . .").

It is also well settled that the standing requirement cannot be dispensed with by styling the complaint as a class action. Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing . . ."). Each named plaintiff in a class action "must allege and show that [he] personally [has] been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent." Id.; W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (same) (quoting Warth, 422 U.S. at 502). Thus, a court must address the "threshold question" of Article III standing before it ever reaches the question of class certification. See Pub. Emps.' Ret. Sys. Of Miss. v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010); In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006).

Here, plaintiffs do not dispute that they only purchased shares in FAZ and ERY. See SAC ¶ 67; see also Hr'g Tr. (Dkt. No. 82) 58:4-58:6 (Jan. 6, 2012). Those purchases, then, are

16

the only sources of any injury giving rise to the claims asserted in the SAC.  Plaintiffs have not been personally injured with respect to any losses related to BGZ and TZA because they never owned shares in those Funds.  Thus, they do not have any injury traceable to purchases in those particular Funds and "have no standing to assert claims in relation to funds in which [they] did not personally invest."  Pub. Emps.' Ret. Sys. Of Miss., 714 F. Supp. 2d at 481.[5]

Accordingly, plaintiffs may proceed only with claims related to Funds in which they purchased shares (i.e., FAZ and ERY), and may not pursue claims relating to Funds in which they did not (i.e., BGZ and TZA).

C.    STATUTE OF LIMITATIONS

Ensuring an action is timely brought is an additional hurdle.  Cf. In re Morgan Stanley Mortg. Pass-Through

---

[5] See also In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 368-69 (S.D.N.Y. 2011); New Jersey Carpenters Health Fund v. Novastar Mortg., Inc., No. 08-5310, 2011 WL 1338195, at *6 (S.D.N.Y. Mar. 31, 2011); In re IndyMac Mortgage-Backed Secs. Litig., 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010); New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp. 2d 254, 265 (S.D.N.Y. 2010); In re Lehman Bros. Secs. & ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010); New Jersey Carpenters Health Fund v. Residential Capital, LLC, No. 08-8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010); New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08-5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).

The Court recognizes that at least one judge in this District has found standing as to offerings in which the plaintiffs have not acquired securities.  See In re Citigroup Inc. Bond Litig., 723 F. Supp. 2d 568 (S.D.N.Y. 2010).  This Court finds, however, that Article III of the Constitution and the weight of recent caselaw in this District, see, e.g., Pub. Emps.' Ret. Sys. Of Miss., 714 F. Supp. 2d at 481, and this note, supra, counsel in favor of the result at which this Court arrives.

Certificates Litig., No. 09 Civ. 2137, 2010 WL 3239430, at *6
(S.D.N.Y. Aug. 17, 2010) (addressing the timeliness of the
plaintiffs' claims before addressing the sufficiency of the
complaint's allegations).  It is axiomatic that a complaint must
contain sufficient factual allegations to enable a court to
determine if an action is properly before it.  See, Iqbal, 129
S.Ct. at 1949.

Claims brought under the Securities Act must be "brought
within one year after the discovery of the untrue statement or
the omission, or after such discovery should have been made by
the exercise of reasonable diligence." 15 U.S.C. § 77m.  In
other words, the statute of limitations begins to run on
Securities Act claims when the plaintiff has actual or
constructive ("inquiry") notice.  Dodds v. Cigna Secs., Inc., 12
F.3d 346, 350 (2d Cir. 1993).  Whether a plaintiff was on
inquiry notice may be determined as a matter of law.  Staehr v.
Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir.
2008).

In Merck & Co. v. Reynolds, --- U.S. ---, 130 S.Ct. 1784
(2010),[6] the Supreme Court addressed the issue of inquiry notice,
holding that "the discovery of facts that put a plaintiff on

---

[6] Merck addressed "inquiry notice" as it applied to the statute of limitations
for Section 10(b) of the Exchange Act claims.  While the Exchange Act and
Securities Act limitations statutes differ slightly, they do not in any
material way.  See In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326,
371 n.39 (S.D.N.Y. 2011).

inquiry notice does not automatically begin the running of the limitations period." Id. at 1789.  The limitations period begins to run only "when a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 174 (2d Cir. 2011).

Although resolution of "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)," LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 156 (2d Cir. 2003) (quotation omitted) (emphasis added), a plaintiff must still meet the basic pleading burden with respect to the statute of limitations.  For Securities Act claims, a plaintiff must allege the time and circumstances of his discovery of the material misstatement or omission upon which his claim is based.  In re Chaus Secs. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  Here, there are no such allegations.

The SAC simply states that "[l]ess than one year has elapsed from the time that Plaintiffs and other members of the Class discovered the facts upon which the Complaint is based." SAC ¶ 352.  That allegation is insufficient to state plausibly the time and circumstance of each plaintiff's own discovery of the subject misstatements and omissions.  See Iqbal, 129 S.Ct.

at 1949 ("mere conclusory statements[] do not suffice"); In re
Morgan Stanley Mortg. Pass-Through Certificates Litig., 2010 WL
3239430, at *7 (dismissing a complaint with allegations similar
to SAC ¶ 352 regarding compliance with Section 13 for failure to
plead "time and circumstance").  Without "time and circumstance"
allegations, there is no way to determine whether--and which
of--plaintiffs' claims are properly before the Court.  That is
particularly important in the context of a purported multi-fund
action where claims for each fund can significantly increase
defendants' exposure:  there must be at least one plaintiff who
has timely claims for each Fund at issue.

        The face of the SAC itself demonstrates the timeliness of
one plaintiff's claims.  That facial plausibility is based not
on conclusory allegations but on simple math.  Lead Plaintiff
Stoopler filed his individual action on September 18, 2009.  See
Dkt. No. 1.  The Funds were first "bona fide offered" to the
public on November 8, 2008, when Direxion filed with the SEC the
November 3 Supplement.  Direxion Shares ETF Trust, Prospectus
(Form 497) (Oct. 1, 2008 as Supplemented on November 3, 2008);
see 15 U.S.C. § 77m; 17 C.F.R. § 230.430B(f)(2).  Those two
facts conclusively establish that Stoopler's claims were timely
brought.  See 15 U.S.C. § 77m.  In other words, the subject
misrepresentations were not publicly disclosed prior to November

20

8, 2008--<u>i.e.</u>, less than one year prior to the date on which Stoopler filed his action.

Plaintiffs Remmells, Haas, and Behnken, as purchasers in FAZ, SAC ¶¶ 69-71, were "asserted members" of the putative class in the Stoopler action and thus, benefit from <u>American Pipe</u> tolling.  Even if their respective discoveries of the alleged misstatements and omissions are out of time (which the Court cannot assess from the face of the SAC), the statute of limitations was tolled as to their claims.  <u>See</u> <u>American Pipe</u>, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).  Neither math nor <u>American Pipe</u> tolling saves plaintiffs Schwack's or Kilmmon's ERY claims, however.  Accordingly, only Stoopler, Remmells, Haas, and Benhken's FAZ claims may proceed at this time.

It is notable that plaintiffs were on notice of possible problems with their statute of limitations allegations as of January 25, 2011--<u>i.e.</u>, the date of defendants' pre-motion letter regarding dismissal of the Amended Complaint.  <u>See</u> Dkt. No. 53 at 3-4.  Nevertheless, plaintiffs took no action to cure those deficiencies in the SAC.  <u>Compare</u> SAC ¶ 352 <u>with</u> Am. Compl. ¶ 227.  That failure raises concerns about plaintiffs' ability to cure these conclusory allegations.  Regardless, the Court will provide a brief period of time for amendment of the statute of limitations allegations.  <u>See</u> <u>In re Morgan Stanley</u>

21

Mortg. Pass-Through Certificates Litig., 2010 WL 3239430, at *7, 10.  A further amended complaint must allege--with the requisite specificity--compliance with the statute of limitations as to each plaintiff (regardless of math or tolling).  See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., --- F. Supp. 2d ---, 2011 WL 4089580, at *11 (S.D.N.Y. Sept. 15, 2011).

        D.   ACTIONABLE MISSTATEMENTS OR OMISSIONS

        Having addressed the threshold questions of standing and timeliness and finding that some claims remain, the Court now turns to whether the SAC states a plausible claim for violations of Section 11 of the Securities Act.

        Section 11 imposes "virtually absolute liability" where a registration statement (or any part thereof) for a public offering contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k; In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010)(quotation omitted).  Such claims "do not require allegations of scienter, reliance, or loss causation."  Fait v. Regions Fin. Corp., 655 F.3d 105, 109 (2d Cir. 2011).

        Defendants contend that the relevant offering documents here did not contain misrepresentations or omissions because Direxion "made extensive and unusually clear disclosures

22

regarding the very issues that are the subject matter of the [SAC]"--namely, that "the Bear Funds tracked their benchmarks only on a daily basis rather than over longer investment horizons." Defs. Mem. at 8.  Plaintiffs argue that "[r]ather than disclosing that the risk of loss increased if investors held Bear Fund shares for a day or longer, Defendants said exactly the opposite,"--i.e., they made "extensive references to investor's holding periods of one year, three years, or even longer . . . ." Pls. Opp'n at 4, 5.  Plaintiffs argue that the expense disclosures likewise were inadequate because they failed to disclose the magnitude to which expenses could impair the Funds' ability to achieve their investment objectives.  Pls. Opp'n at 13-14; see also SAC ¶¶ 24-29.  The critical question for this Court is not a mere calculation of the number of times the word "daily" or "expense" was used, but rather whether the disclosures sufficiently revealed the magnitude of the risk. See Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc., No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001).

Here, although the Supplements contained a number of references to the "daily" nature of the Funds, they also contained contra-indicators, signifying that holding for longer than a single day was appropriate.  For example, defendants point to the cautionary language on the Supplements' covers to support their argument that the Funds were "short term

23

investment vehicles" that sought "daily returns." But that same warning states, "Further, pursuit of *daily* leveraged investment goals means that the return of a Fund <u>for a period longer than a single day</u> will be the product of the series of daily leveraged returns for each day during the relevant period." Terris Decl. Ex. C at 1 (second emphasis added). Those two statements taken together certainly do not indicate that holding for longer than a single day is inappropriate and/or may impair an investor's ability to profit from their investment in the Funds. That is not the only contra-indicator of the appropriate holding period for the Funds' shares. For example, in addition, the Supplements referenced an annual distribution of dividends (which would have to be only as of a record date), which strongly signaled to investors that holding for a period of longer than one day was appropriate. <u>Id.</u> at 43. Thus, the Court finds that the "daily" or "short term" disclosures were "undercut to some extent by [Direxion's] statements" in the same Supplements that holding for longer than one day was appropriate. <u>See</u> <u>Friedus v. ING Groep N.V.</u>, 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010).

In comparing the disclosures on "rebalancing expenses" in the April 10 Supplement to those in the Supplements, there is import in the clear differences. The Court is not suggesting that disclosures made in the April 10 Supplement necessarily

should have been made in the earlier Supplements.  See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978).  Rather, the April 10 disclosures illuminate the magnitude of the risks associated with holding shares in the Funds for longer than a single day--risks that Direxion should have or could have known at the time they issued the Supplements.  See New Jersey Carpenters Health Fund v. Residential Capital, LLC, 08 Civ. 8781, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective.").

The disclosures in the April 10 Supplement regarding the relationship between volatility of the benchmark to rebalancing expenses stated in no uncertain terms that in times of "higher ranges of volatility," there was a possibility of "near complete loss of Fund value."  April 10 Supp. at 8 (emphasis added).  No such language is included in the Supplements.  Although the Supplements contain statements regarding the correlation between volatility and the Funds' returns, the disclosures in the April 10 Supplement reveal that the Supplements did not disclose "hard facts critical to appreciating the magnitude of the risks described," Credit Suisse First Boston Corp., 2001 WL 300733, at *8; see also New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2010 WL 1473288, at *6

(S.D.N.Y. Mar. 29, 2010)--i.e., that holding for longer than one day carried the risk of complete loss of value of the Funds. Defendants' argument that they disclosed "enough" in the Supplements relating to that risk, Defs. Mem. at 11-12, is belied by the statements in the April 10 Supplements.

Accordingly, the Court finds that the SAC plausibly states that the Supplements contained misstatements and omissions.[7]

E.   DEFENDANTS' REMAINING ARGUMENTS

The Court does not find persuasive defendants' remaining arguments for dismissal of the SAC.

First, defendants argue that under In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig., 774 F. Supp. 2d 584 (S.D.N.Y. 2011) (Holwell, J.), "there can be no loss causation in this case" because the Funds' NAVs declined due to declines in the value of the Funds' underlying investments. Defs. Mem. at 21.  But Judge Holwell's decision in State Street was based, in part, on the fact that "[b]ecause there is no secondary market for a mutual fund's shares, statements by a fund's issuer have no ability to 'inflate' the price of the fund's shares."  Id. at 595.  Here, however, the parties agree that shares in the Funds were sold on the secondary market. Defs. Mem. at 5 (citing SAC ¶ 87).  That fact may be critical to

---

[7] As plaintiffs have pleaded adequately a primary violation under Section 11, the secondary liability claim under Section 15 may proceed at this time.  Cf. Rombach, 355 F.3d at 178.

the question of the movement of the Funds' NAV.  Due to the fact-intensive nature of that issue here, the question of "negative loss causation," 15 U.S.C. § 77k(e), is inappropriate for resolution on this motion to dismiss.

Second, resolution of what (if any) of plaintiffs' losses are attributable to the alleged misrepresentations, see Defs. Mem. at 22-23, requires wading into the facts to an extent that likewise is inappropriate on a motion to dismiss.  For example, at oral argument, plaintiffs' counsel argued that Stoopler lost nearly $10 million on his investment in FAZ whereas defendants' counsel argued that Stoopler "actually benefitted from the supposed misrepresentations and had no damages whatsoever." Hr'g Tr. 27:18-27:20, 28:13-28:16 (Jan. 6, 2012).  As stated above, the Court will not engage in resolution of such factual issues.

Third, defendants' argument with respect to plaintiffs' untimely filing of the certifications required by the PSLRA is equally unavailing.  Defs. Mem. at 20-21.  Although the Court does not condone such untimeliness, plaintiffs' counsel represented at oral argument that their clients all read the SAC prior to its filing, as required by the PSLRA.  Hr'g Tr. 47:8-47:22 (Jan. 6, 2012).  Those representations resolve the certification issues raised in defendants' motion and defendants have not suffered prejudice from the tardiness of the cure.

Accordingly, defendants' motion to dismiss is denied on the above three grounds.

## II.   BOOTH'S MOTION TO INTERVENE

Booth seeks to intervene as a lead plaintiff for purchasers of BGZ and TZA.  Such intervention would cure plaintiffs' standing deficiencies with respect to BGZ and TZA.  Booth seeks both intervention as a matter of right under Rule 24(a) and permissive intervention under Rule 24(b).

### A.   STANDARD

In order to intervene as a matter of right, an intervenor must demonstrate that:  (1) the application is timely; (2) he claims "an interest relating to the property or transaction which is the subject matter of the action;" (3) he is situated such that "disposition of the action may, as a practical matter, impair or impede [his] ability to protect [his] interests;" and (4) his interest is "not adequately protected by an existing party." MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006); accord St. John's Univ., New York v. Bolton, No. 11-0099-cv, 2011 WL 6157352, at *2 (2d Cir. Dec. 13, 2011) (summary order); Fed. R. Civ. P. 24(a).  Failure to demonstrate one of the above requires denial of the intervention motion.  MasterCard Int'l Inc., 471 F.3d at 389;

28

Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 96 (2d Cir. 1990).

Courts typically consider the same four factors whether a motion for intervention is "of right" under Fed. R. Civ. P. 24(a), or "permissive" under Fed. R. Civ. P. 24(b). See, e.g., R Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d 238, 240 (2d Cir. 2006); see also Hnot v. Willis Group Holdings, Ltd., 234 Fed. App'x 13, 14 (2d Cir. 2007) (same). "A district court has broad discretion under Rule 24(b) to determine whether to permit intervention on the basis that the intervenor's claim or defense and the main action have a question of law or fact in common.'" St. John's Univ., New York, 2011 WL 6157352, at *3 (quoting Fed. R. Civ. P. 24(b)(2)).

The timeliness of an intervention motion is a matter left to the district court's discretion. In re Bank of New York Deriv. Litig., 320 F.2d 291, 300 (2d Cir. 2003). In determining timeliness, the Court considers "(a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to the existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." MasterCard Int'l Inc., 471 F.3d at 390.

B.   TIMELINESS

29

The Court's decision regarding Proposed Intervenor's motion turns on the untimeliness of his application.

On September 18, 2009, two things started the clock for the statute of limitations.  First, Stoopler filed his putative class action on behalf of purchasers in FAZ, asserting Securities Act claims based upon misstatements and omissions in the Registration Statement, Prospectus and Supplements (the "offering documents").  See generally Compl. (Dkt. No. 1).  The offering documents contained information and disclosures relating to all four Bear Funds.  Second, that same day, Stoopler published notice as required by the PLSRA, apprising members of the putative class of the pendency of the action and the nature of his claims.  The notice specifically set forth the general misstatements or omissions as well as the specific risks that the offering documents purportedly failed to disclose.  See Dkt. No. 17-3 at 2.  The notice defined the putative class as "any and all investors who purchased or otherwise acquired shares of Direxion Daily Financial Bear 3X Shares (the 'FAZ Fund')."  Id.

As discussed above, in Merck, the Supreme Court held that the statute of limitations begins to run--i.e., there is "inquiry notice"--when "a reasonably diligent plaintiff would have discovered the facts constituting the violation . . . ."  Merck, 130 S.Ct. at 1798; see also In re Wachovia Secs. Litig.,

753 F. Supp. 2d 326, 371 & n.39 (S.D.N.Y. 2011) (applying <u>Merck</u> to Securities Act claims).  Applying <u>Merck</u>, the Second Circuit explained that "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." <u>Pontiac Gen. Emps.' Ret. Sys.</u>, 637 F.3d at 175.

The filing of a complaint (and PSLRA notice) relating to one of four "Bear Funds" whose shares were issued pursuant to the very same offering documents certainly "would suggest to an investor of ordinary intelligence of the probability that []he has been defrauded." <u>Staehr</u>, 547 F.3d at 411.  At that time, a reasonable investor in one of the Bear Funds offered pursuant to the very same offering documents had information "to adequately plead [the facts] in a complaint." <u>Pontiac Gen. Emps.' Ret. Sys.</u>, 637 F.3d at 175.  Thus, the one-year statute of limitations began to run upon the September 18, 2009 filing of the Stoopler action and the publication of the attendant PSLRA notice for Booth's claims relating to BGZ and TZA. <u>See Plumbers' & Pipefitters Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I</u>, No. 08 CV 1713, 2011 WL 6182090, at *2 (E.D.N.Y. Dec. 13, 2011) ("The class action was filed on March 26, 2008, and plaintiff's counsel issued a press release describing these cases on January 21, 2009.  This placed the Intervenors on inquiry notice prior to one year before

filing these respective motions." (citations omitted)); cf. Menowitz v. Brown, 991 F.2d 36, 42 (2d Cir. 1993) (affirming the district court's finding that the plaintiffs were on inquiry notice upon the public disclosure of lawsuits in SEC filings where the "disclosures specifically concerned the very misrepresentations alleged in the complaints"); In re White Electronic Design Corp. Sec. Litig., 416 F. Supp. 2d 754, 775 (D. Ariz. 2006) (quotations omitted) ("The main purpose of the notice requirement is to provide information describing the legal and factual basis of the claims so that an investor can make an informed determination whether intervention is appropriate to protect his interests.").

Booth asserts that he "became aware of the pendency of litigation regarding Direxion ETFs in mid-March 2010," which was the first time he consulted with his current counsel.  Dkt. No. 84 at 1.  With inquiry notice charged as of September 18, 2009, at the time Booth consulted counsel, six months remained within the one-year limitations period.  Cf. 15 U.S.C. § 77m.  Booth (and his counsel) had sufficient time to bring claims related to the two Funds (issued pursuant to the very same offering documents challenged in the Stoopler action) in which he invested.  He did not do so.

In his reply, Booth argues that the filing of the Stoopler action did not trigger notice of his interest in the case

because the PSLRA notice for the initial complaint "was brought
only on behalf of the FAZ Fund acquirers."  Reply Mem. Of Law in
Supp. Of Mot. For Intervention (Dkt. No. 78) ("Reply Mem.") at
2.  That is precisely the point.  It was clear on the face of
Stoopler's complaint and the attendant PSLRA notice that the
putative class action did <u>not</u> include Booth and thus, did not
protect his interests.

Further, as of mid-March 2010, the first pleading which
asserted claims on behalf of BGZ and TZA purchasers (correctly
or not) had <u>not</u> yet been filed.  <u>See</u> Dkt. No. 46 (Am. Compl.
filed Nov. 23, 2011).  Thus, the question of whether Booth's
interests were "adequately represented" as of March 2010 was not
uncertain.  <u>Cf.</u> <u>MasterCard Int'l Inc.</u>, 471 F.3d at 390 (the
proposed intervenor was deemed to have known of his interest at
the outset of the litigation where the "complaint and other
filings" were "publicly available for anyone to access").  Just
the opposite.  But Booth did not take any action until November
9, 2011--more than <u>three years</u> after the Stoopler action and
PSLRA notice (<u>i.e.</u>, more than <u>two years</u> after the statute of
limitations had run), and more than <u>a year and a half</u> after
Booth knew of potential Securities Act claims against Direxion
related to the offering documents.

Publication of Stoopler's notice gave Booth sufficient
information of the claims included in this action so that he (or

33

any other purchasers in BGZ or TZA) could "make an informed
determination whether intervention [was] appropriate to protect
his interests" as of September 18, 2009.  In re White Electronic
Design Corp. Sec. Litig., 416 F. Supp. 2d at 775.  His claims
are out of time under the one-year statute of limitations,
unless they are tolled, as discussed below.  Id.[8]

C.  NEITHER RELATION BACK NOR TOLLING CAN SALVAGE PROPOSED
INTERVENOR'S CLAIMS

Proposed Intervenor argues that his claims are not time
barred because (i) they relate back not only to the Amended
Complaint and SAC, but also the initial FAZ and ERY complaints;
and (ii) his claims were tolled under American Pipe.  Reply Mem.
at 7-8, 9.  None of relation back, American Pipe tolling, or
even equitable tolling salvage the timeliness of Booth's claims.

As an initial matter, Booth cannot relate back to the
Amended Complaint.  The Amended Complaint was the first pleading

---

[8] Booth argues that requiring him to publish notice for appointment as a
BGZ/TZA lead plaintiff "would complicate discovery and risk conflicting
determinations," but that he would do so if ordered by the Court.  Reply Mem.
at 7.  The Court is not aware of any precedent--and Proposed Intervenor has
not cited any--that authorizes intervention on newly-brought class claims
without any PSLRA notice with respect to those claims.

Allowing intervention by Booth not only would encourage uncertainty in just
what claims would (or could) be included in a class action at what time, but
also would conflict with the underlying purpose of the PSLRA--i.e., "to
restrict abuses in securities class action litigation." Cf. Seippel v.
Sidley, Austin, Brown & Wood LLP, No. 03 Civ. 6942, 2005 WL 388561, at *2
(S.D.N.Y. Feb. 17, 2005) (quoting In re Advanta Corp. Secs. Litig., 180 F.3d
525, 530-31 (3d Cir. 1999)).  The policy encouraged by allowing claims to
proceed for which there had been no notice would create uncertainty for
defendants, absent class members, and even those plaintiffs who are appointed
lead plaintiffs.  That uncertainty does not--and would not--promote the
"efficiency and economy of litigation." See Am. Pipe, 414 U.S. at 553.

which asserted claims on behalf of BGZ and TZA purchasers.  In
the Amended Complaint, then-plaintiff Michael Salach was alleged
to have purchased shares in BGZ.  Am. Compl. ¶ 57.  No plaintiff
in that pleading was alleged to have purchased in TZA.  As
discussed below, the Court only may exercise jurisdiction where
there is a plaintiff with standing.  See Pressroom Unions-
Printers League Income Security Fund v. Continental Assurance
Co., 700 F.2d 889, 893 (2d Cir. 1983).  Thus, Salach is the only
plaintiff that could have conferred standing on BGZ claims.  On
January 27, 2011, however, plaintiffs informed the Court that
the Amended Complaint would "not be the operative complaint" and
that they intended to file a second amended pleading.  See Dkt.
No. 55 at 1.  In the Amended Complaint, then-plaintiff Michael
Salach was alleged to have purchased shares in BGZ.  Am. Compl.
¶ 57.  Because Salach is no longer named in the SAC, his claims
were voluntarily dismissed when the SAC superceded the Amended
Complaint.  The "law treats a voluntarily dismissed [claim] as
if had never been filed."  See In re IndyMac Mortgage-Backed
Secs. Litig. 718 F. Supp. 2d 495, 504 (S.D.N.Y. 2010).
Accordingly, "a voluntarily dismissed [claim] does not toll the
statute of limitations," id., nor can claims "relate back to a
[claim] that no longer exists," In re Adelphia Commc'ns Corp.
Sec. & Deriv. Litig., Nos. 03 MD 1529, 03-CV-5750, 2005 WL
1882281, at *1 (S.D.N.Y. Aug. 9, 2005).  The only complaint that

could possibly save Booth's claims is the SAC.  As discussed
below, it does not.

The "threshold issue" of constitutional standing dooms
Proposed Intervenor's arguments on relation back and tolling.
"The longstanding and clear rule is that if jurisdiction is
lacking at the commencement of a suit, it cannot be aided by the
intervention of a plaintiff with a sufficient claim."
Pressroom, 700 F.2d at 893; see also Walters v. Edgar, 163 F.3d
430, 432 (7th Cir. 1998) (Posner, J.) ("The chief exception [to
the principle that jurisdiction once acquired is not defeated by
a change of circumstances] is the existence of a case or
controversy in the Article III sense . . .").  Here, in essence,
Proposed Intervenor seeks to "substitute a new action [i.e., one
for claims relating to BGZ and TZA] over which there is
jurisdiction for one where it did not exist [i.e., one in which
there are no plaintiffs with standing]."  Pressroom, 700 F.2d at
893 (emphasis added).  Thus, where no jurisdiction existed as to
claims related to BGZ and TZA, Proposed Intervenor's motion
"does not relate back to the original suit and would be a new
action."  Id. at n.9.

The same rationale applies to the question of tolling under
American Pipe.  In Walters, the Seventh Circuit held that the
filing of a putative class action complaint by a plaintiff who
did not have standing as to certain claims does not toll the

36

statute of limitations for those who later seek to intervene as plaintiffs.  Walters, 163 F.3d at 432.  That decision is predicated upon the rule that under Article III, where a plaintiff does not have standing to bring a claim, there is no case or controversy over which a federal court may exercise jurisdiction.  Id. at 432-33.

Relation back and tolling, on the facts of Proposed Intervenor's motion, also would not accord with American Pipe's rationales.  See Arneil v. Ramsey, 550 F.2d 774, 782 (2d Cir. 1977), overruled on other grounds, In re WorldCom Secs. Litig., 496 F.3d 245 (2d Cir. 2007).  Under American Pipe, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.  That the rule is "in no way inconsistent with the functional operation of a statute of limitations," id. at 554-55--i.e., protection from the assertion of untimely claims--because it only tolls the limitations period for claims of "asserted" class members.  Id.; see also Arneil, 550 F.2d at 782-83.

Proposed Intervenor was never an "asserted member" of the putative class.  First, at the time Booth learned of this action, the action was, as discussed above, clearly limited to FAZ and ERY purchasers.  He could not have thought otherwise

37

where there was no pleading which asserted those claims. Second, under the SAC, where no plaintiff has standing to bring claims related to BGZ and TZA, BGZ and TZA purchasers cannot be "asserted members" of the putative class. See Arneil, 550 F.2d at 782-83; Walters, 163 F.3d at 432. To suspend the statute of limitations under relation back or American Pipe would improperly cloak claims with jurisdiction where jurisdiction never existed before. See Pressroom, 700 F.2d at 893.[9]

And although American Pipe is sensible for the proposition for which it stands, the circumstances before this Court on Proposed Intervenor's motion are not of the type contemplated by the Supreme Court in American Pipe. In American Pipe, the putative class representatives had constitutional standing to preserve the claims they asserted. Inserting claims in this action (over which the Court never had jurisdiction in the first instance) well after the expiration of the statute of limitations, where no notice of those claims was ever given, would ignore American Pipe's requirement that defendants be apprised "of the essential information necessary to determine

---

[9] The Court recognizes the split among district courts on the issue of whether American Pipe tolling applies to claims where the putative class plaintiff did not have standing to assert those claims. See In re IndyMac, 793 F. Supp. 2d at 646 & nn. 39-40 (noting that courts that have addressed this issue "are divided" and citing cases on both sides). The circumstances of this action--i.e., that the Notices did not include claims relating to BGZ and TZA and that Proposed Intervenor concedes that he was aware of this action eight months prior to the filing of the pleading in this action to assert claims related to BGZ and TZA--have not been addressed in any of the cases on either side of the split.

both the subject matter and size of the prospective litigation"
"[w]ithin the period set by the statute of limitations." Am.
Pipe, 414 U.S. at 555. The Supreme Court could not have
intended the rule of tolling to allow intervenors to insert
jurisdiction over entirely new claims particularly where, as
here, Proposed Intervenor was aware of information sufficient to
put him on notice that his interests were not protected nearly
three years before he filed the instant motion.

This is not a case where Proposed Intervenor could have
believed that the yet-to-be "asserted" class would protect his
interests because, as of mid-March 2010, there was no indication
that the class members were anything but FAZ and ERY purchasers.
Rather, a reasonable purchaser in BGZ and TZA would have relied
upon (i) the class allegations in the initial complaints;
(ii) the definitions in the Notices regarding classes on behalf
of ERY and FAZ purchasers, only; and (iii) the Court's
appointment of lead plaintiffs for FAZ and ERY acquirers only,
and acted to protect his BGZ and TZA interests. Cf. In re
Morgan Stanley Mortgage Pass-Through Certificates Litig., 2011
WL 4089580, at *18. The Court's finding on the circumstances
before it do not contravene American Pipe's policy of
"efficiency and economy of litigation," 414 U.S. at 553, but
rather promote American Pipe's policy of ensuring that the
"subject matter and size of the litigation," id. at 555, be

fixed according to the requirements of Article III of the
Constitution and the purpose of the PSLRA.

Although not argued by Proposed Intervenor or defendants,
the Court has undertaken an independent examination of whether
Booth's claims are salvaged by equitable tolling.  They are not.
Booth cannot show either:  (i) that he acted with diligence
throughout the period he seeks to toll; or (ii) that
extraordinary circumstances prevented him from filing his
petition on time.  See A.C.Q. v. United States, 656 F.3d 135,
144 (2d Cir. 2011) (citing Pace v. DiGuglielmo, 544 U.S. 408,
418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)).

First, Booth knew of this action as of mid-March 2010.  The
Notices relating to this action demonstrated that the
(consolidated) action would not protect his interests related to
BGZ and TZA.  But Booth did nothing to protect his claims until
November 9, 2011, when he moved to intervene.  It is not that
Booth did not take any steps to determine whether his interests
were protected, but rather that he affirmatively acted--i.e.,
contacted his current counsel--and still did not take steps to
protect his interests for over eighteen months.  That fact
pattern does not depict diligence.  See A.C.Q., 656 F.3d at 144.

Second, no extraordinary circumstances prevented Booth's
counsel from determining the nature of Booth's interest--and
whether that interest was protected--in the "Direxion ETFs"

litigation.  Dkt. No. 84 at 1.  Counsel for Proposed Intervenor
needed only to look at the basic requirements of the PSLRA and
the Notices to know that BGZ and TZA were not included in this
action as of mid-March 2010.  Counsel for Booth did not act
diligently--and there are no extraordinary circumstances that
excuse that indolence.  See id. at 145.

Proposed Intervenor brought his claims outside of the
applicable statute of limitations, and nothing salvages those
claims.

Given that Booth's application is untimely, and that the
Court lacks jurisdiction over his claims (i.e., there is both
"prejudice to the existing parties" and "the presence of unusual
circumstances militating . . . against a finding of
timeliness"), the Court need not assess the remaining factors to
determine whether Booth may intervene as of right or
permissively.  He has failed to satisfy one of the four
requisite conditions for intervention.  Accordingly, Booth's
motion to intervene is denied.

CONCLUSION

For the aforementioned reasons, defendants' motion to
dismiss is GRANTED IN PART and DENIED IN PART.

The claims relating to BGZ and TZA are dismissed based upon
plaintiffs' lack of Article III standing to pursue such claims.
The claims of Lead Plaintiff Stoopler and named plaintiffs David

41

Remmells, Jason Haas, and Joel Behnken may proceed, but only as to Funds in which they purchased shares (i.e., FAZ).  The claims of Howard Schwack and James Kilmmon are dismissed for failure to plead compliance with the applicable statute of limitations.

Barton Booth's motion to intervene in this action to bring claims on behalf of purchasers in the BGZ and TZA Funds is DENIED.

At this time, this action is limited to a purported class of purchasers in Direxion's FAZ Fund.

It is hereby ORDERED that no later than February 10, 2012, plaintiffs may file an amended complaint to cure the pleading deficiencies regarding the statute of limitations.  If plaintiffs submit a Third Amended Complaint with additional allegations regarding each plaintiff's compliance with the one-year statute of limitations, and if defendants wish to move to dismiss the claims on statute of limitations grounds, defendants may submit a ten-page brief by February 24, 2012, and plaintiffs may submit ten-page brief in response thereto by March 2, 2012.  No reply will be necessary.

The Court will not lift the PSLRA stay of discovery until the statute of limitations question has been resolved as to all plaintiffs.

The Clerk of the Court is directed to terminate defendants'
Motion to Dismiss (Dkt. No. 62) and Barton Booth's Motion to
Intervene (Dkt. No. 70).


SO ORDERED:

Dated:     New York, New York
           January  27, 2012


                              K— B. Forrear
                         _____
                              KATHERINE B. FORREST
                         United States District Judge

43