# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DIREXION SHARES ETF TRUST | Civil Action No. 1:09-CV-08011-RJH |

## THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

William B. Federman
wbf@federmanlaw.com
Stuart Emmons
swe@federmanlaw.com
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112
*Lead Counsel for the FAZ Plaintiffs and Proposed Class*

Kenneth G. Gilman
kgilman@gilmanpastor.com
Rene Potkay
rpotkay@gilmanpastor.com
**GILMAN LAW LLP**
Beachway Professional Center Tower
3301 Bonita Beach Road
Suite 307
Phone: (239) 221-8301
Fax: (239) 676-8224

Mark C. Rifkin
rifkin@whafh.com
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY  10016
Phone:  (212) 545-4600
Fax:  (212) 545-4653
*Co-Lead Counsel for the ERY Plaintiffs and Proposed Class*

Plaintiffs, individually and on behalf of all others similarly situated, by their attorneys, allege the following, based on counsels' investigation, documents filed with the United States Government and Securities and Exchange Commission (the "SEC"), and information obtained by Plaintiffs.

## I.    INTRODUCTION

1.    Plaintiffs and members of the Class purchased shares of Defendants' Direxion Shares ETF Trust ("Direxion Trust" or "Direxion"), exchange traded Bear Funds ("Bear ETFs" or "Bear Funds"), which were designed to produce positive returns when the indexes with which they are associated declined, pursuant to Direxion's registration statements.[1]  In the offering documents, including the registration statements, in connection with same, Defendants radically understated the extreme risks of these investments.  Defendants misleadingly omitted to disclose necessary information and major material risks of large losses from such investments in the Direxion Bear ETFs.

2.    When these critical undisclosed risks materialized during and after the November 3, 2008 through April 9, 2009 Class Period ("Class Period"), Class Members suffered severe losses.  Such losses included large losses stemming from investments in the Direxion Bear ETFs made and held during periods in which Class Members' predictions about the direction of the market were correct.  Defendants' Bear ETFs, which were issued by the Defendants during the Class Period are set forth in Exhibit "C". These include, for example the **Financial Bear 3X Shares "FAZ", Energy Bear 3X Shares "ERY", Large Cap Bear 3X**

---

[1] Ex. A, hereto is a list of Class Plaintiffs' purchases of the Direxion Trust Bear ETFs.  Ex. B hereto is a list of Defendants' Direxion Trust Registration Statement and Post-Effective Amendments filed with the SEC that are at issue in this case.  Ex. C hereto is a list of the Direxion Bear Funds Class Securities that are at issue in this case.

**"BGZ" and Small Cap Bear 3X Shares "TZA",** which produced large losses for Plaintiffs and Class Members.

3.       The risks that Defendants failed to disclose during the Class Period, from November 3, 2008 until at least April 10, 2009 were material to investors.   For instance Defendants failed to disclose adequately and in a comprehensible way that even if a Bear ETF investor's judgment on the direction of the market was correct, compounding, rebalancing, volatility risks, hedging, holding, and price pressure and market timing, as well as other inherent and unavoidable features of the Bear ETFs would almost certainly eliminate the possibility of realizing any gains from correctly predicting the direction of movement in an index.  In fact, given market conditions reasonably anticipated by Defendants throughout the Class Period, significant losses were virtually inevitable.

4.       Defendants were required by law to disclose risks as important as those discussed herein; and all such material risks should have been prominently disclosed in the "Principal Risks" portion of the Prospectus that was provided to each investor and constituted the main body of the Registration Statement.

5.       If Defendants had earlier disclosed such substantial risks of loss during the Class Period and prior to April 10, 2009, Defendants would have revealed that Defendants' new Bear ETF products had material defects.  However, Defendants consistently failed to disclose such critical risks of investing in their new Bear ETF products and their misrepresentations, omissions and practices concealed material facts from the market and artificially inflated the value of the Funds' shares throughout the Class Period.

6.       On April 10, 2009, Direxion began to come clean when it issued a supplemented Prospectus that radically changed its course by beginning to provide some

necessary disclosure of material facts and risks which further negatively affected the value of the Funds.

7.     By failing to adequately disclose these material risks Defendants were able to vault their defective ETFs into millions in shares outstanding.  Direxion captured a substantial percentage of the market and generated hundreds of millions in fees.

8.     However, ***after*** having obtained financial success in obtaining hundreds of millions of dollars in fees and having caused many Class Members' financial disaster in suffering hundreds of millions of dollars in losses from investing in Direxion's Bear ETF products, on April 10, 2009, Defendants belatedly changed course and began to provide some meaningful disclosure, which also negatively affected the value of the Funds shares.  In an SEC filing on the last day of the Class Period, Defendants made major amendments to the "Principle Risks" disclosures in Direxion's Prospectus and other parts of the Registration Statement and on the cover of Direxion's April 10, 2009 Supplement.

9.     Had Defendants made these disclosures earlier much of the Class Members' investment losses would have been avoided.

## II.     SUMMARY OF FACTUAL ALLEGATIONS

10.     More specifically, beginning on September 17, 2008 and throughout the Class Period ending April 9, 2009, Defendants offered and solicited investments by the general public, including retail investors, in their non-traditional triple leveraged exchanged-traded funds (hereinafter "Direxion Bear ETFs") consisting of a series of exchange-traded funds, including the Bear ETFs Financial Bear 3X Shares "FAZ", Energy Bear 3X Shares "ERY", and the Direxion Bear Funds listed in Exhibit "C". These funds were and are regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"). Direxion designed these new securities products to offer triple leverage to the investing public; Defendants knew these products were the

4

first of their kind to offer triple leverage.  Defendants designed Direxion ETFs to track a particular equity index and trade like equities.  These Funds, Direxion's non-traditional, "triple leveraged" and/or "inverse" ETFs which Direxion called "Bull Funds" or "Bear Funds," exploded in popularity to the general investing public, as they purportedly offered investors alternative investment vehicles to take bullish or bearish and leveraged positions on popular equity indices.  Defendants' non-traditional leveraged ETFs attracted billions of dollars of investor assets.

11.     Defendants represented each Direxion Bear ETF would provide investment results that corresponded to the daily performance of a particular benchmark index.  Funds with the word "Bull" in their name (collectively, the "Bull Funds") attempt to provide investment results that correlate ***positively*** to the return of an benchmark index, meaning the Bull Funds attempt to move in the same direction as the target benchmark index.  Funds with the word "Bear" in their name (collectively, the "Bear Funds"), which are the Funds at issue in this case -- including the FAZ, ERY, BGZ, TZA Funds and Bear Funds listed in Exhibit "C" -- attempt to provide investor results that correlate ***negatively*** to the return of an benchmark index, meaning that the Bear Funds attempt to move in the opposite or inverse[2] direction of the target benchmark index.

12.     Defendants touted their Direxion Bear Funds (hereinafter "Direxion Bear Funds") as directly correlating to the ***inverse*** of a ***multiple*** of the daily returns of the target index or benchmark.  For example, the benchmark for the Direxion Financial ***Bear*** 3X Shares is 300% of the inverse, or ***opposite***, of the daily price performance of the Russell 1000 Financial Services

---

[2]     Defendants use of the term "inverse" as used in the offering documents is technically incorrect.  "Inverse" means 1/x not - x.  Technically, the term "reverse" would have been more descriptive for investors.

Index.  If the Russell 1000 Financial Services Index loses 10%, Defendants' Financial ***Bear*** 3X Shares is purportedly designed to ***gain*** approximately 30%. Conversely, if the Russell 1000 Financial Services Index gains 10%, the Financial Bear 3X Shares ("Direxion FAZ") is purportedly designed to ***lose*** approximately 30%.

13.     This action involves Direxion's Bear Funds, which include the Financial Bear 3X Shares ("FAZ Fund" or "FAZ"), Energy Bear 3X Shares ("ERY Fund" or "ERY"), Large Cap Bear 3X Shares "(BGZ Fund" or "BGZ"), Small Cap Bear 3X Shares ("TZA Fund" or "TZA") and the other Bear Funds listed in Exhibit "C" (hereinafter collectively "Bear Funds"). Defendants offered Direxion's Bear Funds as a way for investors to seek profit when indexes declined and as a hedge against market declines. In a press release issued at the time these funds were launched Direxion also announced that **"Direxion Shares will give savvy investors the array of important investment options they have been seeking to <u>actively capitalize on the volatility of today's markets."</u>  (emphasis supplied)**

14.     In designing and operating its Direxion triple leveraged Bear Funds, the Direxion Defendants have acknowledged that Direxion "does not use fundamental securities analysis to accomplish [the Funds'] objectives."   Rather, the offering documents disclose Defendant Rafferty Asset Management, LLC ("Rafferty" or "Advisor"), the investment advisor to the Direxion Funds, "primarily uses statistical and quantitative analysis to determine the investments each Direxion triple leveraged Fund makes and the techniques it employs.  As a consequence, if a Direxion Fund is performing as designed, the return of the index or benchmark will dictate the return for that Fund."

15.     The Defendants touted the FAZ Fund to be able to deliver on a daily basis triple the inverse return of the Russell 1000 Financial Services Index ("RGUSFL") which fell

approximately 12.6% from December 9, 2008 through April 9, 2009, ostensibly generating a profit to investors who anticipated a decline in the U.S. financial services market.  In other words, reasonable investors would have expected that the FAZ Fund should have appreciated by approximately 38% (3X, or 300%, multiplied by -12.6%, or the <u>inverse</u> of the decline in the RGUSFL) during this period.  However, the FAZ Fund, instead of gaining, actually fell approximately 12% during this period resulting in catastrophic losses for investors instead of generating a positive return of 38%, the antithesis of a directional play.[3]  During the period November 19, 2008 through April 9, 2009 the RGUSFL gained approximately 6.7%.  In other words, reasonable investors would have expected the Defendants' FAZ Fund should have lost approximately 20% of its value during this period.  However, the Defendants' FAZ Fund actually fell approximately 92% during this period.  Underscoring just how dysfunctional Direxion Shares' Funds actually are, during this same period Direxion Shares' Financial Bull 3X Shares (the "FAS Fund") which also tracks the Russell 1000 Financial Services Index, but whose investment objective is the exact opposite of the FAZ Fund, also was down 58%.  During the six month period ending April 30, 2009 the Russell 1000 Financial Services Index was down approximately 24.8%, yet both the FAZ and FAS Funds were down approximately 86% during this period.

16.     As another example, the RGUSFL Index, which is tracked by the FAZ Fund, fell from 703.19 on November 6, 2008 to 577.1 on April 9, 2009, a decline of 17.9%. But the FAZ Fund experienced, not a 53.8% gain, but a decline of 85.3%.

---

[3]     Investopedia.com explains directional trading as follows: "Simple investing. If you think a security is going up, you buy, if you think the security is going down, you sell. This is directional trading, no complicated strategies."   Direxion named its leveraged funds, to be pronounced "DIRECTION").



17.     The foregoing opposite performance occurred during the holding periods of multiple Plaintiffs.  For example:

a.  Lead Plaintiff Evan Stoopler bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Stoopler known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

b.  Additional named plaintiff David Remmells bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Remmells known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

c.  Additional named plaintiff Jason Haas bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Haas known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

d.  Additional named plaintiff Joel Behnken bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Behnken known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

18.     The Defendants touted the ERY Fund to be able to deliver triple the inverse return of the Russell 1000 Energy Index ("RGUSEL").  However, the RGUSEL Index fell from 549.78 on November 6, 2008 to 529.16 on April 9, 2009, a decline of 3.8%. But the ERY Fund experienced, not a 11.3% gain, but a decline of 55.2%.



19.     The foregoing opposite performance for the ERY Fund occurred during the holding periods of multiple Plaintiffs.  For example:

    a.   Lead Plaintiff Howard Schwack bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Schwack known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

    b.   Additional named plaintiff James Killmon bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.  Had Plaintiff Killmon known the nature and full extent of the risks set forth herein, he would not have purchased Bear Fund shares or would not have done so at the prices he paid.

20.     In yet another example of the Bear Funds at issue in this case, the Defendants touted the TZA Fund to be able to deliver triple the inverse return of the Russell 2000 Index ("RTY").  However, the RTY Index fell from 514.64 on November 5, 2008 to 468.2 on April 9, 2009, a decline of 9.0%. But the TZA Fund experienced, not a 27.1% gain, but a decline of 48.3%.



21.     The unanticipated actual returns that are shown by the charts above resulted from, among others the compounding risks, rebalancing risks, volatility risks, discussed herein that were not fully, adequately or comprehensibly explained to investors.

22.     Given the spectacular tracking error, or divergence, of the performance of the Direxion Bear Funds, including the FAZ, ERY, BGZ and TZA Bear Funds listed in Exhibit "C", and their benchmark indices resulting from these risks, the fact that Plaintiffs and the Class sought to protect their assets by investing their monies on the correct directional play was rendered meaningless. The Direxion Bear Funds, therefore, were and are defective securities products and were offered at artificially inflated prices throughout the Class Period. The Direxion Bear Funds did not do what they were represented to do, advertised to do or what reasonable investors, including Plaintiffs, expected them to do and the Plaintiffs and Class Members lost hundreds of millions of dollars from investing in them.

23.     On September 29, 2008, Direxion Shares ETF Trust filed a Registration Statement with the Securities and Exchange Commission on Form N1-A, which included the FAZ, ERY, BGZ and TZA Funds, effective September 29, 2008, including a Prospectus which was filed with the SEC effective October 3, 2008 as supplemented on November 3, 2008, filed November 7, 2008, as supplemented on December 9, 2008. On December 17, 2008 Direxion Shares filed another post effective Amendment to its Registration Statement which became effective on February 15, 2009.

24.     In its Registration Statements, prospectuses and supplements thereto filed throughout the Class Period and after, Direxion failed to disclose critical material facts concerning the inherent risks of loss from investing in its Bear ETF products. In fact, among other things, Defendants failed to disclose that the Bear Funds were not designed or appropriate for most, if not all, retail investors and/or for investors who intended to hold positions in these Funds beyond a single trading session. Defendants failed to adequately and meaningfully

disclose the extent of the risks and magnitude of the losses to investors who purchased shares in the Direxion Bear Funds and who did not sell all those shares during the same trading session in which they were purchased.

25.     In fact the Bear Funds did not deliver three times the inverse of the performance of the underlying benchmark for holding periods beyond a single trading session, and they did **not** deliver that performance over longer holding periods or for that matter even over as single trading session.   However, the prospectuses and supplements did **not** disclose or adequately disclose, among other things: (a) that purchasers of Bear Funds had to purchase and sell their entire positions in a single trading session; (b) what was meant by "daily" objectives; (c) that purchasers needed to make both buy and sell investment decisions each trading session; or (d) the magnitude of the risk of loss that accompanied holding Bear Fund shares for longer than one day.

26.     Significantly the Defendants failed to adequately disclose the disastrous effect that market volatility would have on the Funds' performance over time**.**

27.     An index's volatility rate is a statistical measure of the magnitude of the fluctuations of the index's returns over a measurement period.

28.     At the time of the November and December Prospectus, the markets were experiencing high volatility.  *See* ππ 30, 32 *infra.*

29.     Yet neither the November nor the December 2008 Prospectus supplements disclosed the historical (actual) volatility rates for the FAZ benchmark index - the Russell 1000 Financial Services Index - nor for any of the actual benchmark indexes, other than the volatility rate of Russell 1000 Index underlying BGZ which was disclosed beginning December 9, 2008, of the Direxion Funds that are the subject of this action until April 10, 2009.

30.     As of October 1, 2008, the date of the initial Prospectus, expected volatilities of the FAZ benchmark, RGUSFL, using historical data from the preceding 1, 2 and 3 months periods were 100.1%, 78.0% and 75.2% respectively.  As of October 30, 2008 the volatility rates (using 1, 2 and 3 month data) were substantially the same: 95.02%, 99.38% and 85.24%. However, neither these nor the volatility rates for any other benchmark index underlying a Direxion Fund were disclosed.  Instead, the November Prospectus graphs (at p. 104) assumed an arbitrary volatility rate of 15% and represented that 15% was an "approximate rate for a major domestic index."

31.     At a particular point in time, volatility rates derived from more recent data (*e.g.* one, two or three most recent months of data) are more predictive of the future (at least near term**)** than are volatility rates derived from a longer time-series of data (*e.g.* 12 months), mixing recent levels with more distant, and hence, less relevant levels.  Yet even using data from the preceding 12 month periods the volatility rates for the FAZ benchmark index were 50.40% and 55.98% on October 1, 2008 and October 31, 2008, respectively.  These volatility rates were far in excess of the 15% volatility rate assumed by Defendants in their example.

32.     By the time the Defendants issued the December 9, 2008 Supplement, the volatility rates for the Russell 1000 Financial Services Index, underlying the FAZ Fund, were **in excess of 107%** using one, two, or three months of data.  Yet Defendants disclosed as an example the historical volatility rate for the Russell 1000 Index (an index that can be expected to have lower volatility since it is more diversified and contains Large Capitalization Equities) for the 12 months ending November 30, 2008 of "approximately 40%."  Even using less predictive 12 month data, like Defendants did in their example, the volatility rate for the FAZ benchmark

15

was 62.2% as of November 30, 2008, more than 1 ½ times that of the broader Russell 1000 Index cherry-picked by Defendants as an example.

33.     In short, as of October 1, 2008, the date of the initial Prospectus, expected volatilities of the FAZ benchmark, RGUSFL, using historical data from the preceding 1, 2 or 3 months periods were 100.1%, 78.0% and 75.2% respectively.  As of October 30, 2008 the volatility rates (using 1, 2 and 3 month data) were substantially the same – 95.02%, 99.38% and 85.24%.  By December 9, 2008, these estimates were each **in excess of 107%**.  These volatility rates are based on actual, historical, realized returns, which were readily available to the Defendants, and the Defendants were aware of ***these higher*** levels*.*  Estimates in this range should have been provided by the Defendants to Plaintiffs and Class Members.  **As greater volatility — in this case more than 2.5 x the volatility** disclosed by Defendants — negatively impacts performance (leads to underperformance) due to "rebalancing risk." The examples provided in the Prospectus grossly underestimated volatility and artificially inflated the price of the Bear Funds.

34.     The Prospectus did not contain adequate disclosure of volatility rates for the indexes underlying FAZ, ERY, BGZ, TZA or the Bear Funds listed in Exhibit "C" or a suff*icien*t explanation as to the impact of a specific volatility rates - over appropriate periods of time on the predictable underperformance of the Direxion 3X Bear Funds.

35.     Thus, at the same time Defendants were claiming in public statements that **Direxion Share*s* will give "investors the array of important investment options they have been seeking to <u>actively capitalize on the volatility of today's markets,</u>"** Direxion's offering documents failed to adequately disclose the risks of enormous losses that would result from that same volatility.  (emphasis supplied)**.**

Moreover, as observed by Michael Rawson, an ETF analyst at Morning Star, "[p]erhaps these funds should come with a black box warning that they are really making a bet on the underlying volatility of the index." Rawson, Michael, "*Don't Abuse the Benefits of ETFs*", Morning Star Advisor (June 21, 2010).

36.     Even Defendants' statements concerning "daily investment results" were materially misleading.   Defendants' repeated statements that its Bear Funds seek daily investment results are vague, ambiguous and misleading as the offering documents do not disclose specifically what the historical (realized) returns were.   Moreover, the Defendants' representations concerning "daily investment results" were misleading to investors as the actual daily results significantly underperformed their target and systematically failed to match the underlying index. The returns offered by the Defendants were systematically and statistically significantly lower than the daily target returns.   The actual daily returns underperformed their target returns. As a result, the Defendants misrepresentations inflated the price of the Fund's shares.

37.     Undisclosed to investors was the fact that *actual daily results* earned by the Funds substantially underperformed their target and failed to track their underlying benchmarks. In fact, the returns earned by the Direxion Bear Funds were systematically lower than the expected daily investment results described in the Prospectus.

38.     For instance, from the inception of the FAZ Fund on November 8, 2008 through December 9, 2008 (the date of Direxion's Supplemental Prospectus), the FAZ Fund underperformed its Index for 86% of the trading days. On numerous days it underperformed by more than 5%, with two days experiencing underperformance in excess of 15%.   The mean (average) daily underperformance during this period was 3.52%. The median underperformance

during this period was 2%; this means that on half the days during this period the FAZ underperformed its benchmark by at least 2%.

39.     A daily underperformance of 3.52% (as was the case with the FAZ Fund during the period November 8, 2008 through December 9, 2008) translates into tremendous losses for investors when held across multiple periods.  In only 10 days a loss of almost 30% would result for investors. Half of an investor's initial investment disappears when held for only 20 days. When held for a typical trading year (252 trading days), an investor's $100,000.00 investment is worth only a trivial $14.37. In fact, the index needed to fall 99.988 over this time in order to show any profit.

40.     Despite the persistence of this significant deviation from expected results, Defendants did not disclose in the December 9, 2008 Supplement to Direxion's Prospectus that, even on a ***daily*** basis, the Direxion Bear Funds substantially underperformed their intended investment results.

41.     The prospectuses and supplements were obtuse and hyper-technical, and they did not convey in language capable of understanding by ordinary or even sophisticated investors or by market professionals who did not already know how the Bear Funds were designed, that (a) investors needed to purchase and sell their entire positions in a single trading session on a single day or risk the likelihood of enormous losses; (b) that purchasers needed to make new investment decisions each trading session, and (c) the inherent  risk of loss that accompanied holding Bear Fund shares over multiple trading sessions.

42.     Thus, not until at least April 10, 2009, members of the Class could not have understood from the prospectuses or supplements for the Bear Funds, that: (a) purchasers needed to sell out their entire positions on the same day as their purchases, (b) needed to make new

investment decisions each trading session, (c) the inherent risk of loss that accompanied holding Bear Fund shares over multiple trading sessions, (d) that the investments in the Bear Funds were not appropriate for retail investors and (e) that the Funds would underperform compared to their objectives even over the one day.

43.     In fact in June, 2009, FINRA issued a Regulatory Notice cautioning its members that "inverse and leveraged ETFs . . .  typically are unsuitable *for retail investors* who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA's Regulatory Notice would not have been necessary, and would not have been issued, if the prospectuses and supplements for ETFs (like the Bear Funds) adequately informed investors and brokers that the Bear Funds that purchasers needed to make new purchase and sale decisions each day, and of the risk of loss that accompanied holding any interest in Bear Fund shares for longer than one day.

44.     In July 2009, the Massachusetts Secretary of State and others commenced an investigation into leveraged ETFs.  Investigations are ongoing.

45.     And in a news release dated August 18, 2009 the North American Securities Administrators Association ("NASAA"), whose members include securities administrators of the 50 United States, "identified real estate investment schemes, leveraged ETFs, private placement offerings, natural resources investments, and Ponzi schemes as the greatest potential threats to investors this year."  With respect to leveraged ETFs NASAA stated:

> Leveraged Exchange Traded Funds (ETFs).  This relatively new financial product has been offered to individual investors who may not be aware of the risks these funds carry.  The funds which trade throughout the day like a stock, use exotic financial instruments, including options and other derivatives, and promise the potential to provide greater than market returns as the value of the underlying assets rise or fall.  **Given their volatility, these funds typically are not suitable for most *retail investors*.**

(emphasis added).

46.     On March 25, 2010, the SEC issued a press release, entitled "SEC Staff Evaluating the Use of Derivatives by Funds."  In the press release, the SEC announced that its staff was conducting a review of the use of derivatives by ETFs – such as those used by the Bear Funds – to achieve their intended daily investment returns.  According to the press release, as part of its review, the SEC staff "determined to defer consideration of exemptive requests under the Investment Company Act to permit ETFs that would make significant investments in derivatives."

47.     According to the press release, the SEC staff is considering, among other things, whether "existing prospectus disclosures adequately address the particular risks created by derivatives."

48.     An investigation of the adequacy of existing prospectus disclosures would not have been necessary, and the SEC staff would not be investigating the adequacy of the disclosures, if the existing prospectuses and supplements for ETFs (like the Bear Funds) adequately informed investors and brokers that the Bear Fund shares were at best, one-day investments, that purchasers needed to make new investment decisions each day, of the extreme risk of loss that accompanied holding Bear Fund shares for longer than one day, and that the Bear Funds would not meet their objectives for even one day.

49.     The undisclosed risks to Plaintiffs and Class Members resulted in enormous losses (rather than the expected gains) even following correct judgments about the direction of index levels.

50.     The Defendants used but failed to disclose their underlying mathematic or statistical model linking volatility to underperformance. There was no legitimate reason not to disclose their statistical model in comprehensive detail since this link is inherent and material in

any investment in Defendants' leveraged Bear ETFs.  By not disclosing their mathematical formula or statistical models, as well as specific and material risks inherent in investing in Direxion's leveraged Bear ETFs, Defendants provided a misleading mix of information in Defendants' Registration Statements filed with the Securities and Exchange Commission ("SEC") and prevented Plaintiffs and Class Members from making informed decisions about whether to purchase the Direxion Bear ETFs.

51.     By virtue of Defendants' failure to disclose Direxion's mathematical formula or statistical model linking realized volatility with dramatic underperformance and the specific material risks inherent in investing in its leveraged Bear Funds, Defendants were able to rapidly grow their funds to more than $5 billion in net asset value outstanding during the Class Period.

52.     In the face of concerted and extensive regulatory pressure and complaints from investors, which focused on the reality that investors were unable to meaningfully understand the inherent and complex nature of Defendants' Funds, as well as the risks and consequences of holding an investment in a leveraged Bear Fund for any period longer than a day, Defendants dramatically and radically changed Direxion's Registration Statement beginning on April 10, 2009. Defendants began to, but did not completely, come clean and warn Plaintiffs and Class Members essentially that they should not purchase and hold positions in Defendants' Bear Funds from one trading session to the next and disclosed the potentially catastrophic consequences of same.  Defendants warned that investors that "do not intend to manage the Funds on a *daily* basis should not buy the Funds."

53.     Defendants also acknowledged on April 10, 2009 that it was their intent, although they had never clearly expressed the same in Direxion's Registration Statements prior

to April 10, 2009, that Direxion's Funds, including the Bear Funds, should not be "used by, and are not appropriate for, investors who intend to hold positions."

54.     On April 10, 2010, Defendants stated in "Bold Print" and on the "Cover" of Direxion's Prospectus, as supplemented on April 10, 2009, in relevant partial part as follows:

a.  **"The Funds are n*ot int*ended to be used by, and are not appropriate for, investors who intend to hold positions."**

b.  **"[E]ach of the Bear Funds pursues investment goals which are inverse to the performance of its benchmark, a result opposite of most exchange-traded funds."**

c.  **"The return of each Fund for periods longer then a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for such longer period."**

d.  **"The Funds offered… are very different from most exchange-traded funds. First, all of the Funds pursue leveraged investment goals, which mean that the Funds are riskier than alternatives that do not use leverage because the Funds magnify the performance of the benchmark on an investment."**

e.  **"The Funds should be utilized only by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results, (c) understand the risk of shorting; and (d) intend to actively monitor and manage their investments on a daily basis.  Investors who do not understand the Funds or do not intend to manage the Funds on a daily basis should not buy the Funds."**

22

**f.   "The Funds are intended to be used as short-term trading vehicles for investors managing their portfolios on a daily basis."**

55.    Also, on April 10, 2009, Defendants radically changed the names of each of Direxion's Bear Funds from those formerly titled Direxion Shares ETFs to "Direxion DAILY" Bear Funds.  For example, Defendants re-named its FAZ Fund, until April 9, 2009, named "Financial Bear 3X Shares," to the **"Direxion Daily Financial Bear 3x Shares"** and the ERY Fund, formerly named Energy Bear 3X Shares, to the **"Direxion Daily Energy Bear 3x Shares."** In fact, on April 10, 2009, for the first time, Defendants re-named each and every one of Direxion's forty (40) exchange-traded Funds and added the word "Daily" in the title of each Fund on the cover of its April 10, 2009 Supplement.

56.    Defendants' belated partial disclosures, although materially incomplete, on April 10, 2009, shocked the market and Plaintiffs and Class Members, who had purchased Direxion Bear ETFs during the Class Period.  It is patently obvious that the Defendants had a legal duty to prominently disclose *all* of these material and critical points at the time they first offered shares in the Direxion Funds pursuant to Direxion's Registration Statement dated September 29, 2008 and prior to April 10, 2009.

57.    Reasonable investors would have found Defendants' belated disclosures to be an important part of the mix of information available to them in making their decisions to purchase shares in the Direxion Bear Funds, had such information been made available to them during the Class Period.

58.    This is empirically evident by the fact that following Direxion's April 9, 2009 disclosures, the ratio of shares outstanding to volume in Direxion Bear Funds declined significantly from 0.63 to 0.23 or a 64% decline in average holding period.

59.     Defendants' omissions during the Class Period rendered the statements contained in their Registration Statements materially untrue or misleading. This included, among others, the statements setting forth the persons who Defendants belatedly concluded should purchase the Bear Funds; the very names of the Funds; the name "Direxion" (pronounced "Direction"); the descriptions as to how the Funds performed; the descriptions as to the inverse "correlation risks," "leverage risks," "rebalancing risks" and "volatility risks;" the boilerplate risks concerning the Bear Funds; and all other descriptions and omissions as to how Defendants' Bear Funds operate or would behave.

60.     In fact, Defendants effectively admitted, as they must, that their previous disclosures from September 29, 2008 through April 9, 2009, were misleading and that Defendants had failed prior to April 10, 2009, to adequately and meaningfully explain to investors: (a) who should purchase Direxion Bear Funds; (b) under what specific circumstances the Direxion Bear Funds should be purchased; (c) under what circumstances the Direxion Bear Funds should be sold (*e.g.* in the full amount of the investors' position and on the same trading session day on which it was purchased); (d) that shares in the Direxion Bear Funds should not be held in any amount for any longer than the same day on which they were purchased, and even on a single day basis, they would still lose money.

61.     Plaintiffs bring this class action on behalf of all persons or entities that purchased or otherwise acquired shares in Direxion's Bear ETFs set forth in Exhibit "C", including, but not limited to, FAZ, ERY, BGZ and TZA, each of which were offered by Direxion Shares ETF Trust ("Direxion" or the "Trust"), pursuant or traceable to Direxion's materially false or misleading Registration Statement, Prospectus and Statement of Additional Information (collectively, the "Registration Statement") issued in connection with the Bear Fund's shares (the

"Class") on or after November 3, 2008 and during the class period.  The Class is seeking to pursue remedies under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"). This action asserts strict liability and negligence claims against Defendants.

62.     Plaintiffs and members of the Class have all purchased Direxion's defective Bear product from Defendants. All of the allegations in the Complaint regarding misrepresentations and omissions relate to the inherent characteristics of the Defendants' defective Bear ETFs, and not to the specific nature of any of the underlying indices, commodities or other securities that Direxion's Bear ETFs are tracking. Thus, for example, the purchaser of a Direxion FAZ Bear Fund has standing to represent the purchaser of any other Direxion Bear ETF, including those set forth in Exhibit "C", because all of the allegations of wrongdoing in the Complaint concern the identical inherent defects and characteristics of the defective Direxion Bear ETFs and how they perform in various market conditions, and if the inherent risks connected with those Bear Funds performance results were properly disclosed.

### III.     JURISDICTION AND VENUE

63.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

64.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act.

65.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of Direxion's Bear Funds trade in this District on the New York Stock Exchange.

66.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### IV.    PARTIES

67.      Plaintiffs individually invested assets in FAZ and ERY Funds and were damaged thereby, as detailed in the Investor Certifications in Exhibit "A", attached hereto. The Defendants misrepresentations and omissions during the Class Period were the cause of the actual losses suffered by the Plaintiffs.

68.      Lead Plaintiff Evan Stoopler bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

69.      Additional named plaintiff David Remmells bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

70.      Additional named plaintiff Jason Haas bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

71.      Additional named plaintiff Joel Behnken bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

72.      Additional named plaintiff Howard Schwack bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

73.      Additional named plaintiff James Killmon bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

74.      Defendant Direxion Shares ETF Trust is a Delaware statutory trust and a registered investment company which offered to the public a number of triple leveraged exchange-traded Bear Funds (Direxion Bear ETFs), including those set forth in Exhibit "C", including, but not limited to, the FAZ Fund, ERY Fund, BGZ Fund and TZA Fund. Shares of the Bear Funds trade on an organized market, the NYSE Arca. Bear ETFs are also traded on an

organized secondary market. As a result, the Defendants statements had the ability to and did in fact inflate the price of the fund's shares. Unlike traditional mutual funds, shares are not individually redeemable securities.

75.     Defendant Daniel D. O'Neill is the President and a Trustee of Direxion. O'Neill signed the Registration Statements dated September 29, 2008 and December 17, 2008 concerning the Bear Funds set forth in Exhibit "C" and exercised control over the affairs of Direxion and each of the Direxion Bear ETFs.

76.     Defendant Todd Kellerman is the Treasurer and Controller of Direxion. Kellerman signed the Registration Statements dated September 29, 2008, as supplemented on December 9, 2008 concerning the Bear Funds set forth in Exhibit "C" and exercised control over the affairs of Direxion and each of the Direxion Bear ETFs.

77.     Defendant Daniel J. Byrne is a Trustee of Direxion Shares.  Defendant Byrne signed the Registration Statements dated September 28, 2008 and December 17, 2008 concerning the Bear Funds set forth in Exhibit "C" and exercised control over the affairs of Direxion and each of the Direxion Bear ETFs.

78.     Defendant Gerald E. Shanley, III is a Trustee of Direxion Shares.  Defendant Shanley signed the Registration Statements dated September 28, 2008 and December 17, 2008 concerning the Bear Funds set forth in Exhibit "C" and exercised control over the affairs of Direxion and each of the Direxion Bear ETFs.

79.     Defendant John Weisser is a Trustee of Direxion Shares.  Weisser signed the Registration Statements dated September 28, 2008 and December 17, 2008 concerning the Bear Funds set forth in Exhibit "C" and exercised control over the affairs of Direxion and each of the Direxion Bear ETFs.

80.     Defendant Rafferty Asset Management LLC ("Rafferty") is the investment advisor for the Direxion Bear Funds set forth in Exhibit "C" including, but not limited to the FAZ, ERY, BGZ and TZA Funds.  Rafferty provides investment management services to each of the Bear Funds.  Rafferty was responsible for developing, implementing, and supervising the Direxion Bear Fund's investment program.  Defendant O'Neill is also the Managing Director of Rafferty.

## V.     CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the Defendants' Bear Funds set forth in Exhibit "C" pursuant or traceable to Direxion Shares' false and misleading Registration Statement on or after November 3, 2008 and through April 9, 2009, the "Class Period", and were damaged thereby.  Excluded from the Class are Defendants, the officers, directors and trustees of Direxion Shares, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.

83.     Plaintiffs' claims are typical of the claims of each of the members of the Class as all members of the Class are similarly affected by Defendants' identical wrongful conduct in violation of federal law that is complained of herein and in connection with the issuance of each of the inherently defective Bear Funds named in Exhibit "C".

84.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     what are the true methods and inherent risks involved in Defendants' operation of their Direxion Bear Funds set forth in Exhibit "C", including the FAZ, ERY, BGZ and TZA Funds;

b.     did Defendants adequately disclose the risks of loss of an investment made in the Direxion Bear Funds;

c.     whether Registration Statements filed by Defendants contained untrue statements or statements that were misleading because of Defendants' failure to disclose material facts concerning Direxion's Bear Funds;

d.     whether Defendants failed to disclose material risks concerning Defendants' Bear Funds;

e.     whether the Securities Act was violated by Defendants' failures to disclose the risks and the related facts as alleged herein concerning Defendants' Bear Funds;

f.     whether control person liability for such violations is appropriate; and

g.     to what extent the members of the Class have sustained damages and the proper measure of damages.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.  FACTUAL ALLEGATIONS

### A.  **Traditional ETFs**

87.     ETFs are investment companies that are legally classified as open-ended companies or unit investment trusts.  ETFs differ from traditional mutual funds in the following ways:

- ETFs do not sell individual shares directly to investors and only issue shares in large blocks (of 50,000 shares, for example) that are known as "Creation Units;"

- Investors generally do not purchase Creation Units with cash (although Creation Units in the FAZ Fund, ERY Fund, BGZ Fund and TZA Fund were and are purchased with cash);

- After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on an organized secondary market.  This permits other investors to purchase individual shares (instead of Creation units); and

- Investors who want to sell their ETF shares have two options:  (1) they typically sell individual shares to other investors in the secondary market, or (2) they can sell the Creation Units back to the ETF.

88.     In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or SPDR), which tracked the S&P 500 index.

89.     Soon after, more traditional ETFs were introduced. For example, the Diamonds ETF, introduced in 1998, tracked the Dow Jones Industrial Average. The Cubes ETF, introduced in 1999, tracked the Nasdaq-100 index.

90.    Unlike Direxion's new triple leveraged Bear ETFs, traditional exchange-traded funds do not pursue investment goals which are inverse to and/or triple the performance of their benchmark.

**B.    Direxion's Non-Traditional New Leveraged Bear ETFs**

91.    Defendant Direxion's non-traditional, or triple leveraged inverse ETFs – sometimes referred to by Direxion as Bear ETFs – are new products that Defendants designed and offered to the general public to deliver returns three times the inverse or opposite of the performance of the index or benchmark they track.  Defendants touted their inverse Bear ETFs as a way for investors to profit from, or at least hedge their exposure to, downward moving markets.

92.    Defendants' non-traditional leveraged Bear Funds, such as Direxion's FAZ, ERY, BGZ and TZA Funds, are both short and leveraged, meaning that they seek to achieve a return that is a multiple of the inverse performance of the underlying index.  Defendants' triple-leveraged Bear FAZ ETF seeks to deliver three times (3x) the opposite of the Russell 1000 Financial Services Index's performance. Defendants' triple-leveraged Bear ERY ETF seeks to deliver three times (3x) the opposite of the Russell 1000 Energy Index's performance. Defendants triple-leveraged BGZ Bear ETF seeks to deliver three times (3x) the opposite of the Russell 1000 Index.  Defendants triple-leveraged TZA Bear ETF seeks to deliver three times (3x) the opposite of Russell 2000 Index.[4]  A complete list of Defendants' triple-leveraged Bear Funds at issue in this case and their corresponding benchmark index(es) are set forth in Exhibit "C". To accomplish their objectives throughout the Class Period, Defendants leveraged and inverse Bear Funds pursued a range of complex investment strategies through the use of short

---

[4]    The Russell 1000 is a large cap index, while the Russell 2000 is a small cap index.

sales, swaps, futures contracts and other derivative instruments.  Defendants failed to sufficiently disclose the specific material facts and transactions concerning these investments to Plaintiffs and Class Members during the Class Period or the major impact of Defendants' rebalancing activities on a daily basis throughout the Class Period. As a result, Defendants did in fact inflate the price of the Bear Funds' shares throughout the Class Period.

      **C.**    **Direxion's Triple Leveraged ETFs Were Offered By Defendants Pursuant to False and Misleading Registration Statements**

      93.    Beginning in 2008 and continuing until the present, Defendants created and operated an open-ended investment company under Section 8 of the Investment Company Act, 15 U.S.C. § 80a-8.

      94.    Open-ended investment companies are required, *inter alia,* to satisfy the registration requirements of the Securities Act of 1933 in order to sell securities to the public. Securities Act, 15 U.S.C. § 77j.

      95.    Direxion's Registration Statement for its Bear Funds including the FAZ, ERY, BGZ and TZA Funds, and certain other funds, became effective on or after September 17, 2008 and during the Class Period ending April 9, 2010.

      96.    On September 29, 2008 Direxion filed a post effective Amended Registration Statement for the FAZ, ERY, BGZ and TZA Bear Funds, and certain other Funds, with the SEC, effective September 29, 2008, including a Prospectus which was filed with the SEC effective October 3, 2008 as supplemented on November 3, 2008, filed November 7, 2008, as supplemented on December 9, 2008.  The Registration Statement was signed by Defendants O'Neill, Kellerman, Byrne, Shanley and Weiser.  On December 17, 2008 Direxion Shares filed another post effective Amendment to its Registration Statement for its Bear Funds which became

effective on February 15, 2009.  The Registration Statement was signed by Defendants O'Neill, Byrne, Shanley and Weisser.

97.     Plaintiffs and/or Class members purchased the shares of Direxion's Bear Funds traceable to the Direxion Registration Statements referred to above on or after September 17, 2008.

98.     As further explained below Direxion's Registration Statement and Prospectuses for Direxion's Bear Funds, including, but not limited to the FAZ, ERY, BGZ and TZA Funds failed to clearly explain the inherent complex nature of Direxion's new triple leveraged Bear Funds and to provide all essential information in a way that would help investors to make informed decisions about whether to purchase the Funds' shares.

99.     In November 2008, Defendants launched their new Direxion triple leveraged Bear Funds, including the FAZ, ERY, BGZ and TZA Funds, which were purportedly designed by Defendants to **triple the inverse of the performance** of their underlying indices or benchmarks, and the Funds traded on an active organized exchange and in a secondary market.

100.     On November 3, 2008, Direxion issued a press release entitled "Direxion Launches Eight New Leveraged ETFs; innovative funds benchmarked to help advisors and investors seeking to outperform major Russell Indexes in Bull and Bear markets."  Among those eight funds offered by Direxion were the FAZ, ERY, BGZ and TZA Funds.  The Company's press release provided in part:

> Boston, MA – November 3, 2008 - Direxion, a pioneer in providing alternative investment strategies to sophisticated investors, today announced their entrance into the ETF space with the Direxion Shares 3X Exchange-Traded Funds, slated to begin trading Wednesday, November 5, 2008. The new ETFs are a group of leveraged Bull and Bear index funds that seek 300% of the daily performance, or 300% of the inverse of the daily performance (before fees and expenses) of the four distinct Russell indexes they benchmark. There is no guarantee that the funds will achieve their objective.

The new Direxion Shares ETFs are designed to give investment advisors and sophisticated investors the ability to execute active trading strategies in all types of markets. **The funds deliver increased market exposure via 3 to 1 leverage, long and short of their respective indices and afford investors the opportunity to effectively allocate capital to seek improved risk-adjusted returns. Direxion Shares ETFs represent the highest amount of leverage, currently available in the ETF space.** [emphasis supplied]

"These eight leveraged index Bull and Bear ETFs will give our investors the ability to achieve increased exposure to the diversified Russell 1000®, Russell 2000®, Russell 1000® Energy and Russell 1000® Financial Services Indexes — critical investment tools for navigating changing markets," said Dan O'Neill, Direxion Shares' President. **"We're thrilled to be the first to deliver portfolio solutions that track these dynamic Russell indexes using the power of leverage."** [emphasis supplied]

\*\*\*

**The ETF structure allows investors to benefit from the flexibility and low cost features of an exchange traded fund product, coupled with the leveraged investment solution experience that Direxion Funds is known for in the mutual fund industry.** [emphasis supplied]

101.     On November 8, 2008, Direxion Shares issued a press release in which it announced:

"Our new leveraged Bull and Bear ETFs offer an unprecedented level of leverage in the ETF arena, something that today's dynamic investors are demanding," said Bill Franca, Direxion's Executive Vice President of Sales and Distribution. **"Direxion Shares will give savvy investors the array of important investment options they have been seeking to actively _capitalize on the volatility of today's markets._"** [emphasis supplied]

102.     Thus, at the inception of the Class Period, Defendants represented that Direxion's "new leveraged" products offered investors a way to **_"capitalize on the volatility of today's markets"_** (emphasis supplied), suggesting to investors that with respect to such products, market volatility created value. Against this back-drop, Defendants launched Direxion's triple-

leveraged products.[5]   On or prior to November 19, 2008, the FAZ, ERY, BGZ and TZA Funds began trading on the NYSE Arca.

### 1.      The November 3, 2008 Prospectus

103.      The November 3, 2008 Prospectus for the Bear Funds, filed with the SEC on November 7, 2008, among others, describes the Funds' investment techniques and policies in pertinent part as follows:

> Rafferty Asset Management, LLC ("Rafferty" or "Adviser"), the investment adviser to the Funds, uses a number of investment techniques in an effort to achieve the stated goal for each Fund…. The Bear Funds are managed to provide returns inverse (or opposite) by a defined percentage to the return of each Bear Fund's index or benchmark for the relevant period. Rafferty creates… net "short" positions for the Bear Funds. (Rafferty may create short positions in the Bull Funds and long positions in the Bear Funds even though the net exposure in the Bull Funds will be long and the net exposure in the Bear Funds will be short.) Long positions move in the same direction as their index or benchmark, advancing when the index or benchmark advances and declining when the index or benchmark declines. **Short positions move in the opposite direction of the index or benchmark, advancing when the index or benchmark declines and declining when the index or benchmark advances. Rafferty generally does not use fundamental securities analysis to accomplish such correlation. Rather, Rafferty primarily uses statistical and quantitative analysis to determine the investments each Fund makes and the techniques it employs.** As a consequence, if a Fund is performing as designed, the return of the index or benchmark will dictate the return for that Fund….
>
> *A Fund generally will hold a representative sample of the securities in its benchmark index. The sampling of securities that is held by a Fund is intended to maintain high correlation with, and similar aggregate characteristics (e.g., market capitalization and industry weightings) to, the benchmark index.* A Fund also may invest in securities that are not included in the index or may overweight or underweight certain components of the index.

---

[5]      On April 10, 2009, Defendants shocked the market and investors when they radically changed their disclosures and included new text informing investors that they should not hold an investment for more than one day and provided volatility disclosures, including actual volatility rates for each of Direxion's Funds, a volatility table showing levels of volatility up to 100% and separate tables showing levels of volatility for some indexes in excess of 100% and also began to demonstrate how volatility rates could in fact cause an investor to lose his/her entire investment.

*Each Bull and Bear Fund is designed to provide daily investment returns, before fees and expenses, that are a multiple of the returns of its index or benchmark for the stated period. While Rafferty attempts to minimize any "tracking error" (the statistical measure of the difference between the investment results of a Fund and the performance of its index or benchmark), certain factors will tend to cause a Fund's investment results to vary from the stated objective. A Fund may have difficulty in achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs and/or a temporary lack of liquidity in the markets for the securities held by the Fund.* In addition, a Fund may have difficulty achieving its daily target if the Fund's target index moves dramatically in a direction adverse to the Fund and the Fund is unable to maintain its portfolio. This should not occur unless the daily movement of the target index is in excess of 25%.

Each Bull and Bear Fund invests significantly in swap agreements, forward contracts, reverse repurchase agreements, options, including futures contracts, options on futures contracts and financial instruments such as options on securities and stock indices options, and caps, floors and collars. Rafferty uses these types of investments to produce economically "leveraged" investment results. Leveraging allows Rafferty to generate a greater positive or negative return than what would be generated on the invested capital without leverage, thus changing small market movements into larger changes in the value of the investments of a Fund.

Seeking daily leveraged investment results provides potential for greater gains and losses relative to benchmark performance. For instance, the Large Cap Bull 3X Shares seeks to provide, before fees and expenses, 300% of the daily return of the Russell 1000® Index. If the Russell 1000® Index gains 2% on a given day, the Large Cap Bull 3X Shares would be expected to gain about 6%. Conversely, if the Russell 1000® Index declines 2% on a given day, the Large Cap Bull 3X Shares would be expected to about lose 6%.

***

**The Projected Return of a Bear Fund.** A Bear Fund seeks to provide a daily return which is a multiple of the inverse (or opposite) of the daily return of a target index or benchmark. To create the necessary exposure, a Bear Fund engages in short selling — borrowing and selling securities it does not own. The money that a Bear Fund receives from short sales — the short sale proceeds — is an asset of the Bear Fund that can generate income to help offset the Bear Fund's operating expenses. If the Russell 1000® Index declines 2% on a given day, the gross expected return for the Large Cap Bear 3X Shares would be 6% and the net expected return, which factors in interest income and the impact of operating expenses, will be slightly higher under normal market conditions.

**The Projected Returns of Leveraged Index Funds for Periods Longer Than the Target Period.** The Funds seek daily leveraged investment results which should not be equated with seeking a leveraged goal for longer than a day. For instance, if the Russell 1000® Index gains 10% during a year, the Large Cap Bull

3X Shares should not be expected to provide a return of 30% for the year even if it meets its daily target throughout the year. This is true because of the financing charges noted above but also because the pursuit of daily goals may result in daily leveraged compounding, which means that the return of an index over a period of time greater than one day multiplied by a Fund's daily target or inverse daily target (*e.g.*, 300% or -300%) will not generally equal a Fund's performance over that same period.

104.    The Prospectus part of the Registration Statement contained a "Principal Risks" Section. Primarily with respect to leverage, compounding and volatility risks, the Prospectus made the following disclosures:

### *Correlation Risk*

A number of factors may affect a Fund's ability to achieve a high degree of correlation with its benchmark, and there can be no guarantee that a Fund will achieve a high degree of correlation. A failure to achieve a high degree of correlation may prevent a Fund from achieving its investment objective. A number of factors may adversely affect a Fund's correlation with its benchmark, including fees, expenses, transaction costs, costs associated with the use of leveraged investment techniques, income items and accounting standards. A Fund may not have investment exposure to all securities in its underlying benchmark index, or its weighting of investment exposure to such stocks or industries may be different from that of the index. In addition, a Fund may invest in securities or financial instruments not included in the index underlying its benchmark. A Fund may be subject to large movements of assets into and out of the Fund, potentially resulting in the Fund being over- or under-exposed to its benchmark. Activities surrounding annual index reconstitutions and other index rebalancing or reconstitution events may hinder the Funds' ability to meet their daily investment objective on that day. Each Fund seeks to rebalance its portfolio daily to keep leverage consistent with each Fund's daily investment objective.

Each of the three graphs below shows a simulated hypothetical one year performance of an index compared with the performance of a Fund that perfectly achieves its investment objective of three times (300%) the daily index returns. The graphs demonstrate that, for periods greater than one day, a leveraged Fund is likely to underperform or over-perform (but not match) the index performance times the stated multiple in the Fund objective.

To isolate the impact of leverage, these graphs assume a) no dividends paid by the companies included on the index; b) no fund expenses; and c) borrowing/lending rates (to obtain required leverage) of zero percent. If fund expenses were included, the Fund's performance would be lower than that shown. ***Each of the***

37

*graphs also assumes a volatility rate of 15%, which is approximate for a major domestic index. An index's volatility rate is a statistical measure of the magnitude of fluctuations in the returns of an index. Other indexes to which the Funds are benchmarked have different historical volatility rates; certain of the Funds' historical volatility rates are substantially in excess of 15%.*

(emphasis added)

**Flat Market**



**Upward Trending Market**



**Downward Trending Market**



***

*Inverse Correlation Risk*

Each Bear Fund is negatively correlated to its index or benchmark and should lose money when its index or benchmark rises — a result that is the opposite from conventional funds. Because each Bear Fund seeks daily returns inverse by a defined percentage to its index or benchmark, the difference between a Bear Fund's daily return and the price performance of its index or benchmark may be negatively compounded during periods in which the market's decline.

Certain Funds are "leveraged" funds in the sense that they have investment objectives to match a multiple of the performance of an index on a given day. These Funds are subject to all of the correlation risks described above. In addition, there is a special form of correlation risk that derives from these Funds' use of leverage, which is that for periods greater than one day, the use of leverage tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple in the fund objective, before accounting for fees and fund expenses.

*Tracking Error Risk*

Several factors may affect a Fund's ability to achieve its daily target. A Fund may have difficulty achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs, and/or a temporary lack of liquidity in the markets for the securities held by a Fund. A failure to achieve a daily target may cause a Fund

to provide returns for a longer period that are worse than expected. In addition, a Fund that meets its daily target over a period of time may not necessarily produce the returns that might be expected in light of the returns of its index or benchmark for that period. Differences may result from the compounding effect of daily market fluctuations, the use of leverage and the Bear Funds' inverse correlation.

105.    The statements contained in the prospectus section of the Registration Statement, as explained herein, were materially misleading. As a result of the inherently defective nature of the Direxion Bear Funds, it was virtually impossible for the Bear Funds to gain but virtually certain that they would underperform and cause enormous losses to Plaintiffs and Class Members.

106.    The Statement of Additional Information ("SAI") incorporated into the Prospectus by reference contains additional risk factor disclosures.

107.    Cross-references to the SAI or shareholder reports are to be avoided if possible, and all major Risk Factors are to be clearly explained in the prospectus part of the registration statement, not the SAI. *See* SEC Form N-1A General Instructions, pp. 16-19.   In any event, as set forth below, these risk disclosures were also materially misleading.

108.    The SAI contained the following additional misleading risk disclosures concerning "tracking error:"

**Risk of Tracking Error**

Several factors may affect a Fund's ability to track the performance of its applicable index. Among these factors are: (1) Fund expenses, including brokerage expenses and commissions (which may be increased by high portfolio turnover); (2) less than all of the securities in the target index being held by a Fund and securities not included in the target index being held by a Fund; (3) an imperfect correlation between the performance of instruments held by a Fund, such as futures contracts and options, and the performance of the underlying securities in the cash market comprising an index; (4) bid-ask spreads; (5) a Fund holding instruments that are illiquid or the market for which becomes disrupted; (6) the need to conform a Fund's portfolio holdings to comply with that Fund's investment restrictions or policies, or regulatory or tax law requirements; and (7) market movements that run counter to a Bull Fund's investments (which will

cause divergence between a Fund and its target index over time due to the mathematical effects of leveraging).

While index futures and options contracts closely correlate with the applicable indices over long periods, shorter-term deviation, such as on a daily basis, does occur with these instruments. As a result, a Fund's short-term performance will reflect such deviation from its target index.

In the case of Bear ETFs whose NAVs are intended to move inversely from their target indices, the factor of compounding also may lead to tracking error. Even if there is a perfect inverse correlation between a Fund and the return of its applicable target index on a daily basis, the symmetry between the changes in the benchmark and the changes in a Fund's NAV can be altered significantly over time by a compounding effect. For example, if a Fund achieved a perfect inverse correlation with its target index on every trading day over an extended period and the level of returns of that index significantly decreased during that period, a compounding effect for that period would result, causing an increase in a Fund's NAV by a percentage that is somewhat greater than the percentage that the index's returns decreased. Conversely, if a Fund maintained a perfect inverse correlation with its target index over an extended period and if the level of returns of that index significantly increased over that period, a compounding effect would result, causing a decrease of a Fund's NAV by a percentage that would be somewhat less than the percentage that the index returns increased.

109.    In addition the SAI contained the following disclosure under the heading

"**Special Note Regarding the Correlation Risks of Bull Funds**."  This disclosure directed only

toward Bull Fund investors, not Bear Fund investors, stated in part:

The first table below shows an example in which a Bull Fund that has an investment objective to correspond to three times (300% of) the daily performance of an index. The Bull Fund could be expected to achieve a 30% return on a yearly basis if the index performance was 10%, absent any costs or the correlation risk or other factors described above and in the Prospectus under "Correlation Risk." However, as the table shows, with an index volatility of 20%, such a fund would return 18.02%, again absent any costs or other factors described above and in the Prospectus under "Correlation Risk." In the charts below, areas shaded green represent those scenarios where a Bull Fund with the investment objective described will outperform (i.e., return more than) the index performance times the stated multiple in the Fund's investment objective; conversely areas shaded red represent those scenarios where the Fund will underperform (i.e., return less than) the index performance times the stated multiple in the Fund's investment objective.

110.     Set forth at the end of this risk disclosure section, which was directed only toward the Bull Funds and not the Bear Funds -- were three tables intended to illustrate (a) estimated Fund return over *one year* when the Fund objective is to seek daily investment results, before fund fees and expenses and leverage costs, that correspond to 300% of the daily performance of an index; (b) estimated Fund return over *one year* when the Fund objective is to seek daily investment results, before fees and expenses, that correspond to the inverse (minus 100%) of the daily performance of an index; and (c) estimated fund return over *one year* when the fund objective is to seek daily investment results, before fees and expenses, that correspond to three times the inverse (minus 300%) of the daily performance of an index.  Without any meaningful additional narrative or explanation as to the Bear Funds, Direxion states that these three tables are intended to isolate the effect of index volatility and index performance on the return of a Bull Fund and that the Fund's actual returns may be significantly greater or less than the returns shown above as a result of any of the factors discussed above or under "Correlation Risk" in prospectus.  See Exhibit D attached hereto.

111.     These disclosures, too, as discussed below, were materially misleading.  Regardless, Direxion specifically informed investors that this Section of the SAI applied only to the Bull Funds and not to the Bear Funds.  Bear Fund investors would not have had a reason to read these disclosures in that they were told such disclosures did not pertain to their prospective investments.  Moreover, the Tables were not cross-referenced in the prospectus portion of the Registration Statement.

112.     When introducing a new security and investment product, it is incumbent on the seller to disclose the material risks of that investment.

a.      In the Code of Federal Regulations, 17 C.F.R. § 274.11A, the SEC states that Part A of Form N-1A must include the information required in a fund's prospectus under Section 10(a) of the Securities Act. SEC Form N-1A, General Instructions, p. 7. Rule 130 of the Securities Act defines the term "rules and regulations," as used in Sections 7, 10, and 19 of the Securities Act, to include the forms used in the registration of securities and the instructions to those forms. 17 C.F.R. § 230.130.

b.      The SEC's general instructions for filing a Form N1-A Registration Statement, expressly provide that: "The purpose of the prospectus is to provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus." SEC Form N-1A, General Instructions, p. *7. See also* 17 C.F.R. § 274.11A, stating that Part A of Form N-1A must include the information required in a fund's prospectus under Section 10(a) of the Securities Act.

c.      Cross-references to the Statement of Additional Information or shareholder reports are to be avoided if possible, see *id.,* and all major Risk Factors are to be clearly explained in the prospectus part of the Registration Statement. See General Instructions, pp. 16 - 19. As the SEC also makes abundantly clear: "The purpose of the SAI is to provide additional information about the Fund that the Commission has concluded is not necessary or appropriate in the public interest of for the protection of investors to be in the prospectus, but that some investors may find useful." *See* General Instructions, p. 7.

d.      A registration statement and/or prospectus must disclose all material facts "necessary to make the statements therein not misleading." *Yu v. State Street Corp.*, 686 F. Supp. 2d 369, 374 (S.D.N.Y. 2010) (quoting 15 U.S.C. §77k(a)).   A false or misleading statement is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.  *Id*; *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F. 3d 187, 197 (2nd Cir. 2009).

**a.  The Registration Statement and Prospectus as a Whole were Materially False or Misleading**

113.      Throughout the Class Period, Defendants were required in the "Principal Risks," or risk factors, portion of the prospectus section of Direxion's Registration Statements to make, but in fact failed to make, prominent, specific and comprehensible disclosure of each of the following important risks of the loss of a substantial portion of the investor's original investment if the investor chose to purchase a Direxion triple leveraged Bear ETF, including, but not limited to the FAZ, ERY, BGZ and TZA Funds:

a.  The Bear Funds were not intended to be used by, and are not appropriate for, investors who intend to purchase any share(s) unless they sell out their entire position in the shares(s) in the same trading session;

b.  The Bear Funds are not intended to be used by, and are not appropriate for, investors who intend to hold any of their positions for longer than the same day in which they purchased such positions;

c.  If an investor purchases a share(s) in a Direxion Bear Fund and does not sell the entire position in the same trading session, the investor is at risk of losing the entire amount of his investment;

d.  Even if the underlying index declines substantially, the Direxion Bear Funds could not only fail to raise three times as much as the index declined, but could decline substantially.

e.  If an investor purchases a share(s) in a Direxion Bear Fund and holds the position for a period longer than a single day, the return of the Fund would be materially different than the levered return of the Fund's benchmark index for the multiple day period;

f.  Mathematical compounding prevents the Bear Funds from significantly matching returns of their underlying index for periods longer than a day;

g.  During periods of high volatility mathematical compounding will have an extreme negative effect on the Funds' performance, other than for the purchase and sale of a Fund's shares for a single day only;

h.  The negative effect of compounding on cumulative returns is magnified in the Direxion Funds since they utilize triple leverage and therefore investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased;

i.  Volatile markets exacerbate the negative effects of compounding and leverage on cumulative returns and increased index volatility will increase the likelihood that the Bear Funds will underperform. Therefore investments in the Bear Funds shall not be held for more than a single day and should be sold in the same trading session in which they were purchased;

j.  An inherent risk in a so-called Direxion Bear Fund is that the Direxion Bear Fund could decrease substantially in value even when the underlying index

45

decreased substantially and, therefore, investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased;

k.  Even if an investor was correct in their expectation that a substantial decline would occur in a given index or benchmark, the investor could suffer substantial losses if the investor chose to act on that expectation by investing in the Direxion Bear Funds for that index or benchmark and holding the investment for more than one day;

l.  When the investor was correct that a substantial decline would occur in the index and the investor would have profited from such decline by shorting the components of an index directly or through virtually any means of shorting the index, *other than through the purchase of the Direxion Bear Funds*, the investor could still suffer substantial losses of their original investment if the investor chose to instead purchase the Direxion Bear Funds in an attempt to achieve his goal and held the investment for more than one day;

m.  Even if the investor was correct and the underlying index declined substantially over a period of weeks or months, the investor still could lose substantially all his investment by investing in the Direxion Bear Fund on its respective index and therefore an investment in the Bear Fund should not be held for more than a single day and should be sold in the same trading session in which it was purchased;

n.  The foregoing inherent risk of loss of an investment in Direxion's Bear Funds existed no matter how large the decrease in the underlying index. Contrary to

Defendants' representations (a) the underlying index did not have to be "flat" or "trendless" over the investor's holding period for losses to occur, and (b) in a substantial uptrend or downtrend in the index, very large underperformance and, indeed, opposite performance could and did occur,

o. An inherent characteristic and risk of loss in a Bear Fund was that it could generate the opposite returns from what its name indicated when the underlying index or benchmark decreased substantially and therefore investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased;

p. The name Direxion (pronounced "DIRECTION") was a misnomer because any Direxion fund could and, during the class period, many such Direxion funds actually did, decline substantially when the underlying index declined substantially and therefore investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased;

q. Even if the underlying index declined substantially over a period of four months, the investor could sustain such extreme losses on the Direxion Bear Funds, that the investor mathematically could not recoup their investment in the Direxion Funds and therefore investments in a Bear Fund should not be held for more than a single day and should be sold in the same trading session in which they were purchased.

114.    The Registration Statement and Prospectus also failed to make specific mathematical or specific plain English disclosures of the material risks involved in Direxion

triple leveraged Bear Funds sufficient to enable investors to make informed investment decisions.   A mathematical formula or statistical model linking index volatility to underperformance, if it had been disclosed, would have provided material and sum certain information to investors and their more sophisticated advisors to help investors to make informed decisions about whether to purchase the Funds' shares.  "Disclosure indicating that, with current index volatilities of 100% an investor could anticipate substantial losses regardless of the direction or magnitude of the underlying index move would greatly aid a potential investor."

115.    Rather than present the mathematical or statistical model or plain English disclosures for their products and describe such products' resulting performance and components, Defendants cobbled together, instead, an amalgam of qualitative discussions employing undefined terms and self-serving graphs and tables. This mix of information presented a green light for investors to purchase and also hold Direxion's Bear ETFs for extended periods. They transformed Defendants' ETFs into an extremely fast growing product that grew to more than five billion dollars ($5,000,000,000) in funds outstanding during the Class Period.

### b. The Registration Statement and Prospectus Failed to Adequately Disclose the Volatility and Rebalancing Risks

116.    Volatility as described herein refers to actual (sometimes referred to as historical or realized) volatility of the returns of an index over a specified time period (*e.g.,* 1, 2, 3, 6 or 12 months).  Variance is the mean of squared deviations of returns from their average. Standard deviations, the square root of variance and expressed as a percent can be thought of as a typical unsigned (magnitudinal only) change in an index over a period.  It is the volatility of the index based on historical returns with the last observation employed in the calculation the most recent one. Volatility does not measure the direction of the changes (*i.e.* positive or negative) of

the index's returns, merely their magnitude.  Two indexes with different volatilities may have the same expected return at the end of a given time period, but the index with higher volatility will have larger swings in values over that time period. For example compare the two graphs below:

117.     More specifically, volatility is measured by the annual standard deviation of the daily price changes in the index.  The standard deviation is calculated by taking the square root of the average of the squared differences between the daily percentage rates of return and the average of the daily percentage rates of return over a given period.[6]

---

[6]     The standard deviation is kind of the "mean of the mean," and often can help tell the story behind the data. To understand this concept, it can help to learn about what statisticians call **normal distribution** of data. Niles, Robert, *Standard Deviation,* http://www.robertniles.com/stats/stdev.shtml.

A normal distribution of data means that most of the examples in a set of data are close to the "average," while relatively few examples tend to one extreme or the other. *Id.*

Let's say you are studying nutrition. You need to look at people's typical daily calorie consumption. Like most data, the numbers for people's typical consumption probably will turn out to be normally distributed. That is, for most people, their consumption will be close to the mean, while fewer people eat a lot more or a lot less than the mean. *Id.*

If you looked at normally distributed data on a graph, it would look something like this:



The **x**-axis (the horizontal one) is the value in question, calories consumed, dollars earned or crimes committed, for example. And the **y**-axis (the vertical one) is the number of data points for each value on the **x**-axis; in other words, the number of people who eat **x** calories, the number of households that earn **x** dollars, or the number of cities with **x** crimes committed. *Id.*

118.    Volatility can be measured over any period of time (*e.g.*, 1, 2, 3, 6 or 12 months). Sometimes a moving average is computed, such as a 30 day moving average. *See* π 182 *infra.* (setting forth a Moving 30 Day Average Volatility chart for the Russell 1000 Financial Services Index over the period December 17, 2007 through April 17, 2009).   Irrespective of the data period chosen, however, to make it comparable, it must be annualized.

---

Not all sets of data will have graphs that look this perfect. Some will have relatively flat curves, others will be pretty steep. Sometimes the mean will lean a little bit to one side or the other. But all normally distributed data will have something like this same "bell curve" shape. *Id.*

The **standard deviation** is a statistic that tells you how tightly all the various examples are clustered around the mean in a set of data. When the examples are pretty tightly bunched together and the bell-shaped curve is steep, the standard deviation is small. When the examples are spread apart and the bell curve is relatively flat, the standard deviation is relatively large. *Id.*

Computing the value of a standard deviation is complicated. However, the graph below shows what a standard deviation represents:



One standard deviation away from the mean in either direction on the horizontal axis (the red area on the above graph) accounts for somewhere around 68 percent of the people in this group. Two standard deviations away from the mean (the red and green areas account for roughly 95 percent of the people. And three standard deviations (the red, green and blue areas) account for about 99 percent of the people. *Id.*

If this curve were flatter and more spread out, the standard deviation would have to be larger in order to account for those 68 percent or so of the people. So that's why the standard deviation can tell you how spread out the examples in a set are from the mean. *Id.*

119.     The November Prospectus' narrative and graphs (at p. 104), assumed a volatility rate of 15% and represented that 15% was an "approximate rate for a major domestic index." The Prospectus did not disclose the volatility rates for the indexes underlying FAZ, ERY, BGZ, TZA or any of the Bear Funds set forth in Exhibit "C". Volatility rates are not readily accessible to the average investor; their determination requires the collection and input of returns data and the performance of a mathematical computation (manually (using a calculator) or using a computer program). The Prospectus also failed to provide a sufficient explanation of the impact of relevant higher volatility rates on the performance of the Direxion 3X Bear Funds.

120.     At the time of the November and December Prospectuses, the financial markets were experiencing high volatility. (*See, e.g.,* setting forth moving 30 day average volatility graphs for the equity indexes over the period December 17, 2007 through April 17, 2009).

121.     For example, the volatility rates at or about the time of the October 1, 2008, November 3, 2008, December 9, 2008 and/or December 17, 2008 (effective February 15, 2009) Registration Statements and Prospectuses for each of the indexes underlying the FAZ and ERY Funds at issue in this case are as follows:

|  | 3 month | 2 month | 1 month |
|---|---|---|---|
| **FAZ** |  |  |  |
| 10/1/2008 | 75.16% | 77.98% | 100.09% |
| 10/31/2008 | 85.24% | 99.38% | 95.02% |
| 12/8/2008 | 107.74% | 109.28% | 117.89% |
| 2/13/2009 | 98.47% | 79.56% | 98.47% |
| **ERY** |  |  |  |
| 10/31/2008 | 88.15% | 104.86% | 129.46% |
| 12/8/2008 | 104.79% | 116.51% | 99.48% |
| 2/13/2009 | 66.33% | 42.98% | 44.25% |

122.     Thus, for example as of October 1, 2008 Prospectus, expected volatilities of the FAZ benchmark, RGUSFL, using historical data from the preceding 1, 2 and 3 month periods

were 100.1%, 78.0% and 75.2% respectively.  As of October 30, 2008 the volatility rates (using 1, 2 and 3 month data) were substantially the same: 95.02%, 99.38% and 85.24%.   However, neither these nor the volatility rates for any other benchmark index underlying a Direxion Fund, was disclose**d**.  Instead, the November Prospectus narrative and graphs (at p. 104) assumed an arbitrary volatility rate of 15% and represented that 15% was an "approximate rate for a major domestic index."

123.    The volatility rates derived from more recent data (*e.g.* one, two or three month data) are more predictive of the future than are volatility rates derived from longer time-series of data (*e.g.* 12 months), which mix recent levels with more distant levels. Yet even using 12 month data the volatility rates for the FAZ benchmark were 50.40% and 55.98% on October 1, 2008 and October 31, 2008, respectively.  Using six month data (like Defendants did in the April 10, 2009 supplement) the volatility rates were 57.72% and 68.72% on October 1, 2008 and October 31, 2008, respectively.   These volatility rates were far in excess of the 15% volatility rate assumed by Defendants in their example.

124.    These volatility rates are based on actual, historic*al,* realized returns and were readily available to the Defendants. The Defendants were aware of ***these higher*** levels*.* Estimates in this *rang*e should have been provided. **As greater volatility than was dis*cl*osed by De*fenda*nts — in this case 2.5 x the volatility** — negatively impacts performance (leads to underperformance) due to "rebalancing risk," the example provided in the Prospectus grossly underestimated volatility.

125.    In Direxion's S*tatem*ent of Additional Information (SAI – October 1, 2008, Supplemented November 3, 2008), Defendants included some minor and very general disclosures concerning "function[s]" that could affect a Bull Fund's return for longer than one

day, including index performance, index volatility, and  fund expenses concerning a Bull Fund (not the Bear Fun**ds at issue** in this *ca*se).

126.    At the end of a risk disclosure, entitled "**Special Note Regarding the Correlation Risks of Bull Funds," the SAI set forth a table entitled** "Estimated Fund Return Over One Year of 3X Bear ETFs."  The table shows hypothetical vo*lat*ility rat*es (n*ot volatility rates for any specific index) ranging from 5% to 55%.  Absent from the disclosures were volatility rates ranging from 56% to 100%, or higher, even though at the time these disclosures were made volatility rates for many of the indexes underlying the Direxion Funds, including the index underlying the FAZ, were within or above this higher range.  Defendants also failed to provide any narrative text or meaningful data to explain the specific table relating to the 3X Bear Funds or any of the specific Bear Funds.  In fact, the narrative preceding the tables indicated that they only applied to the Bull Funds thereby steering Bear Fund investors away.

127.    Thus, at the same time Defendants were clai**ming in public statements that Direxion's funds offered investors "important investment options they have been seeking to actively capitalize on the volatility of today's markets,"** Direxion's offering documents failed to adequately disclose the risks of enormous losses which would result from that same volatility.

128.    The November 3, 2008 Prospectus and SAI also failed to disclose the effect of volatility on investments in the Direxion funds held for periods shorter than one year.

129.    The table set forth below attempts to isolate the expected lo*s*ses resu*lting* only from volatility at rates ranging from 0% - 100% over 1, 2, 3, 4, 8, 13, 26 and 52 week holding periods:

Loss after these many weeks

| Volatility | 1 | 2 | 3 | 4 | 8 | 13 | 26 | 52[7] |
|---|---|---|---|---|---|---|---|---|
| *10%* | -0.08% | *-0.16%* | -0.24% | -0.31% | -0.63% | -1.02% | -2.02% | -4.00% |
| 20% | -0.29% | -0.58% | -0.87% | -1.15% | -2.29% | -3.70% | -7.26% | -14.00% |
| 30% | -0.66% | -1.31% | -1.96% | -2.60% | -5.13% | -8.21% | -15.74% | -29.00% |
| 40% | -1.18% | -2.34% | -3.49% | -4.63% | -9.04% | -14.28% | -26.52% | -46.00% |
| **50%** | **-1.95%** | **-3.85%** | **-5.72%** | **-7.56%** | **-14.54%** | **-22.54%** | **-40.00%** | **-64.00%** |
| **60%** | **-3.05%** | **-6.00%** | **-8.87%** | **-11.64%** | **-21.93%** | **-33.13%** | **-55.28%** | **-80.00%** |
| *70%* | -5.27% | *-10.26%* | -14.98% | -19.46% | -35.13% | -50.51% | -75.51% | -94.00% |
| 80% | -4.99% | -9.72% | -14.22% | -18.50% | -33.58% | -48.56% | -73.54% | -93.00% |
| 90% | -6.52% | -12.62% | -18.32% | -23.64% | -41.69% | -58.38% | -82.68% | -97.00% |
| 100% | -8.48% | -16.23% | -23.33% | -29.83% | -50.76% | -68.38% | -90.00% | -99.00% |

130.    As is evident from the data presented in the table, in periods of high volatility an investor would lose a significant portion of his initial investment even over relatively short periods of time.  For example, **using a modest volatility level of 70% an investor could expect to lose 50% of their investment due only to rebalancing within one fiscal quarter (13 weeks)..**

131.    Nevertheless, Defendants failed to disclose the effect of volatility on performance of the Bear Funds over a period of time shorter than one year.

132.    It is therefore crucial to an investor, in order to make an informed decision as to whether to purchase Direxion Triple Leverage (3X) Bear Funds, to know the actual recent volatility levels or the indexes underlying the funds in which he was contemplating investing at the time of his investment decision; knowledge of this information would have materially affected his assessment of what were in fact extremely high risks of investment, and dramatic predictable underperformance in Direxion's 3X Bear Funds.

133.    It would also be material to an investor to know the effect of volatility on investments held for periods shorter than one year (for instance, over 1, 2, 3, 4, 8, 13, or 26 week

---

[7]    The data in the far right column of the table, above, is the table set forth by Direxion in the SAI to its April 10, 2009 supplemented prospectus.

periods) at realistic levels of volatility.  Notwithstanding same, the Defendants failed to disclose the effect of volatility on fund performance over periods shorter than one year.

134.     Until April 10, 2009, the Defendants failed to disclose the specific impact of volatility rates above 55% upon performance of each of the Bear Funds, including FAZ, ERY, BGZ and TZA.

135.     In fact rather than warning investors of the volatility and rebalancing risks associated with holding a Bear or Bull over time, the narratives and graphs in the prospectus portion of the Registration Statement, misleadingly implied that if a fund was held for a longer period of time, the returns would be larger. Rather than presenting graphs depicting expected returns over time at the actual (historical) high volatility rates that existed at the time, Defendants included graphs depicting expected results when an unnamed index (no particular one) with a volatility rate of 15% was flat, trending upward and trending downward.

136.     Indeed, Defendants' foregoing risk disclosures, including the graphs, stated or showed that, in conditions in which the underlying index was moving in an upward trend or downward trend, the correlation risk was relatively low over a period of one year.

137.     The significance and materiality of the Defendants' omissions in the November 2008 Supplement is enormous.  For example, Defendants failed to disclose that except in the most extraordinary market conditions, including, but not limited to when the underlying index has zero volatility (does not change), or the underlying index experiences a series of returns all in the same direction, it is arithmetically impossible for the Fund's return to equal or exceed that of the cumulative return for the benchmark for the relevant period.  Thus, for periods longer than a day, the fund will underperform the benchmark index.

138.     Defendants' repeated ambiguous statements that its Bear Funds seek daily investment results is vague and misleading because it does not make clear that no matter what happens, purchasers must purchase and sell their entire position at the end of the day or risk serious losses. The Registration Statements and prospectuses identified in Exhibit B purposefully obfuscated the true nature of the risks involved in investing in the defective Direxion ETF products, either by using hyper-technical language or language so equivocal that a reasonable investor would not be able to attach the appropriate importance to what was being read. Defendants deliberately and wrongfully failed to convey to potential investors, in language capable of understanding, that the purchasers of Direxion 3X Bear Funds needed to purchase and sell their entire positions on the same day, or suffer a substantial and often certain risk of loss that accompanied holding Direxion fund shares for longer than one day. These misrepresentations and omissions existed throughout the Class Period.

139.     In short, as of November 3, 2008, Defendants were aware of the actual volatility rates for the Russell 1000 Financial Services Index underlying the Direxion FAZ Fund, as well as for each of the indexes underlying the Bear Funds including the ERY, BGZ and TZA Funds. Specifically, as of October 1, 2008, the date of the initial Prospectus, volatility rates for the index underlying the FAZ Fund using one, two, or three months of data were 100.1%, 78% and 75.2% respectively.  Notwithstanding Defendants chose to only present the hypothetical volatility rate of 15% in its prospectus, and hypothetical volatility rates of 0% - 55% for its Bear Funds in the November 3, 2008 SAI.  Of course in neither was there disclosure of the actual volatility rates of the underlying indexes that existed at the time.   And of course the SAI steered bear fund investors away from the 0% - 55% hypothetical rates presented in the Table therein.  Finally, all

major Risk Factors are to be clearly explained in the prospectus part of the registration statement, *see* SEC Form N-1A General Instructions, pp. 16-19, not in the SAI.

140.     The higher volatility rates (*i.e.,* 56% to 100%, which are absent from the disclosures and which were present at the time of these disclosures, Exhibit D, *supra,* and actually occurred during the Class Period), severely and adversely affected performance of the Bear Funds, but Defendants chose not to disclose the higher volatility levels, or how the actual volatility rates would impair performance of the Funds.

**The Disclosures in the Registration Statement and Prospectus Suggested that Direxion's Funds were Appropriate for Retail and Buy and Hold Investors**

141.     In addition to omitting to disclose material risks concerning the Direxion Bear Funds, Direxion's Registration Statement and Prospectus filed November 3, 2008 and December 9, 2009, and all other Registration Statements and Prospectuses filed prior to and throughout the Class Period, suggested that it was appropriate for investors to hold Direxion's leveraged Bear ETFs for substantial periods of time, including periods of one year.

**Defendants Undertook To Repeatedly State Results And Risks Of Investing In Their ETFs For A Year And, Thereby, Were Further Required To Disclose The <ins>Important Risks In Order to Avoid Misleading Investors</ins>**

142.     Separately, there is an additional reason why Defendants were required to disclose in the Prospectus the foregoing undisclosed fundamental risks of large losses. It is that Defendants undertook to make in the Prospectus very extensive descriptions of the results of holding the Direxion products over time. Those disclosures included benign charts, graphs and generalized text descriptions of the expected performance and risks of an investment held in Defendants' ETFs for a one year time period.

143.     Once Defendants undertook to describe in their prospectus the expected results and risks of one year long investments or other investments of more than a day in Defendants'

ETFs and prior to their radical changes in disclosure on April 10, 2009, Defendants were required to add any material facts required to make Defendants' other statements not misleading. 17 CFR § 274.11A (Form N-1A, registration statement of open-end management investment companies); 17 CFR § 232.130 (the term "rules and regulations," as used in Sections 7, 10, and 19 of the 1933 Act, to include the forms used in the registration of securities and the instructions to those forms).

144.    Defendants failed to do so.    Instead they made incomplete disclosures, insufficient to inform investors of the risks of Direxion's investment products, that rendered statements made in the Registration and Prospectus materially misleading.

145.    The Registration Statements and Prospectuses used an evolving series of qualitative statements with undefined terms regarding short term trading vehicles, volatility, and compounding.    They also gave examples, and illustrations of estimated expenses and hypothetical performance information that would only be important to buy and hold investors. Defendants did so by, for example:

        a.   providing tables of different projected returns, over a holding period of one year, for investments in leveraged funds:

- *see* SAI of Registration Statement ("RS") filed September 29, 2008, pp. 29-30;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, pp. 27-29;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on November 3, 2008, pp. 27-29.
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on November 3, 2008 and December 9, 2008, pp. 12-35.  See December 17, 2008, effective February 15, 2009, pp. 29-30;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on April 10, 2009, pp. 28-31 (showing 100% volatility parameters;

        b.   providing charts illustrating one year (1 yr.) index returns:

- *see* SAI of Registration Statement ("RS") filed September 29, 2008, pp. 29-30;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, pp. 27-29;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on November 3, 2008, pp. 27-29.
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on November 3, 2008 and December 9, 2008, pp. 12-35.  See December 17, 2008, effective February 15, 2009, pp. 29-30;
- *see* SAI of Registration Statement ("RS") filed October 1, 2008, as supplemented on April 10, 2009, pp. 28-31 (showing 100% volatility parameters;

c.   describing the impact on investment results of dividends -the receipt of which required holding past times of ex-dividend dates:

- *see* September 29, 2008 Form N-1A, p. 176;
- *see* October 1, 2008 Form N-1A, p. 42;
- *see* October 1, 2008, as supplemented on November 3, 2008 p. 23;
- *see* October 1, 2008, as supplemented on November 3, 2008 and December 9, 2008, p. 43-44, December 17, 2008 effective February 15, 2009, pp. 43-44;
- *see* October 1, 2008, as supplemented on April 10, 2009, p. 121;

d.   estimating the costs of investing $10,000 in the Direxion ETFs for periods of one or three years assuming a 5% annual return, not a daily return:

- *see* September 29, 2008 Form N-1A, pp. 16-39;
- *see* October 1, 2008 Form N-1A, pp. 10-14;
- *see* November 3, 2008 Supplement, pp. 11-18;
- *see* December 9, 2008 Prospectus, pp. 12-35;
- *see* December 17, 2008 Form N-1A, pp. 25-75;
- *see* April 10, 2009 Supplement, pp. 32-81 (showing 100% volatility parameters)

e.   otherwise making numerous disclosures that enabled and encouraged investors to hold Direxion shares for extended periods of time.

146.   The September 29, 2008 Registration Statement (including the November 3, 2008 Supplemental Prospectus) and all Registration Statements Prospectuses throughout the Class Period, provided examples of expenses to be incurred by investors when they held each

specific Bear Fund for 1 and 3 year periods. The Registration Statement suggested the "annual fund operating expenses" for persons who held their investments for 1 or 3 years were estimates, indicating that investing for periods greater than one day is a perfectly acceptable strategy.

147.    The Registration Statement provided examples to investors for each of the Bear Fund which were based upon a hypothetical assumption that they invested $10,000 in a specific Bear Fund for a 1 or 3 year period and then redeemed their shares at the end of either the 1 or 3 year period.  It also stated and represented to investors that for each specific Bear Fund they were to assume that their investment has a 5% return ***each year***.  The specific examples for each of the specific Direxion Bear ETFs including, but not limited to the FAZ, ERY, BGZ and TZA Funds, did not contain any qualifying language and did not state investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased.

148.    Below is a specific example with respect to the Large Cap Bear 3X Shares Fund ("BGZ Fund").

**Large Cap Bull 3X Shares**
**Large Cap Bear 3X Shares**

> **Fees and Expenses.** These tables describe the estimated fees and expenses that you may pay if you buy, hold or sell Creation Units of the Large Cap Funds. Annual fund operating expenses are estimates.

> **Expense Example**

> The table below is intended to help you compare the cost of investing in the Large Cap Funds with the cost of investing in other funds. Investors should note that the following examples are for illustration purposes only and are not meant to suggest actual or expected fees and expenses or returns, all of which may vary. The Large Cap 3X Shares issues and redeems Shares in Creation Units for cash and also on an in-kind basis. The Large Cap Bear 3X Shares issues and redeems Shares in Creation Units for cash. Shares are issued and redeemed in Creation Unit aggregations only. The example does not include the brokerage commissions that secondary market investors may incur to buy and sell Shares. **The table assumes that you invest $10,000 in Creation Units of the Large Cap Funds for the**

periods shown and then redeem all of your Shares at the end of the periods, but does not include transaction fees on purchases and redemptions of Shares. It also assumes that your investment has a 5% return each year and that the Large Cap Funds' operating expenses remain the same through each year. Although your actual costs may be higher or lower, based on these assumptions your costs would be: (emphasis supplied)

Large Cap Bull 3X Shares

| 1 Year | 3 Years |
|--------|---------|
| $97 | $313 |

Large Cap Bear 3X Shares

| 1 Year | 3 Years |
|--------|---------|
| $97 | $318 |

(emphasis supplied)

**Annual Operating Expenses(2)** (as a percentage of daily assets):

| Large Cap Bull 3X Shares | |
|---|---|
| Management Fees | 0.75% |
| Distribution and/or Service (12b-1) Fees(3) | 0.00% |
| Other Expenses(4) (5) | 0.25% |
| Total Annual Operating Expenses | 1.00% |
| Expense Waiver/Reimbursement | 0.05% |
| Net Annual Operating Expenses(7) | 0.95% |

| Large Cap Bear 3X Shares | |
|---|---|
| Management Fees | 0.75% |
| Distribution and/or Service (12b-1) Fees(3) | 0.00% |
| Other Expenses(4) (5) | 0.27% |
| Total Annual Operating Expenses | 1.02% |
| Expense Waiver/Reimbursement | 0.07% |
| Net Annual Operating Expenses(7) | 0.95% |

(1) For the Large Cap Bull 3X Shares and the Large Cap Bear 3X Shares, fixed transaction fees of $2,500 and $500, respectively, will be charged when you create or redeem Creation Units regardless of the number of Shares redeemed on the date of the transaction. For the Large Cap Funds, a variable transaction fee of up to 0.15% of the value of each Creation Unit will be charged to offset costs associated with processing the order. An additional fee of up to 3 times the fixed per order transaction fee plus up to 0.15% of the value of each Creation Unit may be charged if you do not create or redeem Shares through the Continuous Net Settlement System of the NSCC, or in

(emphasis added). (See tables described in paragraph 145(d))

149.     These statements and representations were all encompassing and did not contain any meaningful limitations or qualifications for investors which would have suggested that investors should not hold their investments for 1 year or 3 years.

150.     Direxion also suggested through other language in its Registration Statement and Prospectus that its Funds are appropriate investment vehicles for long-term and retail investors:[8]

> Shares may only be purchased from or redeemed with the Funds in Creation Units.   As a result, *retail investors* generally will not be able to purchase or redeem Shares directly from or with the Funds.   *Most retail investors will purchase or sell Shares in the secondary market with the assistance of a broker.* Thus, some of the information contained in this prospectus such as information about purchasing and redeeming Shares with the Fund and all references to the transaction fee imposed on purchases and redemptions, is not relevant to *retail investors*.

***

> ### High Portfolio and Turnover Risk
>
> Frequent trading could increase the rate of creations and redemptions of Fund Shares and the Funds' portfolio turnover, which could involve correspondingly greater expenses to a Fund, including brokerage commissions or dealer mark-ups/mark-downs and adverse tax consequences to a Fund's shareholders.
>
> Unlike traditional mutual funds, however, each Fund issues and redeems its Shares at NAV per share in Creation Units plus applicable transaction fees and each Fund's Shares may be purchased and sold on the Exchange at prevailing market prices. Given this structure, the risks of frequent trading may be less than in the case of a traditional mutual fund. Nevertheless, to the extent that purchases and redemptions directly with the Funds are effected in cash rather than through a combination or redemption of portfolio securities, frequent purchases and redemptions could still increase the rate of portfolio turn-over.

---

[8]     Retail investors are individuals who purchase securities for their own personal accounts rather than for an organization. Retail investors typically trade in smaller dollar amounts, and than institutional investors such as mutual funds, pension funds, or university endowments.

*The costs associated with the Funds' portfolio turnover will have a negative impact on longer-term investors.* Although the Funds reserve the right to reject any purchase orders or suspend the offering of Fund Shares, the Funds do not currently impose any trading restrictions on Fund shareholders nor actively monitor for trading abuses.

***

**A Precautionary Note to Retail Investors** the Depository Trust Company ("DTC"), a limited trust company and securities depositary that serves as a national clearinghouse for the settlement of trades for its participating banks and broker-dealers, or its nominee will be the registered owner of all outstanding Shares of each Fund of the Trust.  Your ownership of Shares will be shown on the records of DTC and the DTC Participant broker through whom you hold the Shares.   THE TRUST WILL NOT HAVE ANY RECORD OF YOUR OWNERSHIP.  *Your account information will be maintained by your broker, who will provide you with account statements, confirmations of your purchases and sales of Shares, and tax information.*  Your broker also will be responsible for ensuring that you receive shareholder reports and other communications from the Fund whose Shares you own.  Typically, you will receive other services (e.g., average cost information) only if your broker offers these services.

(emphasis in bold italics added).

151.    Again these disclosures did not contain any qualifying language and did not state investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased.

**Direxion's December 9, 2008 Supplement to the October 1, 2008 Prospectus**

152.    On December 9, 2008, Direxion supplemented its Registration Statement and Prospectus in a filing with the SEC on Form 497.  In this document, Direxion disclosed for the first time that the Funds are intended to be used as "short-term trading vehicles."

153.    Direxion, however, stopped short of making the types of disclosures that would render the December 9th Prospectus not materially misleading.  Instead, Defendants further confused investors. In addition to the reasons discussed below, the December 9, 2008 Prospectus was materially misleading for the reasons set forth in paragraph 113. In short Defendants failed

disclose that its Bear ETFs were not appropriate for investors who buy and hold these investments beyond a single trading session.

154.    Among other things, the Supplemented Prospectus filed December 7, 2008, disclosed on the front cover:

> **The Funds are exchange-traded funds that seek *daily leveraged* investment results. The Funds are intended to be used as short-term trading vehicles. The pursuit of leveraged investment goals means that the Funds are riskier than alternatives which do not use leverage. Further, the pursuit of *daily* leveraged investment goals means that the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period. As a consequence, especially in periods of market volatility, the path of the benchmark during the period may be at least as important to the Fund's return for the period as the cumulative return of the benchmark for the relevant period. The Funds are not suitable for all investors. The Funds should be utilized only by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results and (c) who intend to actively monitor and manage their investments. There is no assurance that the Funds will achieve their objectives and an investment in a Fund could lose money. No single Fund is a complete investment program. (emphasis added)**

 (emphasis in original).

155.    Defendants' warnings on Direxion's December 17, 2008 Prospectus Cover are vague, confusing and misleading.

156.    First, Direxion states on the Prospectus Cover that the "**Funds are intended to be used as short-term trading vehicles."**  However, Direxion failed to define the term "short-term trading vehicle" which is susceptible to multiple meanings.   For instance, InvestorWords.com defines "short term" as "[u]sually one year or less."  YourDictionary.com defines "short term," among other things, as "designating or of a capital gain, loan, etc. that involves a relatively short period, usually of less than a year." Typically short-term is defined as a year period.  *See* American Heritage Dictionary 4th Edition at p. 1611.  Moreover, in the context of accounting, both the FASB (the Financial Accounting Standards Board) and GAAP

(generally accepted accounting principles) recognize assets and liabilities, including **investments**, to be "short term" if they are expected to mature within **one year**.

157.     Significantly, Direxion failed to disclose that its Funds were only appropriate investment vehicles for day trades and that they were inappropriate investment vehicles for traders who intended to hold their Fund positions for periods greater than the day on which they were purchased.

158.     Direxion's statement on the Prospectus Cover and also made by Defendants that "the pursuit of daily leveraged investment goals means that the return of a Fund for a period longer than a day will be the product of a series of daily leveraged returns for each day during the relevant period" was inaccurate and misleading and further confused investors.

159.     "In mathematics, a **product** is the result of multiplying." [http://en.wikipedia.org/wiki/Product_(mathematics)].  Thus, the statements in $\pi$ 158 (and again repeatedly used including the December 9, 2008 and December 17, 2008 Registration Statement) suggests that a multi-day return is calculated as follows:  $3R_1 \, x \, 3R_2 \, x \, 3R_3 \, x \, 3R_4 \, x \, 3R_5$ and so on. In other words, according to Defendants' statement, for a given period each of the daily returns of a fund (in our case -3 x the return of the underlying index)  for that period would be multiplied together to determine the cumulative return for that period. Since the absolute values for $R_t$ and $3R_t$ are generally less than 1, the product of these returns quickly converges to zero and will be completely unrelated to the Fund's actual results for a holding period longer than a day; the longer the holding period, the closer the product of the returns gets to zero. In other words, the daily returns of a fund at the close of a trading session will be some fraction (negative or positive, for example 2%) of the value of the fund at the close of the previous day's trading session.  When these fractions (*i.*e. returns) are multiplied together over a multiple day period

their product will rapidly approach zero.  For instance assuming a 2% daily return each day: .02

x .02 = .0004; .2 x .2 x .2 = .000008.  After K days, the product will have approximately (1.75 x

K) zeros to the right of the decimal place.

160.     As an further example, the following table summarizes the actual returns for the

FAZ Fund during the 14 trading days from November 7, 2008, through November 26, 2008,

multiplying the returns each day by the product of the prior days' results:

| Date | Ret(FAZ) | Ret(Index) | Product of FAZ Returns |
|---|---|---|---|
| 11/7/2008 | -5.26% | 2.42% | |
| 11/10/2008 | 8.25% | -4.37% | --0.00434317710973173 |
| 11/11/2008 | 6.33% | -2.14% | -0.000275024 |
| 11/12/2008 | 17.51% | -6.57% | -4.81651E-05 |
| 11/13/2008 | -26.42% | 7.05% | 1.27251E-05 |
| 11/14/2008 | 16.59% | -5.35% | 2.11102E-06 |
| 11/17/2008 | 13.90% | -5.37% | 2.93362E-07 |
| 11/18/2008 | 2.28% | -0.47% | 6.67881E-09 |
| 11/19/2008 | 26.19% | -11.44% | 1.74903E-09 |
| 11/20/2008 | 24.67% | -10.20% | 4.31512E-10 |
| 11/21/2008 | -13.04% | 3.70% | -5.62665E-11 |
| 11/24/2008 | -55.96% | 15.27% | 3.14876E-11 |
| 11/25/2008 | -15.97% | 2.37% | -5.0282E-12 |
| 11/26/2008 | -14.19% | 4.68% | 7.1353E-13 |

161.     Applying the statements in the Prospectus to the actual results for the FAZ Fund

over the 14 trading days indicates a return for FAZ that is 7.1353E-13.  This exponential notation

means $7.1353 \times 10^{-13}$; in fractional form, $\frac{7.1353}{10,000,000,000,000}$ (slightly more than 7/ten trillionths)

or in decimal notation, 0.000000000000713.  Based upon the equation in the Prospectus, the

expected return for the 14 day period would be practically zero.

162.     In plain English, if a Class Member had invested $1,000 in the FAZ Fund on

November 11, 2008, according to the Defendants statement and set forth in the Prospectus, he

would expect to earn virtually nothing over this 14-day period, thus ending the trading day on November 26, 2008, with the same $1,000 balance in his investment account.

163.     In fact, if a Class Member invested $1,000 in the FAZ Fund on November 11, 2008, at the end of the 14-day period, he actually would have had only $556.35 left in his account.   In other words, although the statement concerning the product or returns in the Prospectus that purportedly described the effect of holding a Direxion Bear Fund for more than one trading day showed neither a gain nor a loss, in fact the Class Member would have suffered a substantial loss of approximately 44 percent of his investment from November 11, 2008, to November 26, 2008, as shown in the following table:

| Date | Ret(FAZ) | FAZ Value |
|------|----------|-----------|
|      |          | $ 1,000.00 |
| 11/7/2008 | -5.26% | $    947.39 |
| 11/10/2008 | 8.25% | $ 1,025.59 |
| 11/11/2008 | 6.33% | $ 1,090.54 |
| 11/12/2008 | 17.51% | $ 1,281.52 |
| 11/13/2008 | -26.42% | $    942.95 |
| 11/14/2008 | 16.59% | $ 1,099.38 |
| 11/17/2008 | 13.90% | $ 1,252.16 |
| 11/18/2008 | 2.28% | $ 1,280.66 |
| 11/19/2008 | 26.19% | $ 1,616.04 |
| 11/20/2008 | 24.67% | $ 2,014.74 |
| 11/21/2008 | -13.04% | $ 1,752.03 |
| 11/24/2008 | -55.96% | $    771.57 |
| 11/25/2008 | -15.97% | $    648.36 |
| 11/26/2008 | -14.19% | $    556.35 |

164.     This illustrates that the statement in the Prospectus that "the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period" is materially false and misleading; it concealed from the Class the substantial risk of loss associated with holding Direxion Bear Funds for periods longer

than a single trading day, and it mistakenly conveyed the impression to investors that Direxion Bear Funds were risk-free investments over longer holding periods.

165.     On the Prospectus Cover Defendants further state that "as a consequence" of the misleading and inaccurate statement, "the return of a Fund for a period longer than a single day will be the product of the series of daily leveraged returns for each day during the relevant period," "especially in periods of market volatility, the path of the benchmark during the period may be at least as important to the Fund's return for the period as the cumulative benchmark for the relevant period." "As a consequence…" contains no real meaningful accurate information for investors as it merely states that one factor "may" be more important than another.  For example, logically let the statement "the path of the benchmark during the period" be Statement A, and "the cumulative benchmark for the relevant period" be Statement B.  The phrase "the path of the benchmark during the period may be at least as important to the Fund's return for the period as the cumulative benchmark for the relevant period" translates to A *could be* greater than B.  By inference, A could also be less than B.  In other words, A compared to B could be greater than, less than or equal to B.  Thus, it contains zero information.  The Statement does not assist or meaningfully inform investors and merely continues to confuse them completely.  In short, Defendants' equivocal statements continued to radically understate the risks as of December 9, 2008 of investing in the 3X Bear Funds and the consequences of doing so.

166.     Defendants' statement on Direxion's December 9, 2008 Prospectus Cover concerning volatility is also a meaningless vague statement.  "Volatility" means "change," and as prices change continuously when markets are open, "periods of volatility" translates to "when the Fund trades."  Or, "always."  Defendants' statement does not warn investors of the real

catastrophic historical risks due to the actual volatility of the underlying indexes occurring from September through December of 2008 and their impact on the Bear Funds at issue.

167.    This statement further confused and misled investors as it was vague, ambiguous and failed to prominently and clearly emphasize critical historical and other necessary information concerning volatility risks and their impact on the performance of the Bear Funds.

168.    On the Prospectus Cover Direxion further states that investors should "monitor and manage their investments…" but this statement is not informative to investors.  It does not say investors should manage their investments on a daily basis.  Moreover, Direxion's statement *does not* say how investors should monitor or manage their investments or what rebalancing or other calculations they should perform. It also does *not* say that they should not hold their investments for multiple days.

169.    In addition to the representations made on the Prospectus Cover, the December 9th Prospectus made additional disclosures concerning Direxion's "investment techniques and policies:"

> A Fund generally will hold a representative sample of the securities in its benchmark index. *The samp*ling of securities that is held by a Fund is intended to maintain high correlation with, and similar aggregate characteristics (e.g., market c*api*talization and industry weightings) to, the benchmark index. A Fund also may invest in securities that are not included in the index or may overweight or underweigh[t] certain components of the index.
>
> ***
>
> Each Bull Fund and Bear Fund has a clearly articulated goal which requires the Fund to seek economic exposure in excess of its net assets. To meet its objectives, each Fund invests in some combination of financial instruments so that it generates economic exposure consistent with the Fund's investment objective.

The impact of market movements determines whether a portfolio needs to be re-positioned. If the target index has risen on a given day, a Bull Fund's net assets should rise, meaning the Fund's exposure may need to be increased. Conversely, if the target index has fallen on a given day, a Bull Fund's net assets should fall, meaning the Fund's exposure may need to be reduced. If the target index has risen on a given day, a Bear Fund's net assets should fall, meaning the Fund's exposure may need to be reduced. If the target index has fallen on a given day, a Bear Fund's net assets should rise, meaning the Fund's exposure may need to be increased. A Fund's portfolio may also need to be changed to reflect changes in the composition of an index and corporate actions like stock splits and spin-offs. Rafferty increases the Fund's exposure when its assets rise and reduces the Fund's exposure when its assets fall. To determine which instruments to purchase or sell, Rafferty identifies instruments it believes exhibit price anomalies among the relevant group of financial instruments to identify the more advantageous instrument.

Each Bull and Bear Fund is designed to provide daily investment returns, before fees and expenses, that are a multiple of the returns of its index or benchmark for the stated period. While Rafferty attempts to minimize any "tracking error" (the statistical measure of the difference between the investment results of a Fund and the performance of its index or benchmark), certain factors will tend to cause a Fund's investment results to vary from the stated objective. A Fund may have difficulty in achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs and/or a temporary lack of liquidity in the markets for the securities held by the Fund.

Each Bull and Bear Fund invests significantly in swap agreements, forward contracts, reverse repurchase agreements, options, including futures contracts, options on futures contracts and financial instruments such as options on securities and stock indices options, and caps, floors and collars. Rafferty uses these types of investments to produce economically "leveraged" investment results. Leveraging allows Rafferty to generate a greater positive or negative return than what would be generated on the invested capital without leverage, thus changing small market movements into larger changes in the value of the investments of a Fund.

Seeking daily leveraged investment results provides potential for greater gains and losses relative to benchmark performance. For instance, the Large Cap Bull 3X Shares seeks to provide, before fees and expenses, 300% of the daily return of the Russell 1000[®] Index. If the Russell 1000[®] Index gains 2% on a given day, the Large Cap Bull 3X Shares would be expected to gain about 6%. Conversely, if the Russell 1000[®] Index declines 2% on a given day, the Large Cap Bull 3X Shares would be expected to about lose 6%.

\*\*\*

**The Projected Return of a Bear Fund.** A Bear Fund seeks to provide a daily return which is a multiple of the inverse (or opposite) of the daily return of a target index or benchmark. To create the necessary exposure, a Bear Fund engages in short selling — borrowing and selling securities it does not own. The money that a Bear Fund receives from short sales — the short sale proceeds — is an asset of the Bear Fund that can generate income to help offset the Bear Fund's operating expenses.

**The Projected Returns of Leveraged Index Funds for Periods Longer Than the Target Period.** The Funds seek daily leveraged investment results which should not be equated with seeking a leveraged goal for longer than a day. For instance, if the Russell 1000® Index gains 10% during a year, the Large Cap Bull 3X Shares should not be expected to provide a return of 30% for the year even if it meets its daily target throughout the year. This is true because of the financing charges noted above but also because the pursuit of daily goals may result in daily leveraged compounding, which means that the return of an index over a period of time greater than one day multiplied by a Fund's daily target or inverse daily target (*e.g.,* 300% or –300%) will not generally equal a Fund's performance over that same period. The following example illustrates this point.

170.     Omitted from these disclosures was the statement in the November 3, 2008 Prospectus (at the end of the section entitled **"The Projected Return of a Bear Fund,"** that gave an example of the "net expected" daily performance of a Bear Fund: "If the Russell 1000® Index declines 2% on a given day, **the gross expected return for the Large Cap Bear 3X Shares would be 6% and the net expected return**, which factors in interest income and the impact of operating expenses, **will be slightly higher under normal market conditions."** In addition to Defendants' deletion of the statement, the 6% example would also have to be reduced by average daily underperformance of 3.5%. (emphasis added).

171.     With respect to "Tracking Error Risk" the December 9, 2008 Prospectus stated:

**Tracking Error Risk**

Several factors may af**fect a Fund's ability to achieve its da***ily targ*et. *A* Fund may have difficulty achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs, and/or a tempor**ary lack of liquidity in the markets for the securities held by a Fund. A failure to achieve a dai**ly target may cause a Fund to provide returns for a longer period that ar**e worse than expected. In addition, a Fund that meets its** daily target over a period of time may not necessarily produce the returns that might be expected in light of the

returns of its index or be**n**ch*mark* for that per*iod*. Differen*ces m*ay result from the compounding effect of daily market fluctuations, the use of leverage and the Bear Funds' inverse correlation.

172.     In addition to the statements set forth above, and the previous statements made in the November 3, 2008 Supplemental Prospectus and Statement of Additional Information, in the October 1, 2008 Prospectus as supplemented on November 3, 2008 and December 9, 2008, Defendants, for the first time, inserted a new risk disclosure in the "Principal Risks" section entitled "Daily Rebalancing and Market Volatility Risk."

173.     The "Daily Rebalancing and Market Volatility Risk" section provided in pertinent part:

**Daily Rebalancing and Market Volatility Risk**

Each Fund seeks to provide a return which is a multiple of the daily performance of its benchmark. No Fund attempts to, and no Fund should be expected to, provide returns which are a multiple of the return of the benchmark for periods longer than a single day. Each Fund rebalances its portfolio on a daily basis, increasing exposure in response to that day's gains or reducing exposure in response to that day's losses. **Daily rebalancing will impair a Fund's performance if the benchmark experiences volatility.** For instance, a hypothetical 3X Fund, whether Bull or Bear, would be expected to lose 6.48% (as shown in Graph 1 below) if its benchmark were flat over a hypothetical one year period during which its benchmark experienced annualized volatility of 15%. **If the benchmark's annualized volatility were to rise to 40%, the hypothetical loss for a one year period would widen to approximately 38% (as illustrated in Graph 2). The volatility for the Russell 1000 Index for the 12 months ended November 30, 2008, was approximately 40%**, as compared to volatility of 15% for the same period one year earlier. An index's volatility rate is a statistical measure of the magnitude of fluctuations in the returns of an index. Other indexes to which the Funds are benchmarked have different historical volatility rates; certain of the Funds' current volatility rates are substantially in excess of 40%. **Since market volatility, like that experienced by the markets currently, has negative implications for Funds which rebalance daily, investors should be sure to monitor and manage their investments in the Funds in volatile markets.** The graphs assume that the Fund perfectly achieves its investment objective. To isolate the impact of leverage, these graphs assume a) no dividends paid by the companies included on the index; b) no fund expenses; and c) borrowing/lending rates (to obtain required leverage) of zero percent. If fund expenses were included, the Fund's performance would be lower than that shown.

(emphasis added).

**Graph 1**



**Graph 2**



174.    The December 9, 2008 Prospectus was materially misleading for the reasons set

forth in paragraph 113 and for the further reasons set forth above. In short Defendants failed

disclose that Direxion's Bear ETFs were not appropriate for investors who buy and hold these

investments beyond a single trading session.   The December 9, 2008 Prospectus was also

materially misleading for the reasons set forth below.

**Defendants' Disclosures Concerning "Rebalancing Risk" and "Volatility Risk" were
Materially Misleading**

175.     Defendants' statement that "[s]ince market volatility, like that experienced by the markets currently, has negative implications for Funds which rebalance daily, investors should be sure to monitor and manage their investments in the Funds in volatile markets" is vague, uninformative and materially misleading.  It does not say investors should manage their investments on a daily basis.  Moreover, Direxion's statement *does not* say how investors should monitor or manage their investments or what rebalancing or other calculations they should perform. It also does *not* say that investors should not hold their investments for multiple days.

176.     Defendants' statement above that "[d]aily rebalancing will impair a Fund's performance if the benchmark experiences volatility" is vague and misleading.  Since there is *always* volatility, daily rebalancing will *always* "impair a Fund's performance."  Defendants should have disclosed that except in the most extraordinary market conditions, including, but not limited to when the underlying index has zero volatility (does not change), or the underlying index experiences a series of returns all of the same sign, it is arithmetically impossible for the Fund's return to equal or exceed that of the cumulative return for the benchmark for a given period.  Thus, for periods longer than a day, the fund <u>will</u> substantially underperform the benchmark index.

177.     Defendants' statement concerning the volatility of the Russell 1000 index, is irrelevant, misleading and biased for the following reasons:

a.     It is misleading. Since a portfolio constrained to a single industry is less diversified than a well-diversified portfolio, like the Russell 1000, its volatility will be greater. So the magnitude of the impairment will be much greater than indicated by the graphs.  Further, a portfolio of small cap stocks has greater volatility than a large cap portfolio.

b.     It is biased.  The annualized volatility rates for each of the indexes underlying the FAZ, ERY, TZA and BGZ Funds were much higher than the 40% volatility rate of the Russell 1000 Index cited by Defendants as an example.  For instance, the annualized volatility of the Russell 1000 Financial Services index at the time of the December 9th Prospectus was in excess of 107%, -- much greater than the 40% posited in Graph 2.

178.    Defendants' statements and illustrations do not adequately disclose in plain English the following:

   a.   The underlying benchmark indexes for the Bear Funds always experience volatility, (*i.e.,* if the index ever moves);

   b.   The volatility rates at which the funds would experience a "must lose" situation;

   c.   The **serious** rebalancing risk as it relates to realistic volatility rates.  In other words, Defendants should have prominently and sufficiently disclosed and in bold print, if not also on the cover of the Prospectus:

> **Due to daily rebalancing, the Direxion's Bear Funds will underperform the benchmark.  If current levels of volatility persist, investors should expect to lose 50% of their investment within three months and essentially 100% of their investment within a year.**

179.    Defendants radically understated the risks concerning the consequences of Direxion's daily rebalancing of each of the Bear Funds at issue and the magnitude of impairment of the Bear Funds' performance as the underlying index moves daily.

180.    The December 9, 2008 Prospectus' narrative and graphs disclosed -- as its only example -- the historical volatility rate for the Russell 1000 Index (a broader and less volatile index than those underlying FAZ, ERY, and TZA) for the 12 months ending November 30, 2008 of "approximately 40%."   The Prospectus did not disclose the volatility rates for the indexes underlying FAZ, ERY, and TZA.  Again, volatility rates are not readily accessible to the average investor; their determination requires the collection and input of data and the performance of a mathematical computation (manually (using a calculator) or using a computer program).

181.    At the time of the December 9th Prospectus the indexes underlying FAZ, ERY, TZA and BGZ were experiencing high volatility.

182.     The graph below depicts the moving 30 day average volatility for the FAZ benchmark index, the Russell 1000 Financial Services Index, over the period December 17, 2007 through April 17, 2009:



183.     The graph below depicts the moving 30 day average volatility for the ERY, TZA and BGZ benchmark indexes, respectively, over the period February 14, 2008 through April 17, 2009:

**MOVING AVERAGE 30 TADING DAY VOLATILITY**



184.     The graphs above paint a picture of the volatility of the underlying indexes beginning roughly 9 to 12 months before the first effective Registration Statement until about six month      after      the      first      effective      Registration      Statement. Note what exactly it shows:  For each date, it depicts the annualized volatility of the indexes based on the daily returns for the previous 30 trading days.  A straight-edge can be used to

examine the level on a particular day. (See Defendants' 100% level volatility chart not disclosed until April 10, 2009, attached to the Complaint as Exhibit "D".

185.     More specifically, for each trading day, a standard deviation was calculated using the returns for the 30 most recent trading days.   These numbers were annualized for comparison, as they must be. The plots on the graphs above indicate that volatilities (standard deviations of returns) increased dramatically during the October – December 2008 time-period.

186.     The actual volatility rates at or about the time of the December 9, 2008 Prospectus for each of the indexes underlying the FAZ and ERY Funds set forth in $\pi$ 120.

187.     Thus, for instance, as of October 1, 2008, the date of the initial Prospectus, expected volatilities for the Russell 1000 Financial Services Index using 1, 2 or 3 months of data were 100.1%, 78.0% and 75.2% respectively.  **By December 9, 2008, these estimates were each in excess of 107%**.

188.      Yet Defendants disclosed as an example the historical volatility rate of "approximately 40%" for the Russell 1000 Index (a broader and less volatile index) for the 12 months ending November 30, 2008.

189.     Using long time-series data, for example by using a full year's worth of data as Defendants did in the Prospectus, to estimate future volatility is and was misleading since volatilities based on more recent data (*e.g.,* 1, 2 or 3 months) were both much higher and had greater forecasting power for future realized volatility.   More recent data (fewer, more recent observations) provides greater forecasting power.   As more recent measures have a greater ability to forecast subsequent realized volatilities, these mixing yields an estimate that is biased downwards (lower than it should be).   By using a full year's worth of data, the volatility measure used by Defendants mixed recent high levels of volatility with more distant lower levels thereby

understating the expected volatility at the time of Direxion's offering disclosures.  Moreover, it is obvious that by December 9, 2008, any reasonable estimate of volatility must be much greater than the 40% cited by the Prospectus.

190.    Even using less predictive 12 month data, like Defendants did in their example, the volatility rate for the FAZ benchmark was 62.2% as of November 30, 2008, more than 1 ½ times greater than that of the broader Russell 1000 Index used by Defendants as an example.

191.    These actual volatility rates for the Russell 1000 Financial Services Index and the Russell 1000 Energy Index, *supra,* are based on actual, historical, realized returns and Defendants had knowledge of this data.  Notwithstanding same, Defendants chose not to provide any meaningful volatility rate data to Plaintiffs and the Class Members in the December 9, 2008 Supplement to the October 1, 2008 Prospectus.  The Prospectus omitted to disclose this critical information concerning the volatility rates and their specific impact on Plaintiffs and Class Members' investment decisions for the Direxion Bear Funds including in the FAZ, ERY, BGZ and TZA Bear ETFs.

192.    In the SAI to the December 9, 2008 Supplement Defendants again provided a "Special Note Regarding the Correlation Risks of Bull Funds" but again did not do so for the Bear Funds.  In this Special Note, Defendants again generally described the "function[s]" that would affect fund performance for a Bull Fund over a one year period, but did not do so for the Bear Funds at issue.

193.    To purportedly explain the risks of volatility on investments held over time, the narrative to Direxion's December SAI Supplement (at p. 28) assumed a representative volatility rate of only 20%. The Prospectus did not contain adequate disclosure of volatility rates for the indexes underlying the Bear Funds, including the FAZ, ERY, BGZ and TZA Bear Funds. The

Prospectus also failed to provide a sufficient explanation of the impact of relevant higher volatility rates on the performance of these Direxion 3X Bear Funds.

194.    At the end of the "Special Note Regarding the Correlation Risks of Bull Funds" -- not Bear Funds -- section of the SAI to the December 9, 2008 Supplement, Defendants again provided a table entitled "Estimated Fund Return Over One Year of 3X Bear ETFs."  The Table again showed volatility rates ranging from 5% to 455%.  Defendants failed to disclose the relevant volatility levels from 56% to 100%, although actual volatility rates for the indexes underlying the Bear Funds, including FAZ, ERY, BGZ and TZA Funds, were in or above that range at the time of the December 9th disclosures.. Defendants failed to provide any narrative text or meaningful data to explain the specific table relating to the 3X Bear Funds, the volatility rate(s) used, or volatility rates for any of the specific indexes underlying the Bear Funds.  The narrative only explained that the table (with a range of 5% - 45% volatility) "was intended to isolate the effect of index volatility and index performance on the return of a Bull Fund," not the subject Bear Funds.

195.    The higher volatility rates (*i.e.* 46% to 107%), which are absent from Defendants' disclosures and which actually occurred during the Class Period, severely and adversely affected performance of the Bear Funds, but Defendants chose not to disclose these higher volatility levels, or their actual impact on the Funds or how volatility would reduce expected annual returns to an almost certain 100% loss.

196.    A reasonable investor, in order to make an informed decision as to whether to purchase shares in the Direxion Triple Leveraged (3X) Bear Funds after December 9, 2008, would want to know what the actual volatility rates were at the time of his investment decision in December of 2008 and thereafter, as it would have materially affected his assessment of what

was in fact an extremely high risk investment in the Direxion's 3X Bear Funds, including the FAZ, ERY, BGZ and TZA Funds.

197.     It would also be material to a reasonable investor to know the expected effect of actual volatility rates on investments held for time periods shorter than one year, such as the effects of volatility on Bear Fund performance over 1, 2, 3, 4, 8, 13 and 26 week periods.

198.     A disclosure on the Prospectus Cover of the December 9, 2008 Prospectus states that the "Funds are intended to be used as short-term trading vehicles."  This statement could easily be construed by investors to mean investors should not hold their investments in the Funds for periods greater than one year.

199.     Had Defendants disclosed the effects of actual volatility (as it existed at the time of the December 9th disclosures) of the indexes underlying the Bear Funds including the FAZ, ERY, BGZ and TZA Funds on investments in these funds held for periods less than one year, investors could have seen the dramatic impact of volatility on expected returns for periods shorter than a year.

200.     The table set forth below attempts to isolate the expected losses resulting only from volatility at rates ranging from 0% - 100% over 1, 2, 3, 4, 8, 13, 26 and 52 week holding periods:

| | Loss after these many weeks | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Volatility | 1 | 2 | 3 | 4 | 8 | 13 | 26 | 52 |
| 10% | -0.08% | -0.16% | -0.24% | -0.31% | -0.63% | -1.02% | -2.02% | -4.00% |
| 20% | -0.29% | -0.58% | -0.87% | -1.15% | -2.29% | -3.70% | -7.26% | -14.00% |
| 30% | -0.66% | -1.31% | -1.96% | -2.60% | -5.13% | -8.21% | -15.74% | -29.00% |
| 40% | -1.18% | -2.34% | -3.49% | -4.63% | -9.04% | -14.28% | -26.52% | -46.00% |
| 50% | -1.95% | -3.85% | -5.72% | -7.56% | -14.54% | -22.54% | -40.00% | -64.00% |
| 60% | -3.05% | -6.00% | -8.87% | -11.64% | -21.93% | -33.13% | -55.28% | -80.00% |
| 70% | -5.27% | -10.26% | -14.98% | -19.46% | -35.13% | -50.51% | -75.51% | -94.00% |
| 80% | -4.99% | -9.72% | -14.22% | -18.50% | -33.58% | -48.56% | -73.54% | -93.00% |
| 90% | -6.52% | -12.62% | -18.32% | -23.64% | -41.69% | -58.38% | -82.68% | -97.00% |
| 100% | -8.48% | -16.23% | -23.33% | -29.83% | -50.76% | -68.38% | -90.00% | -99.00% |

201.     As is evident from the data presented in the table, in periods of high volatility an investor would lose a significant portion of his initial investment, even over relatively short periods of time.  For example, at volatility rates of 70%, an investor in a Bear Fund would lose more than 10% of his investment in just 2 weeks when the market was flat over that period. With volatility rates at 100%, an investor would lose 16% over that same two week period and 30% over a four week period.

202.     Nevertheless, Defendants failed to disclose the effect of volatility on performance of the Bear Funds over a period of time shorter than one year.

203.     The significance and materiality of the Defendants' omissions concerning applicable volatility rates and their effect on Bear Fund performance as of December 9, 2008 is

enormous.  For example, except in the most extraordinary market conditions, including, but not limited to when the underlying index has zero volatility (does not change), or the underlying index experiences a series of returns all in the same direction, it is arithmetically impossible for a fund's return to equal or exceed that of the cumulative return for the benchmark for a given period.  Thus, for periods longer than a day, the fund _will_ substantially underperform the benchmark index. Defendants had a duty to disclose this material data.  At the time of the December 9th disclosures greater actual volatility existed for each of the indexes underlying FAZ, ERY, TZA and BGZ (with respect to the RGUSFL more than 2.5 times greater) than Defendants' 40% illustration.  This higher volatility negatively and materially impacts underperformance due to "rebalancing risk."  Accordingly, the examples and illustrations presented by the Defendants in December of 2008 grossly underestimated expected losses for Plaintiffs and Class Members based on volatility and rebalancing risks and were materially misleading.

204.    Defendants radically understated the risks concerning the consequences of Direxion's daily rebalancing of each of the Bear Funds at issue and the magnitude of impairment of the Bear Funds' performance as the underlying index moves daily.

**The Disclosures in the December 9, 2008 Prospectus Suggested that Direxion's Funds were Appropriate for Retail and Buy and Hold Investors**

205.    Direxion, again, included language in the Prospectus that suggested that its Funds, including the FAZ, ERY, BGZ and TZA Funds, were appropriate for retail investors and investors that intended to hold positions for longer than one day:

> Shares may only be purchased from or redeemed with the Funds in Creation Units. As a result, ***retail investors*** generally will not be able to purchase or redeem Shares directly from or with the Funds. ***Most retail investors will purchase or sell Shares in the secondary market with the assistance of a broker***. Thus, some of the information contained in this prospectus, such as information

about purchasing and redeeming Shares from or with a Fund and all references to the transaction fee imposed on purchases and redemptions, is not relevant to *retail investors.*

\*\*\*

*High Portfolio and Turnover Risk*

Frequent trading could increase the rate of creations and redemptions of Fund Shares and the Funds' portfolio turnover, which could involve correspondingly greater expenses to a Fund, including brokerage commissions or dealer mark-ups/mark-downs and adverse tax consequences to a Fund's shareholders.

Unlike traditional mutual funds, however, each Fund issues and redeems its Shares at NAV per share in Creation Units plus applicable transaction fees and each Fund's Shares may be purchased and sold on the Exchange at prevailing market prices. *Given this structure, the risks of frequent trading may be less than in the case of a traditional mutual fund.* Nevertheless, to the extent that purchases and redemptions directly with the Funds are effected in cash rather than through a combination or redemption of portfolio securities, frequent purchases and redemptions could still increase the rate of portfolio turn-over.

*The costs associated with the Funds' portfolio turnover will have a negative impact on longer-term investors.* Although the Funds reserve the right to reject any purchase orders or suspend the offering of Fund Shares, the Funds do not currently impose any trading restrictions on Fund shareholders nor actively monitor for trading abuses.

\*\*\*

**A Precautionary Note to Retail Investors.** The Depository Trust Company ("DTC"), a limited trust company and securities depositary that serves as a national clearinghouse for the settlement of trades for its participating banks and broker-dealers, or its nominee will be the registered owner of all outstanding Shares of each Fund of the Trust.  Your ownership of Shares will be shown on the records of DTC and the DTC Participant broker through whom you hold the Shares. THE TRUST WILL NOT HAVE ANY RECORD OF YOUR OWNERSHIP. *Your account information will be maintained by your broker, who will provide you with account statements, confirmations of your purchases and sales of Shares, and tax information.* Your broker also will be responsible for ensuring that you receive shareholder reports and other communications from the Fund whose Shares you own. Typically, you will receive other services (e.g., average cost information) only if your broker offers these services. The Defendants also included detailed charts depicting performance over long holding periods for each of the Bear and Bull Funds.

(emphasis in bold italics added)..

206.    Again these disclosures did not contain any qualifying language and did not state that investments in the Bear Funds should not be held for more than a single day and should be sold in the same trading session in which they were purchased. Throughout the entire Class Period and not until April 10, 2009 did Direxion state otherwise in bold or plain English. To the contrary, throughout the Class Period, Direxion did not market the Bear Funds as day trading vehicles or provide plain English instructions in its Registration Statements that an investor should purchase and sell his entire position in a Direxion Bear Fund in the same trading session.

**Direxion Failed to Disclose the Material Fact that It's Funds Systematically Underperformed Their Underlying Indexes on a Daily Basis**

207.    Defendants' disclosures concerning "daily investment results" were materially misleading. Defendants' repeated statements that Direxion's Bear Funds seek daily investment results are vague, ambiguous and misleading as the offering documents do not specify specifically what the historical (realized?) returns were. In fact Direxion's actual realized daily returns significantly and systematically underperformed their target benchmark indices. The returns realized by the Funds were systematically lower than the daily target returns. The returns earned by the Direxion Bear Funds were systematically lower than the expected daily investment results described in the Prospectus.

208.    For instance, from the inception of the FAZ Fund on November 8, 2008 through December 9, 2008 (the date of Direxion's Supplemental Prospectus), the FAZ Fund underperformed its benchmark of -300% times the underlying index 19 out of 22 trading days, or 86% of the time. On numerous days it underperformed by more than 5%, with two days experiencing underperformance in excess of 15%. The mean (average) daily underperformance during this period was 3.52%. The median underperformance during this period was 2%; this

means that on half the days during this period the FAZ underperformed its benchmark by at least 2%[9].

---

[9] The daily tracking errors of the FAZ Fund during this period is also depicted by the histogram below:



As depicted above, for each trading day from its inception, November 8, 2008 through December 9, 2008, a "daily tracking error" was calculated as the difference between the actual return of the FAZ ETF and the "target" return—in this case -300% times the realized return on the Russell 1000 Financial Services Index.  If the FAZ ETF perfectly tracked the index, each tracking error would be exactly zero.  If tracking errors were random but unbiased—that is, if on average the FAZ ETF performed on a daily basis as well as its target -- then these tracking errors would be symmetrical around the zero on the x-axis in the diagram above.  As this diagram demonstrates, however, the majority (86%) of the tracking errors are negative (to the left of the zero on the x-axis in the diagram above).  This means that on 86% of the trading days during this period the actual performance of the FAZ ETF was below that of its target.  In fact, as depicted by the diagram, on numerous days, the FAZ ETF underperformed by more than 5% (*see* shaded columns to the left of -0.05 on the x-axis in the diagram above), with two days experiencing underperformance in excess of 15%. (*see* shaded column to the left of -0.15 on the x-axis of the diagram above)   Across the sample, the mean (average) underperformance was -3.52%.  The median was -2% which indicates that on half the days, underperformance was at least 2%.

209.     A daily underperformance of 3.52% (as was the case with the FAZ Fund during the period November 8, 2008 through December 9, 2008) translates into tremendous losses when held across multiple periods.  Assuming its underlying index is flat (its value does not change throughout the given period), in only 10 days a loss of over 30% would result; more than half of the initial investment disappears when held for only 21 days—which is the average number of trading days in a month; and, when held for a typical trading year (252 trading days), a $100,000.00 investment is worth only a trivial $11.97, **a loss of 99.988%**.[10]  For an investor just to break even over a one year period at this level of average daily underperformance, the index underlying the fund would have to depreciate (since this is a levered bear fund) by 99.95% per year.  The Russell 1000 Financial Services Index was 703.2 on November 6, 2008.  An investor could make money on if this index fell to 0.38 within a year.

210.     Despite the persistence of this significant deviation of actual returns from expected results, Defendants did not disclose in the December 9, 2008 Supplement to Direxion's Prospectus that, even on a ***daily*** basis, the Direxion Bear Funds substantially underperformed their intended investment results.

211.     To illustrate the traumatic effect this systematic daily under-performance had on fund performance during the Class Period, a "Target Return" was calculated for the FAZ, ERY, BGZ and TZA Funds for each trading day by multiplying the inverse of the daily index return by 300% (or by -3), since all Direxion Bear Funds were targeted to earn three times the inverse of the benchmark every day.

---

[10]     A flat index is assumed for purposes of this example.  However, when the index moves in either direction the same losses will still occur.  With respect to Bear Funds, the losses resulting from tracking error will be subtracted from any gains resulting from an index's decline and added to any losses resulting from and index's rise.

212.     Comparing the daily Target Returns to actual realized daily returns for the FAZ Fund from November 6, 2008 through April 9, 2009, for example, the ***actual*** realized daily returns were approximately 2.39% ***below*** the Target Returns each day.  Thus, even if investors had made daily purchase decisions, the ***actual*** daily returns for the FAZ Fund was approximately 2.39% ***below*** what investors reasonably would have expected them to be.

213.     Comparing the daily Target Returns to actual realized daily returns for the ERY Fund from November 6, 2008 through April 9, 2009, the ***actual*** realized daily returns were approximately 0.9% ***below*** the Target Returns each day.  Thus, even if investors had made daily purchase decisions, the actual daily return in the ERY Fund was 0.9% ***below*** what investors reasonably expected they would receive.  Over this holding period, an investor lost 61% of their wealth due to tracking error alone.

214.     As another example, comparing the daily Target Returns to actual realized daily returns for the BGZ Fund from November 5, 2008 through April 9, 2009, the ***actual*** realized daily returns were approximately 0.6% ***below*** the Target Returns each day.  Thus, even if investors had made daily purchase decisions, the actual daily return in the BGZ Fund was approximately 0.6% ***below*** what investors reasonably expected they would receive.  Over this holding period, an investor lost 47% of their wealth due to tracking error alone

215.     Finally, comparing the daily Target Returns to actual realized daily returns for the TZA Fund from November 5, 2008 through April 9, 2009, the ***actual*** realized daily returns were approximately 0.9% ***below*** the Target Returns each day.  Thus, even if investors had made daily purchase decisions, the actual daily return in TZA Fund was 0.9% ***below*** what investors reasonably expected they would receive.   Over this holding period, an investor lost 61.7% of their wealth due to tracking error alone

216.     Defendants clearly were aware of the significant historical daily underperformance of their Bear ETFs at the time they filed Direxion's December 9, 2008 prospectus supplement.  This is evident by the fact that omitted from Direxion's December 9th disclosures was the statement in the November 3, 2008 Prospectus (at the end of the section entitled **"The Projected Return of a Bear Fund**), that gave an example of the "net expected" daily performance of a Bear Fund: "If the Russell 1000® Index declines 2% on a given day, the gross expected return for the Large Cap Bear 3X Shares would be 6% **and the net expected return, which factors in interest income and the impact of operating expenses, will be slightly higher under normal market conditions."**  (emphasis added).  The block quotation below shows the December 9th disclosure concerning "The Projected Return of a Bear Fund" with the omitted example that was included in the November 3, 2008 Prospectus inserted in bracketed, bold italics:

> **The Projected Return of a Bear Fund.** A Bear Fund seeks to provide a daily return which is a multiple of the inverse (or opposite) of the daily return of a target index or benchmark. To create the necessary exposure, a Bear Fund engages in short selling — borrowing and selling securities it does not own. The money that a Bear Fund receives from short sales — the short sale proceeds — is an asset of the Bear Fund that can generate income to help offset the Bear Fund's operating expenses.  ***[If the Russell 1000® Index declines 2% on a given day, the gross expected return for the Large Cap Bear 3X Shares would be 6% and the net expected return, which factors in interest income and the impact of operating expenses, will be slightly higher under normal market conditions]*.**

217.     Although Defendants removed the bracketed statement from its December 2008 Prospectus, Direxion failed to disclose any information that would inform investors that Direxion's Bear Funds were systematically underperforming on a daily basis and the magnitude of same.

218.     Instead, Direxion misleadingly represented that it was *only possible* that tracking error (negatively or positively) could occur:

Each Bull and Bear Fund is designed to provide daily investment returns, before fees and expenses, that are a multiple of the returns of its index or benchmark for the stated period. While Rafferty attempts to minimize any "tracking error" (the statistical measure of the difference between the investment results of a Fund and the performance of its index or benchmark), certain factors will tend to cause a Fund's investment results to vary from the stated objective. A Fund may have difficulty in achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs and/or a temporary lack of liquidity in the markets for the securities held by the Fund.

***

**Tracking Error Risk**

Several factors may affect a Fund's ability to achieve its daily target. A Fund may have difficulty achieving its daily target due to fees and expenses, high portfolio turnover, transaction costs, and/or a temporary lack of liquidity in the markets for the securities held by a Fund. A failure to achieve a daily target may cause a Fund to provide returns for a longer period that are worse than expected. In addition, a Fund that meets its daily target over a period of time may not necessarily produce the returns that might be expected in light of the returns of its index or benchmark for that period. Differences may result from the compounding effect of daily market fluctuations, the use of leverage and the Bear Funds' inverse correlation.

219.    Despite the persistence of this significant deviation from expected results, Defendants did not disclose in the Prospectus that, even on a ***daily*** basis, the Direxion Bear Funds substantially underperformed their intended investment results.

220.    In fact rather than mislead investors by the vague disclosures set forth above and by warning investors of risks events **might** occur when they were in fact already transpiring, Defendants should have informed investors that from their inception Direxion's Bear ETFs had been systematically underperforming their indexes.  A better disclosure would have been that if the RGUSFL declined by 2%, the FAZ would be expected a return of 6% minus the average daily underperformance of 3.51%.

**The December 17, 2008 Registration Statement, Effective February 15, 2009**

221.    On December 17, 2008, Direxion filed another post-effective amendment to its Registration Statement.   The amended Registration Statement, which became effective on February 15, 2009, contained the same misleading disclosures that were contained in the December 9, 2009, Prospectus, effective February 15, 2009. Consistent with their prior critical omissions of material facts, Defendants only included a general table showing levels of volatility capped at 55%. Defendants also included on the cover and again in the body of the Prospectus its prior false and misleading statement defining daily leveraged goals as "the return of a Fund for a period longer than a single day as the product of the series of daily leveraged returns for each day during the relevant period."

222.    On December 17, 2008, shortly after the December 9, 2008 Prospectus and at the time of the filing of Direxion's December 17, 2008 Registration Statement, which became effective on February  15, 2008, Direxion Shares issued a press release announcing that it had added six new leveraged ETFs to its existing fund lineup.  In the press release Direxion again encouraged investors to purchase its triple-leveraged funds in order to capitalize on the then existing volatile financial markets.  The press release stated in part:

> "Our first eight Direxion Shares ETFs have been extremely well received by sophisticated advisors and institutional investors – some seeking to hedge positions in their portfolios and **others seeking to take advantage of the current volatile markets,**" stated Dan O'Neill, Direxion Shares' President.   "We experienced remarkable levels of trading volume following the launch of our initial ETFs, garnering over $800 million in assets in the first five weeks, as of 12/12/2008.   The reception of these funds in the marketplace has been overwhelmingly positive." [emphasis supplied]
>
> Much like the first eight Direxion Shares ETFs launched in November 2008, these six new ETFs afford investment advisors and sophisticated investors the ability to execute active trading strategies in varying market types.   The funds deliver increased market exposure of 300 percent, long and short, of their respective

indices.   The suite of Direxion Shares ETFs represents the highest amount of leverage currently available in the ETFs space.

***

By providing both Bull and Bear versions of each of the indexes, Direxion gives seasoned investors the ability to seek competitive returns in rising and falling markets across a wide spectrum of diversified assets.  The ETF structure allows investors to benefit from the flexibility of an exchange traded fund product, coupled with the leveraged investment solution experience that Direxion is known for in the mutual fund industry. (emphasis supplied)

223.     On January 8, 2009 Direxion issued a press release announcing that it had added two 3X leveraged ETFs to its existing fund offerings.  In the press release Direxion again encouraged investors to purchase its triple-leveraged funds in order to capitalize on the then existing volatile financial markets.  The press release stated in part:

"We received such a wonderful response from investors after the launch of our first fourteen ETFs last year," stated Dan O'Neill, Direxion Shares' President. "Trading volume for the products has been quite high, mainly due to the fact that we now offer investors the highest amount of leverage available in the market place on the long and the short side.  **Additionally, the flexibility that these products afford investors can prove quite valuable in these volatile markets**." [emphasis supplied]

Many sophisticated advisors and institutional investors are using these 3X ETFs to hedge the positions in their current portfolios, **while others are using the Funds to seek to take advantage of the volatility found in today's markets**. The Direxion Shares ETFs represent the highest amount of leverage currently available in the ETF space.  [emphasis supplied]

***

By providing both a Bull and a Bear Fund to track each of the indexes, Direxion gives seasoned investors the ability to seek competitive returns in rising and falling markets across a wide spectrum of diversified assets.

224.     On February 15, 2009 Direxion's December 17, 2008 became effective. It contained the same misleading disclosures that were contained in the December 9, 2009, Prospectus. It was materially misleading for the same reasons set forth herein. The level of volatility was again capped by Defendants at an unrealistic level of 0-55%.  For instance, the

93

volatility rates for the index underlying the FAZ Fund, using data from the preceding 1, 2, and 3 month periods was 98.47%, 79.56% and 93.59%.

225.    The Defendants also failed to disclose significant daily underperformance of the Bear Funds.  For example, from November 6, 2008 through February 13, 2009, the average daily underperformance of the FAZ Fund was 2.21% while the average daily underperformance of ERY was 1.02%.

226.    All of the above discussed disclosures made in Direxion's Registration Statements and Prospectuses were false or misleading because they failed to disclose the material risks set forth above including but not limited to dangerous consequences of index volatility on the performance of the Bear Funds.

**The April 10, 2009 Supplemental Prospectus**

227.    On April 10, 2009, Direxion Shares began to, but did not, come clean about the true risks of its highly leveraged ETF products when it disclosed, among other things, in its supplemented Prospectus filed with the SEC that day that "[t]he return of each Fund for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the Fund's benchmark for such longer period[;]. . . the Funds are not intended to be used by, and are inappropriate for, investors who intend to hold positions:"

> **The Funds offered in this Prospectus are exchange-traded funds but they are very different from most exchange-traded funds. First, all of the Funds pursue leveraged investment goals, which means that the Funds are riskier than alternatives that do not use leverage because the Funds magnify the performance of the benchmark on an investment. Second, each of the Bear Funds pursues investment goals which are inverse to the performance of its benchmark, a result opposite of most exchange-traded funds. Third, each Fund offered in this Prospectus seeks *daily leveraged* investment results. _The return of each Fund for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for such longer period._**

*__The Funds are intended to be used as short-term trading vehicles for investors managing their portfolios on a daily basis. The Funds are not intended to be used by, and are not appropriate for, investors who intend to hold positions.__* **The Funds should be utilized only by sophisticated investors who (a) understand the risks associated with the use of leverage, (b) understand the consequences of seeking daily leveraged investment results, (c) understand the risk of shorting; and (d)** *__intend to actively monitor and manage their investments on a daily basis. Investors who do not understand the Funds or do not intend to manage the funds on a daily basis should not buy the Funds.__* **There is no assurance that the Funds will achieve their objectives and an investment in a Fund could lose money. No single Fund is a complete investment program.**

(underlined, italicized emphasis added).

228.     With respect to daily rebalancing risk and volatility risk, after the Class Period,

on April 10, 2009, the Prospectus further disclosed:

Each Fund seeks to provide a return which is a multiple of the daily performance of its benchmark. No Fund attempts to, and no Fund should be expected to, provide returns which are a multiple of the return of the benchmark for periods longer than a single day. Each Fund rebalances its portfolio on a daily basis, increasing exposure in response to that day's gains or reducing exposure in response to that day's losses. Daily rebalancing will impair a Fund's performance if the benchmark experiences volatility. For instance, a hypothetical 3X Bull Fund would be expected to lose 11% (as shown in the Table 1 below) if its benchmark provided no return over a one year period during which its benchmark experienced annualized volatility of 20%. A hypothetical 3X Bear Fund would be expected to lose 14% (as shown in the Table 1 below) if its benchmark provided no return over a one year period during which its benchmark experienced annualized volatility of 20%. If the benchmark's annualized volatility were to rise to 40%, the hypothetical loss for a one year period for a Bull Fund widens to approximately 38% while the loss for a Bear Fund rises to 46%.  *__At higher ranges of volatility, there is a chance of a near complete loss of Fund value even if the benchmark is flat. For instance, if annualized volatility of the benchmark is 90%, both a Bull and a Bear Fund targeted to the same benchmark would be expected to lose more than 90% of their value even if the cumulative benchmark return for the year was 0%. An index's volatility rate is a statistical measure of the magnitude of fluctuations in the returns of an index.__*

**Table 1**

| Volatility Range | Bull Fund Loss | Bear Fund Loss |
|---|---|---|
| 10% | −3% | −4% |
| 20% | −11% | −14% |
| 30% | −24% | −29% |
| 40% | −38% | −46% |
| 50% | −53% | −64% |
| 60% | −67% | −80% |
| 70% | −78% | −94% |
| 80% | −87% | −93% |
| 90% | −92% | −97% |
| 100% | −96% | −99% |

*Table 2 shows the range of volatility for each of the indexes to which one of the Funds is benchmarked over the six months ended February 27, 2009. (In historical terms, volatility ranges during this period were extremely high.)* The indexes to which the Funds are benchmarked have historical volatility rates over that period ranging from 3% to 26%. Since market volatility, like that experienced by the markets currently, has negative implications for the performance for periods longer than a single day for Funds which rebalance daily, investors should be sure to monitor and manage their investments in the Funds in volatile markets. Investors can use Table 1 and Table 2 together to understand the risks of holding the Funds for long periods. *These tables are intended to simply underscore the fact that the Funds are designed as short-term trading vehicles for investors managing their portfolios on a daily basis. They are not intended to be used by, and are not appropriate for, investors who intend to hold positions in an attempt to generate returns through time.*

**Table 2**

| Index | Volatility Range |
|---|---|
| BNY BRIC Select ADR Index® | 99 % |
| BNY China Select ADR Index® | 82 % |
| IIdus India Index | 82 % |
| MSCI EAFE® Index | 67 % |
| MSCI Emerging Markets Index[SM] | 100 % |
| MSCI US REIT Index[SM] | 111% |
| NYSE Current 2 Year U.S. Treasury Index | 3 % |
| NYSE Current 5 Year U.S. Treasury Index | 8 % |

| | | |
|---|---|---|
| NYSE Current 10 Year U.S. Treasury Index | 13 | % |
| NYSE Current 30 Year U.S. Treasury Index | 26 | % |
| Russell 1000® Index | 57 | % |
| Russell 1000® Energy Index | 83 | % |
| Russell 1000® Financial Services Index | 93 | % |
| Russell 1000® Technology Index | 60 | % |
| Russell 2000® Index | 64 | % |
| Russell 3000® Index | 58 | % |
| Russell Midcap® Index | 62 | % |
| S&P Global Clean Energy Index™ | 93 | % |
| S&P Homebuilding Select Industry Index℠ | 118 | % |
| S&P Latin America 40 Index | 101 | % |

(emphasis added).

229.     The volatility rates set forth in Table 2 were obtained by using six month data as opposed to the 12 month data used to determine the 40% volatility rate for the Russell 1000 Index cited in the example in Direxion's November 3, 2008 Prospectus.

230.     The volatilities for The Russell 1000 Financial Services Index (underlying FAZ), the Russell 1000 Energy Index (underlying ERY), the Russell 2000 Index (underlying TZA) and the Russell 1000 Index (underlying BGZ) disclosed in Table 2 were 93%, 83%, 64% and 60 %, respectively.  These or even greater rates were predicted by *the undisclosed actual volatility rates* that existed at the time of the November 2008, December 2008 and February 2009 disclosures.

231.     Also Table 1 indicated (for the first time) some of the negative effects that would result from holding Direxion's triple-leveraged ETFs over multiple days over periods in which volatility exceeded 55%.

232.     Also, on April 10, 2009, Defendants radically changed the names of each of Direxion's funds from those formerly titled Direxion Shares ETFs to "Direxion DAILY" Funds. For example, Defendants re-named its FAZ Fund, formerly named "Financial Bear 3X Shares," to the **"Direxion Daily Financial Bear 3x Shares"** and the ERY Fund, formerly named Energy

Bear 3X Shares, to the **"Direxion Daily Energy Bear 3x Shares."** In fact, on April 10, 2009, for the first time, Defendants re-named each and every one of Direxion's forty (40) exchange-traded Funds and added the word "Daily" in the title of each Fund on the cover of its April 10, 2009 Supplement.

233.    On April 10, 2009 Defendants, for the first time, further disclosed:

a. **"The Funds are not intended to be used by, and are not appropriate for, investors who intend to hold positions;"[11]**

b. **"The Funds should be utilized only by sophisticated investors who… intend to actively monitor and manage their investments on a daily basis;"**

c. **"Investors who do not … intend to manage the Funds on a daily basis should not buy the Funds."**

d. **"The return of each Fund for periods longer then a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for such longer period."**

234.    Thus, Defendants began on April 10, 2009 to reverse their previous positions and began to provide some important information, including historical information concerning performance and that it could be risky to hold Direxion's triple-leveraged funds for multiple days. Their disclosures shocked the market, Plaintiffs and Class Members. As a result, Defendants statements, which had been concealed throughout the Class Period, did in fact negatively affect the price of the Bear Funds.

---

[11]    Even this disclosure was extremely confusing to reasonable investors.  Even if one buys and sells intra-day, they have held a position for the period between the buy and the sale.  This statement by Defendants instructing investors not to purchase or use Direxion triple leveraged funds if they "intend to hold positions" purports to label all investors as inappropriate and is extremely misleading.

235.     It was Defendants themselves who had never previously made these disclosures. Defendants effectively admitted that these, or similar, disclosures should have made to investors throughout the Class Period beginning with Direxion's first effective Registration Statement.

236.     These new disclosures also began to explain the risks that even if an investor correctly forecasts the direction of the index, he could lose substantially by investing in a Direxion 3X Bear ETF. However, even this partial disclosure was itself misleading. It was not only "possible" that the funds would move in the "opposite direction" of their indexes; this was certain to occur in the overwhelming majority of market conditions.

237.     Once again, Defendants effectively acknowledged that their previous disclosures were misleading and began to explain how Defendants' investment product should be properly used.  However, Defendants still did not tell the investor how to invest, or how the tables could be used to predict dramatic underperformance.  Defendants still failed to specifically or meaningfully explain what Defendants mean by, or how to, "monitor" or periodically "rebalance" their portfolio.  Moreover, Defendants again failed to disclose the significant historical tracking error which had caused, and could be expected to continue to cause, the funds to systematically underperform their targets on a daily basis.

238.     Further, Defendants substantially revised their disclosures in their Statements of Additional Information to their Supplement dated April 10, 2009 so as to disclose "boomerang" results in which their leveraged ETFs moved in the opposite direction from that expected when the underlying index was not flat or trendless. For the first time, Defendants' offering documents used 100% volatility parameters in its volatility tables; **previously only 0-55% parameters had been provided by Defendants in Direxion's disclosures.**

239.     Until at least April 10, 2009, however, Defendants failed to disclose the specific catastrophic risks, facts, or consequences concerning an investor's not purchasing and selling out his entire position in a single trading session.

240.     Defendants failed to adequately disclose, prior to April 10, 2009, that investments in Direxion's triple leveraged Bear Funds during times of extreme volatility could be disastrous, with the potential for the Funds to deliver enormous losses over relatively short time periods. In fact, to the contrary, when Direxion launched its new leveraged ETFs, on November 3, 2008, including the FAZ, ERY, BGZ and TZA Funds, it touted and emphasized the benefits of volatility in connection with an investment in its Funds:

> "Our new leveraged Bull and Bear ETFs offer an unprecedented level of leverage in the ETF arena, something that today's dynamic investors are demanding… **Direxion's Shares will give savvy investors the array of important investment options they have been seeking to actively capitalize on the volatility of today's market.**

 (emphasis supplied);

241.     Through the design of its triple leveraged Bear Funds, Direxion exposed investors to the real possibility of losing a majority of their investment in fast-moving and volatile markets. Notwithstanding the same, Direxion made its triple leveraged Funds available to all retail investors and suggested through its Registration Statement and Prospectus that investing in its Funds was appropriate for retail investors.

242.     Defendants failed to adequately disclose to Plaintiffs and Class Members that due to rebalancing required to maintain their leverage, the Direxion triple leveraged Funds do exactly the opposite of what a prudent investor would do or reasonably expect Direxion to do. For example, Direxion failed to disclose to Plaintiffs and Class Members that with respect to the Bear Funds Direxion increases a fund's short position after its index declines and decreases the fund's short position after its index rises. In other words, so to speak, the Direxion Funds "buy

high and sell low." Defendants also failed to disclose, until at least April 10, 2009, that its rebalancing necessarily destroys its Direxion Bear Fund's performance over time and acted throughout the Class Period to inflate the price of the Bear Fund's shares.

243.    Direxion's attempts to explain the relationship between compounding and volatility vis-à-vis an acknowledgement that periods of higher index volatility will cause the effect of compounding to be more pronounced did not at all explain to investors that (a) volatility erodes returns, a fact not commonly understood; (b) the path that returns take over time has important effects on mid and long-term total return achieved; (c) the return volatility relationship matters even more so where triple leverage is employed; and (d) the effect is greater for Bear Funds than for Bull Funds.  In short, with triple leveraged ETFs, such as the FAZ, ERY, BGZ and TZA Funds, investors receive at least three times the risk of the index but less than three times the return and an expected loss.  The drag imposed by return volatility makes such a result inevitable.  Obviously, this is not a desirable outcome for investors seeking to hedge against a declining market.

244.    Throughout the Class Period, Defendants continued to maintain a green light for investors to hold Defendants' leveraged Bear Funds in their portfolios for extended periods. But Defendants qualified such green light with unexplained and ambiguous "monitoring" and "rebalancing" references and other vague and ambiguous limitations, radically understated boiler plate risk disclosures and limitations.

245.    Defendants' belated partial disclosures, although materially incomplete, on April 10, 2009, shocked the Plaintiffs and Class Members, who had purchased Direxion Bear ETFs during the Class Period.  It is patently obvious that the Defendants had a legal duty to prominently disclose *all* of these material and critical points at the time they first offered shares

in the Direxion Funds pursuant to Direxion's Registration Statement dated September 29, 2008 and prior to April 10, 2009.

246.     Reasonable investors would have found Defendants' belated disclosures to be an important part of the mix of information available to them in making their decisions to purchase shares in the Direxion Bear Funds, had such information been made available to them during the Class Period.

247.     This is empirically evident by the fact that following Direxion's April 10, 2009 disclosures, the average period in which investors held shares in Direxion Bear Funds declined significantly.

248.     By then, however, it was far too late for Plaintiffs and Class Members who had already suffered damages in catastrophic amounts due to the materialization of the risks Defendants failed to disclose.

249.     The Defendants' catastrophically belated disclosures on April 10, 2009 showed that Defendants' Registration Statements that were filed and effective on and after September 29, 2008 and as amended throughout the Class Period ending were all misleading.

**Additional Undisclosed Material Risks**

**Investors' Main Reason for Investing in Defendants' New ETFs**

250.     The one main investment reason for investors to purchase and hold Defendants' new ETFs, was the investor's desire to receive leveraged returns based on his prediction about the direction of the movement of the underlying index. This investment objective could be pursued through numerous traditional means. These included the purchase of puts or calls on the index, buying or shorting index futures, purchasing derivatives and other means. Such other means included the use of a margin account to purchase or short all the constituents of the index.

These investment options are highly levered.  In fact, one can get a perfect +3 or -3 return on an investment with the judicious use of a margin account.

251.     Defendants' newly created Bear ETFs purportedly offered an effective convenient new way to pursue this investment and objective.

252.     Although investors could make investments designed to profit from a decline in the index—whether through shorting components of the index, through index futures or options or other transactions -- Defendants' falsely touted the purchase of their triple leveraged, negatively yielding ETFs as a superior method.

253.     Defendants' misleading failed to inform investors that these other methods were far superior to Direxion's triple leveraged ETFs for placing leveled bets over time.

254.     On June 21, 2010 *Morning Star Advisor* published an article authored by Michael Rawson, entitled, *"Don't Abuse the Benefits of ETFs."* Rawson commented on this very issue:

> Probably the most egregious use of the ETF vehicle is embodied in leveraged and inverse products. While on the one hand, ETF providers clearly state that these products attempt only to provide a multiple of their index on a daily basis, their marketing of these products suggest that they can be used for asset-allocation or other non-speculative purposes. What they don't tell you is that the ETF is not the best vehicle for placing levered bets over time frames extending beyond one day. The volatility drag is a tremendous hidden cost which eats into returns.

255.     Defendants knew that investors could gain from anticipated declines in a given index or benchmark by other more appropriate methods, as opposed to investing in Defendants' high risk negative return yielding Bear Funds, but failed to disclose same.

**The Inherent Extreme Risks That Defeated The Main Reason For Investing In Defendants' ETF And Otherwise Resulted In Large Losses**

256.     Defendants' triple leveraged ETF creation was a new product.  But Defendants operated their Direxion ETFs such that actual returns to the Fund would generally be

significantly below those anticipate from movements in the underlying index alone.  Further, these underperformance deviations can be accurately predicted using a statistical formula.

257.    Predictions from this statistical formula are very similar to and highly consistent with the results presented by Direxion in their December and April tables.

258.    This statistical formula very clearly revealed to Defendants before and during the Class Period the inherent flaw of Defendants' Bear ETFs and the important risks of large losses given extant levels of volatility.

259.    This statistical formula dictates that, in reasonably anticipated market scenarios, investors who held Direxion products for extended periods of more than a day were vulnerable to large losses.

260.    These market conditions existed when the impact of volatility *(i.e.,* the day-to-day changes in prices) of the underlying index and the Fund's leverage significantly exceeded the impact of the index's performance over time. This statistical model makes clear that the probability and magnitude of losses increases the more time the investment was held, and the higher the index volatility.

261.    Most significant, not only was any gain in the Bear Funds resulting from negative movement in the index virtually eliminated, but also the Funds, and therefore the investor, would actually lose money. Thus, even if the main objective of the investment was realized, *i.e.* the index moved in favor of the investor, the investor would suffer losses. This was because negative movements in the index that were supposed to be in the investors' favor in relation to the performance of the Bear Funds were accompanied by movements in Defendants' ETF share price in the **opposite direction** from that which the Direxion Bear ETF's name and Defendants' disclosures indicated.

262.     During late 2008 and the first four months of 2009, there were many rapid, substantial declines in the index or benchmark underlying a Direxion ETF. But the corresponding Direxion ETF failed to increase by three times the amount of this decline.

> **a.     Such Moves In The Opposite Direction Were Not Aberration But Inherent Characteristics of Defendants' Bear Triple Leveraged ETFs**

263.     Critically, Defendants failed to disclose that the foregoing moves in the opposite direction were not "one-off" aberrations or accidents.

264.     In the section entitled "Investment Techniques and Polices" in each of the Registration Statements and Prospectuses, Defendants state: "Direxion's Advisor does not use fundamental securities analysis to accomplish such correlation." Rather, Rafferty primarily uses statistical and quantitative analysis and as a consequence, if a Fund is performing as designed, the return of the index or benchmark will dictate the return for that Fund.

265.     While Defendants make reference to a "statistical analysis" that will determine how investments will be made and what techniques are to be employed by a particular fund, and defendants subsequently provide estimated returns consistent with a statistical model. Defendants did not supply the appropriate statistical formula pursuant to which their triple leveraged Bear funds must comply. Managing their Funds in a way such that their returns are fated to approximate those predicted by the formula, and not temporary aberrations, inherently created the risks of catastrophic losses alleged herein. Defendants failed to prominently provide the statistical formula concerning the performance of it investments and to meaningfully provide and illustrate examples of how their funds worked depriving investors of information they needed to make informed decisions concerning whether to purchase Defendants' Bear Funds.

266.     Defendants managed their ETFs such that investment results, before fees and expenses, are destined to corresponded to (or approximately to) the following formula:

$$= \ (1 + R_T^{index})^x \cdot e^{\frac{(x - x^2)\sigma^2 T}{2}}$$

267.     In this formula, R is the index's return for the holding period, x is the leverage ratio, T is the time period (in years) that the investment is held, and σ is the annualized volatility of the index during the holding period.

268.     To ease exposition, consider the case where the underlying index is flat, so $R^{index}$ = 0, and x, the leverage factor is -3 or -300%.  In this case, the formula reduces to $e^{-6\sigma^2 T}$.

269.     The formula dictates that the return realized over a number of days will be the mathematical constant e (approximately 2.7183) raised to a "power" that reflects the leverage, volatility and the length of the holding period.   Reference chart in xl file "Chart of Loss versus…"

270.     In this scenario, losses increase with increasing holding time and index volatility. The longer the holding period and more pronounced the day to day volatility of the underlying index, the more the deviation from the expected correlation.

271.     Defendants failed to disclose that (and how) the Defendants triple leveraged Bear Funds lose more money in market conditions that are adverse to Defendants' formula. For example, Defendants failed to disclose that, when the day to day volatility of the underlying index is substantial and the underlying index makes a very substantial move in the direction the investor desires, the leveraged fund would not only underperform substantially, but move in the opposite direction from that expected.

272.     Significantly, Defendants failed to disclose (a) that the loss will not be related to a multiple in the underlying index but rather to the power of the underlying index; and (b) that,

even when the underlying index makes a very substantial move in the direction the investor desires, but the volatility of the underlying index is large enough, the leveraged fund would not only underperform substantially, but move in the opposite direction from that expected. That is, the loss due to rebalancing will overwhelm any gains due to a correct prediction of the direction of the movement of the underlying index.

273.    Because of Defendants' failures to make mathematical **or** plain English disclosures of the foregoing risks involved in Defendants' leveraged ETFs, investors could not make informed decisions based upon the Registration Statement's disclosures.

274.    Rather than present the mathematical basis for their products and describe such products' resulting strengths and weaknesses in plain English, Defendants cobbled together instead an amalgam of qualitative discussions employing vague, undefined and artificial terms and self-serving graphs and matrices.

275.    This mix of information presented a green light for investors to make purchases and hold Defendants' ETFs for extended periods of more than a day. It vaulted Defendants' ETFs over other alternatives for investing based on anticipated movements in the index price. And these disclosures made Defendants' ETFS into an extremely fast growing product that grew to more than $5-billion dollars in funds outstanding, and produced hundreds of millions of dollars in fees for Defendants.

276.    In the summer of 2009, the Financial Industry National Regulatory Authority ("FINRA") also provided an example of what FINRA considered to be unacceptably unexpected results: "Between December 1, 2008, and April 30, 2009, a particular index gained 2 percent. However, a leveraged ETF seeking to deliver twice that index's daily return fell by 6 percent-and an inverse ETF seeking to deliver twice the inverse of the index's daily return fell by 26 percent."

277.     Thus, even when the underlying index was not what Defendants called "flat" or "trendless", the NAV of Defendants' leveraged ETFs could not only substantially deviate from, but could move in the opposite direction of, its stated daily relationship with its underlying index. It could do within a matter of weeks or months and, at the longest, within one quarter (i.e., 63 trading days).

278.     Defendants' Bear Funds, including the FAZ, ERY, BGZ and TZA Funds, experienced such deviations, moved in the opposite direction, and declined in NAV.

### Additional Untrue or Misleading Statements Contained In Defendants' Registration Statements and Undisclosed Risks of Loss in Investing in Defendants' Triple Leveraged Bear Funds

279.     Rather than disclosing their mathematical formula, the resulting risks of catastrophic loss even when an investor was correct about the direction of the underlying index, and all the other risks previously alleged, Defendants made a series of statements in their Registration Statements concerning the risks, but which failed to disclose the existence and magnitude of the foregoing risks of investing in a Direxion leveraged ETF.

280.     The foregoing undisclosed, inherent risks of large losses were material facts that rendered misleading, in all the circumstances, each of the following statements contained in Defendants' Registration Statements.

281.     Further, as set forth, above, Direxion's disclosures say nothing about the effect of volatility over holding periods of less than a year, *e.g.*, 1, 2, 3, 4, 13 or 26 weeks.

282.     Defendants did not tell the investor how to use their volatility tables in the statement of additional information to extrapolate the effect of volatility on shorter or longer holding periods than one year or the specific methods to do so.  Defendants waited until April 10, 2009 to expand the level of volatility presented by the volatility tables set forth in the SAI to include levels of volatility up to of 100%.

283.     On June 11, 2009, FINRA issued Regulatory Notice 09-31 (the "FINRA Notice").  The FINRA Notice cautioned that "**inverse and leveraged ETFs . . . typically are unsuitable for *retail investors* who plan to hold them for longer than one trading session**, particularly in volatile markets."  (emphasis added).  FINRA also reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate."  Thereafter, FINRA spokesman Herb Perone stated:  "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products. . . ."

284.     In a June 30, 2009, research report, Morgan Stanley advised that leveraged and leveraged inverse ETFs are "not appropriate for most investors...." In that same research report, Morgan Stanley warned that "As a result of the daily 're-leveraging' or 'deleveraging,' leveraged and leveraged inverse ETFs are likely to significantly underperform point to point returns of their benchmark index in volatile-trendless markets."

285.     FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website.  FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis - but with the effects of compounding over a longer time frame, results differ significantly.

286.     On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sales practices of firms heavily involved in structuring leveraged ETFs. Galvin stated: "[s]ince 2006 these products have become increasingly popular. Yet, due to the daily nature of the leverage employed, there is no guarantee of amplified annual returns and they generally incur greater transaction costs than traditional exchange traded funds."

287.    On July 21, 2009, as reported by the Wall Street Journal in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs. Edward Jones called ETFs "one of the most misunderstood and potentially dangerous types of ETFs." (Emphasis supplied).

288.    On July 30, 2009, the Wall Street Journal published an article entitled "Warning Signs Up For Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs. The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28, 2009 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.... Proceed with extreme caution." (Emphasis supplied).

289.    And in a news release dated August 18, 2009 the North American Securities Administrators Association ("NASAA"), whose members include securities administrators of the 50 United States, "identified real estate investment schemes, leveraged ETFs, private placement offerings, natural resources investments, and Ponzi schemes as the greatest potential threats to investors this year."  With respect to leveraged ETFs NASAA stated:

> Leveraged Exchange Traded Funds (ETFs).  This relatively new financial product has been offered to individual investors who may not be aware of the risks these funds carry.  The funds which trade throughout the day like a stock, use exotic financial instruments, including options and other derivatives, and promise the potential to provide greater than market returns as the value of the underlying assets rise or fall.  **Given their volatility, these funds typically are not suitable for most _retail investors_.**

(emphasis added).

290.     On August 23, 2009 the Chicago Sun-Times ran a story concerning the SEC's

alert.  The article entitled "SEC Sounds Rare Investor Alarm" provided in part:

> Something extraordinary happened last week on the investor protection front.
> Perhaps you missed it.  An entire category of investments was deemed dangerous
> for ordinary people.
>
> Exchange-traded funds that leverage your holdings could lead to outsized losses,
> the Securities and Exchange Commission said.  It said brokers and financial
> advisors should advise people away from them unless they plan to hold them for
> just a day.
>
> ***
>
> Many people are duped by the ETF label.  ETFs are supposed to be simple, a
> potentially lower-cost alternative to mutual funds, and that's how they started,
> simply tracking an index or a basket of stocks in a particular industry.  Then
> derivatives changed the game.
>
> Companies introduced ETFs designed to double or triple the gains or losses of the
> benchmark.  Then they introduced funds that would do the same thing in inverse
> proportions of the benchmark. ...
>
> The problem with leveraged ETFs comes down to the magic and mystery of
> compounded returns.  If you leave your money in a leveraged ETF over time,
> your return can differ drastically from the fund's stated goal, especially in volatile
> markets.  FINRA gave the example of a five-month period in which the Russell
> 1000 Financial Services Index gained 8 percent, while an ETF seeking to deliver
> three times its daily returns fell 53 percent.
>
> Morning Star, the Chicago-based investment analysis provider, has published
> several pieces warning investors about leveraged ETFs.  John Gabriel, ETF
> analyst at Morning Star, said some large brokerages and financial advisor
> networks, such as LPL, Edward Jones, UBS and Ameriprise have imposed
> restrictions on their sale.  Morgan Stanley and Wells Fargo are considering
> restrictions as investors' losses multiply.
>
> "Investor protection is at the forefront of everybody's concerns," Gabriel said.
> "These firms don't want anything to stain their reputations."

291.     On March 25, 2010, the SEC issued a press release, entitled "SEC Staff

Evaluating the Use of Derivatives by Funds."  In the press release, the SEC announced that its

staff was conducting a review of the use of derivatives by ETFs – such as those used by the Bear

Funds – to achieve their intended daily investment returns.  According to the press release, as

part of its review, the SEC staff "determined to defer consideration of exemptive requests under the Investment Company Act to permit ETFs that would make significant investments in derivatives."

292.     According to the press release, the SEC staff is considering, among other things, whether "existing prospectus disclosures adequately address the particular risks created by derivatives."

293.     An investigation of the adequacy of existing prospectus disclosures would not have been necessary, and the SEC staff would not be investigating the adequacy of the disclosures, if the existing prospectuses and supplements for ETFs (like the Bear Funds) adequately informed investors and brokers that the Bear Fund shares were one-day investments, that purchasers needed to make new investment decisions each day, and of the risk of loss that accompanied holding Bear Fund shares for longer than one day.

294.     An April 9, 2010 article written by Michael Shari, a financial journalist who writes periodically for *Barron's, Financial Times, Fund Management Institutional Investor Magazine* and *Risk Professional*, posted on dailyfinance.com discussed Direxion's leveraged funds:

> "The math in these funds in not logical," warns Jeff Tjornehoj, a research manager at Lipper. "These funds are only for sophisticated investors."

> Paul Justice, an analyst who covers ETF's for Morning Star, a fund rating firm in Chicago, has a simple take on how the math has worked in leveraged Direxion funds since they started trading in the midst of the financial crisis.

> "It's the dead-cat-bounce phenomenon when you have a crash followed by a rally," he says. **"The fact that they [Direxion] even put out a yearly performance chart is misleading."**

> That's why the SEC advised investors last June not to leave their money in any leveraged ETF's for longer than a single day. It's also why some brokerages have banned their financial advisors from using them, says Justice.

**Split-Second Timing**

So what should an individual investor do with a Direxion leveraged ETF?  **"The first thing I would say to an individual investor whose primarily focused on a long-term buy- and –hold strategy is to not pay attention to our funds and forget they ever saw them," says O'Rourke [Senior Vice President of Direxion].**

To be sure, some do-it-yourselfers buy Direxion leveraged ETFs on platforms like Charles Schwab and Fidelity, says O'Rourke.  But the vast majority of investors are large financial institutions that seek out volatility to maximize intraday returns, such as the proprietary trading desks of Wall Street banks, and, of course, hedge funds, he says.  They account for the lion's share of the approximately 5 billion dollars in assets currently in 34 funds.  These institutions buy the funds in the morning and literally monitor them all day until they find the right moment to withdraw before the market closes.  If individuals were to do this, he says, they would have to "quit their day jobs."

(emphasis added).

295.    On June 21, 2010, *Morning Star Advisor* published an article authored by

Michael Rawson, entitled, *"Don't Abuse the Benefits of ETFs."* Rawson commented on the

misleading disclosures and representations concerning leveraged and inverse ETFS:

> **Probably the most egregious use of the ETF vehicle is embodied in leveraged and inverse products. While on the one hand, ETF providers clearly state that these products attempt only to provide a multiple of their index on a daily basis, their marketing of these products suggest that they can be used for asset-allocation or other non-speculative purposes. What they don't tell you is that the ETF is not the best vehicle for placing levered bets over time frames extending beyond one day. The volatility drag is a tremendous hidden cost which eats into returns.** A large number of levered ETFs pairs (one promising 2 times returns and the other negative 2 times returns) have both lost money, for example, Direxion Daily Financial Bull 3X Shares <u>FAS</u> is down about 7% for the year to date, while Direxion Daily Financial Bear 3X Shares <u>FAZ</u> is down 22%. Despite the fact that the S&P 500 is negative for the year to date, ProShares UltraShort S&P500 <u>SDS</u> is down even more. Last year, Massachusetts Secretary of the Commonwealth launched an investigation into the aggressive sales practices of firms marketing leveraged ETFs. **Perhaps these funds should come with a black box warning that they are really making a bet on the underlying volatility of the index.**
> (emphasis added).

296.     Investors in Direxion's Bear Funds, including the FAZ, ERY, BGZ and TZA Funds, were extensively misled. Direxion violated the spirit and purpose of the registration requirements of the Securities Act:   "To protect investors by promoting full disclosure of information thought necessary to informed investment decisions."[12]   The point of a Registration Statement "should be to inform, not to confuse and challenge the readers' critical wit."[13]   The registration provisions of the Securities Act are designed not only to protect immediate recipients of distributed securities but also subsequent purchasers from them.[14] (emphasis added).

297.     Under Rule 173 of the SEC, brokers are not required to provide a prospectus until after five days after Class members purchased their Bear Fund shares.  *See* 17 C.F.R. ¶ 230.173(a) (sale complete on settlement; prospectus must be delivered two days after completion of sale).

298.     Thus, even if the prospectuses had disclosed adequately that Bear Fund shares were one-day investments, which they did not, or that purchasers needed to make new investment decisions each day, and the risk of loss that accompanied holding Bear Fund shares for longer than one day (which they did not in any event), such disclosure would have been ineffective because the holding period for the Bear Fund shares expired ***before*** investors received a prospectus for the securities.

### b.     Causation

299.     As alleged above, each Bear Fund is and was comprised of derivative securities that must be rebalanced every day to achieve daily results that corresponded to three times the inverse performance of that fund's particular benchmark index.   As the underlying basket of

---

[12]     *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

[13]     *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1097 (1991).

[14]     *SEC v. Great American Indus., Inc.,* 407 F.2d 453, 463 (2nd Cir. 1968).

derivative securities comprising each Bear Fund changed from day to day, the Bear Funds were new and materially different investments every day throughout the Class Period and were priced differently accordingly.

300.    Because the Prospectuses issued and disseminated by Defendants throughout the Class Period failed to disclose or adequately disclose the mechanics of rebalancing and the risk to members of the Class of holding those shares for more than one day, Class members did not understand the need to make new investment decisions each day, and the risk of loss that accompanied holding Bear Fund shares for longer than one day as the underlying basket of derivative securities comprising each fund and the nature of the Class members' investments changed from day to day.  Had they known the one-day nature of their investments, the need to make daily investment decisions, and the risk of loss that accompanied holding Bear Fund shares for longer than one day, Class members would not have purchased Bear Fund shares or would not have done so at the prices they paid for the shares.

301.    Because they were not informed or adequately informed of the risk of loss that accompanied holding Bear Fund shares, members of the Class did not understand they were required to make, and consequently did not purchase and sell their entire positions in the same trading session.

302.    As alleged above, over those holding periods longer than one day, the prices of the Bear Fund shares did not provide their expected investment returns, such that Class members incurred actual losses (rather than gains) over the longer holding periods even though the underlying benchmarks also declined (which should have yielded profits for the Bear Fund shareholders).

303.     The losses suffered by members of the Class were and are directly attributable to the fact that they did not rebalance their investments in the Bear Funds each day because there were not informed or adequately informed of the need to do so.

304.     To implement or attempt to implement their investment strategies for the Funds, Defendants were required to rebalance the Funds' portfolios by buying or selling large amounts of complex derivative securities near the end of each trading day.  Those complex derivative securities, which are not traded on an organized exchange, but are traded Over-The-Counter (OTC) were relatively illiquid, meaning that there were not always enough willing sellers or buyers at prices close to current levels to ensure that Defendants could or would execute their Funds' daily trades at advantageous prices.

305.     Moreover, the complex derivative securities that the Funds held in their investment portfolios were not traded after the close of the market each day, which required Defendants to rebalance their Funds' portfolios at or shortly before the close of trading each day. Plaintiffs believe that, after reasonable opportunity for investigation and discovery, the evidence will show that Defendants executed such rebalancing trades during the last 30 minutes of trading (between 3:30 p.m. and 4:00 p.m.) each day.

306.     Throughout the Class Period, Defendants did not disclose, or did not disclose fully or adequately, that they would be required to or did execute large amounts of trades of illiquid derivative securities at or shortly before the close of trading each day.

307.     In addition, because of the large market capitalization of the Bear Funds, daily rebalancing required the Defendants to buy or sell extremely large amounts of derivative securities in a short period of time. Buying or selling those derivative securities in smaller

amounts would not or could not yield sufficiently large absolute returns to effectuate the investment objectives of the Bear Funds given the huge dollar amounts of the Bear Funds.

308.    The need for daily rebalancing, together with the need to rebalance the investment portfolios each day at the end of the trading day in a short period of time (i.e., the last 30 minutes of trading each day), caused Defendants to buy or sell the derivative securities at prices that were not favorable for the Bear Funds' investment strategies. This is known as "price pressure."

309.    Defendants did not disclose, or did not disclose fully or adequately, the extent to which the Bear Funds would be or were exposed to price pressure throughout the Class Period.

310.    Furthermore, as Defendants bought or sold the derivative securities on behalf of the Bear Funds in the large amounts that were necessitated by the huge assets in the Bear Funds, those purchases or sales by Defendants adversely influenced the market prices at which they were buying or selling the securities.

311.    When the investment strategy of the Bear Funds required Defendants to buy the derivative securities, as they bought large amounts of the securities the market prices rose, thus disadvantaging the Bear Funds by raising the prices which Defendants were required to pay to buy the securities. Conversely, when the investment strategy of the Bear Funds required Defendants to sell the derivative securities, as they sold large amounts of the securities the market prices declined, thus disadvantaging the Bear Funds by reducing the prices Defendants received for the securities they sold. This is referred to herein as "timing risk."

312.    Throughout the Class Period, Defendants failed to disclose, or did not disclose fully or adequately, the timing risk, i.e., extent to which they would be compelled to buy or sell such illiquid derivative securities in such large amounts and in such short periods of time that

their purchases or sales would adversely affect the market prices for those securities as they bought or sold them.

313.    Price risk was a material fact that Defendants failed to disclose, or to disclose fully or adequately disclose, in the Registration Statements and Prospectuses issued throughout the Class Period.

314.    Plaintiffs and the other members of the Class purchased Bear Fund shares without knowing the extent of price risk inherent in their investment.

315.    Timing risk also was a material fact that Defendants failed to disclose, or to disclose fully or adequately, in the Registration Statements and Prospectuses issued throughout the Class Period.

316.    Plaintiffs and the other members of the Class purchased Bear Fund shares without knowing the extent of timing risk inherent in their investment.

317.    When Defendants implemented or attempted to implement the Bear Funds' investment strategies by rebalancing their portfolios at or near the end of each day, they did so by executing purchases or sales of large amounts of the derivative securities. When they did so, Defendants effectively disclosed their trades to the market. The trades by Defendants, and the simultaneous effective disclosure of the trades to the market, caused disadvantageous movements in the market prices for the derivative securities in question. Consequently, as Defendants implemented the Bear Funds' investment strategy each day, their own trades inevitably caused the price risk and timing risk to materialize.

318.    As the price risk and timing risk materialized, and as the market prices for the derivative securities moved in the wrong (exact opposite) direction for the Bear Funds'

investment strategy, Defendants paid more for the derivative securities they bought and received less for the derivative securities they sold.

319.    As a direct and proximate result of the market disclosure and materialization of the price risk and timing risk, the net asset value of the Bear Funds declined and Plaintiffs and the other members of the Class suffered harm.

320.    Had Class Members known the nature, persistence and full extent of the price pressure and timing risks, they would not have purchased Bear Fund shares or would not have done so at the prices they paid.

321.    Defendants did not disclose, or did not disclose fully or adequately, that the intended holding period for the Bear Funds was, in fact, less than twenty-four hours, and indeed, is less than the 9:30 am to 4:00 pm hours usually associated with the opening and closing of financial markets also known as one full trading session. This is referred to as "holding period risk."

322.    Because of, among other factors, price pressure and timing risk, the Bear Funds would not and could not achieve their intended investment objectives for holding periods extending beyond one single trading session. Plaintiffs believe that, after reasonable opportunity for investigation and discovery, the evidence will show that price pressure and timing risk prevented the Bear Funds from achieving their investment objectives if shares were held after 3:30 p.m. on the day on which they were purchased.

323.    Thus, for example, if shares of any Bear Fund were purchased at 10:00 a.m. on Day 1 and were held until 10:00 a.m. on Day 2, those shares were held beyond the period for which they were intended and the investor was unlikely to achieve the expected investment return on his Bear Fund investment.

324.     As the holding period lengthened (e.g., from Day 2 to Day 3 to Day 4, etc.), the exposure to holding period risk increased, the likelihood that the investor would achieve the expected investment return on his investment decreased, and the magnitude of his potential loss increased.

325.     Plaintiffs believe that, after reasonable opportunity for investigation and discovery, the evidence will show that price pressure and timing risk was so great that they prevented the Bear Funds from achieving their investment objective even if they were sold after 3:30 p.m. on the same day they were purchased regardless of the time of day they we purchased.

326.     Defendants' statements in the Registration Statements and Prospectuses issued during the Class Period, including those issued on November 3, 2008, December 9, 2008 and February 15, 2008, that the Bear Funds were "daily" investments were materially false and incomplete because they did not disclose the full extent of such holding period risk.

327.     Because the Prospectuses issued during the Class Period were materially false and misleading in that they did not disclose the nature and extent of the holding period risk, Plaintiffs purchased Bear Fund shares and held the shares after 3:30 p.m. on the days on which they were purchased, and they did so without knowing the nature and extent of holding period risk.

328.     Holding period risk was realized when Plaintiffs and other members of the Class held Bear Fund shares after 3:30 p.m. on the days in which they were purchased and thereafter sold those same shares at a loss.

329.     As a direct and proximate cause of the holding period risk, Plaintiffs and other members of the Class suffered harm when they sold Bear Fund shares after 3:30 p.m. on the days on which they were purchased.

330.    Had Class Members known the nature, persistence and full extent of the holding period risk, they would not have purchased Bear Fund shares or would not have done so at the prices they paid.

331.    If investors **redeemed** their Bear Fund shares by the end of each trading day (ideally, before 3:30 p.m.), then there would have been no Bear Fund shares outstanding after the close of trading each night.  This would mean that all traders were using the funds for intra-day strategies as Defendants now claim that the funds were intended.  Had there been no Bear Fund shares outstanding, there would be no need for the Direxion Funds to invest or hedge their investments as there would be no net investment to hedge.  Further, there would be no rebalancing transactions costs.

332.    However, beginning on the first night after any Bear Funds were, on net, issued, and for each and every subsequent night throughout the Class Period, Bear Fund shares were outstanding because many, if not most or all, Bear Fund investors were not redeeming their shares by the end of each trading day as the funds were intended.

333.    Thus, from the first night of trading, and continuing throughout the Class Period, Defendants knew or should have known that some or all investors were not investing in Bear Funds as intended and, more significantly, Defendants knew that the Bear Funds would have to hedge the overnight investments and incur the related transactions costs.

334.    The Direxion Funds incurred substantial transaction and other costs to hedge their investments overnight.  Plaintiffs believe that after reasonable opportunity for investigation and discovery, the evidence will show that their average daily hedging costs throughout the Class Period were approximately 200 basis points, or 2%, which substantially decreased the returns earned by the Bear Funds throughout the Class Period.  This is referred to as "hedging risk."

335.     Hedging risk was a material fact that Defendants failed to disclose, or to disclose fully or adequately, in the Registration Statements and Prospectuses throughout the Class Period.

336.     Plaintiffs and the other members of the Class purchased Bear Fund shares without knowing the full extent of hedging risk.  Had Class Members known the nature, persistence and full extent of hedging risk, they would not have purchased Bear Fund shares or would not have done so at the prices they paid.

337.     Hedging risk was foreseeable as soon as Bear Fund shares remained outstanding after the end of the first day of trading, in that it was within the zone of risk concealed by Defendants throughout the Class Period, as alleged herein.

338.     As hedging risk materialized, Defendants were compelled to expend significant sums that reduced the returns earned by the Bear Funds and the assets in the Bear Funds.

339.     As a direct and proximate result of hedging risk, the net asset value of the Bear Funds declined and Plaintiffs and the other members of the Class suffered harm.

**COUNT I**
**AS AND FOR A FIRST CLAIM**
**(Violations of § 11 of the 1933 Act Against All Defendants)**

340.     This Claim is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §§ 77k, on behalf of the Class, against all Defendants.

341.     Plaintiffs incorporate by reference the above paragraphs, as if set forth herein. This Count is asserted against all Defendants.

342.     Direxion Shares is the issuer of the Bear Funds, including the FAZ, ERY, BGZ and TZA Funds shares sold pursuant to the Registration Statement. The Individual Defendants are signatories or authorizers of the Registration Statement.

343.     Plaintiffs and other members of the Class purchased or otherwise acquired their Bear Fund shares without knowledge of the untruths or omissions alleged herein. Plaintiffs and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions in the Registration Statement.

344.     Direxion Shares is absolutely liable for the material misstatements in and omissions from the Registration Statement.  The other Defendants owed purchasers of the shares the duty to make a reasonable investigation of the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement as set forth herein. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Registration Statement and Prospectus were true or that there was not any omission of material fact necessary to make the statements made therein not misleading.

345.     As signatories to, and/or authorizers of the Registration Statement, officers, directors of the Direxion Funds or controlling persons of the issuers, Defendants owed the purchasers of it Bear Funds, including the FAZ, ERY, BGZ and TZA Funds shares, and including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and

omissions contained in the Registration Statement and Prospectus as set forth herein. As such, Defendants are liable to Plaintiffs and the Class.

346.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.  As a direct and proximate result of Defendants' wrongful conduct, the market prices for its Bear Funds, including the FAZ, ERY, BGZ, and TZA Funds shares were materially different from the prices that Defendants purposefully misled the Plaintiffs and the Class into believing they would be through the reliance of Plaintiffs and the Class upon the false and misleading Registration Statements and Prospectuses signed by Defendants and issued by them during the Class Period, and thereby causing Plaintiffs and the Class to suffer substantial damages in connection with the purchase of the Direxion Funds.  Plaintiffs and the Class all purchased Direxion Funds' shares issued pursuant and/or traceable to the Registration Statements.

347.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint have made claims against Defendants arising out of the common conduct, transactions and occurrences set out in the Amended Consolidated Class Action Complaint and the original, pre-consolidated class action complaints filed in this action. As a result, Plaintiffs' claims relate back to the initial class complaint involving Defendants' conduct in its FAZ Fund as alleged in the first complaint filed in this matter on September 19, 2009.

348.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint were adversely affected by the same common material misstatements and material omissions set forth in the Amended Consolidated Class Action Complaint and the original, pre-consolidated class action complaints and suffered the same injury caused by the same wrongful conduct during the Class Period.

349.     None of the Defendants who are named in this Second Amended Consolidated Class Action Complaint will be unduly prejudiced by the addition of new Plaintiffs and Funds. Throughout the Class Period, Defendants made a continuous offering of the exchange traded Bear Fund products, varying only in respect to what benchmark a particular ETF would track, by making certain repeated and nearly identical misrepresentations and omissions in their offering documents. Thus, each of the Defendants have been on notice of the claims set forth herein since the filing of the initial class action complaint in September 2009 and well prior to this Second Amended Consolidated Class Action Complaint.

350.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint were adversely affected by the same common material misstatements and material omissions set forth in the Amended Consolidated Class Action Complaint and the pre-consolidated class action complaints and suffered the same injury caused by the same wrongful conduct during the Class Period.

351.     Defendants made a continuous offering of the defective Bear Fund products based upon common misrepresentations and omissions during the Class Period. Each of the Defendants has been on notice of the claims set forth herein since the filing of the initial Complaint and prior to this Second Amended Consolidated Class Action Complaint.

352.     At the time of their purchases of shares of the Bear Funds, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered the material misstatements and omissions prior to at least April 10, 2009, when the Supplemental Prospectus, disclosing many of the previously undisclosed risks, was issued, since Defendants have exclusive possession and control over material facts and documents. Less than one year has elapsed from the time that

Plaintiffs and other members of the Class discovered or reasonably could have discovered the facts upon which this Complaint is based and the time at which the Lead Plaintiff Stoopler commenced an action on behalf of purchasers of FAZ shares and Lead Plaintiff Schwack commenced an action on behalf of purchasers of ERY shares.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs first filed their various complaints in this action.

Lead Plaintiff Stoopler

a.     Lead Plaintiff Stoopler purchased FAZ shares from January 2009 through April 1, 2009, without knowledge that such shares should not be held beyond a single trading period, and without knowledge of the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.  Before Defendants materially altered their disclosures with the filing of the April 10, 2009 Supplemental Prospectus, Plaintiff Stoopler did not know, and had no reason to know, that the FAZ shares were intended to be bought and sold during the same trading period, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.

b.     In or about July 2009 Stoopler discovered that Direxion had failed to make full and truthful disclosures regarding the nature of and material risks associated with the FAZ Fund.  In particular, Plaintiff Stoopler had sustained very large losses from his FAZ Fund investments, but could not understand why.  However, by July 2009 information came to Stoopler's attention that indicated investments in FAZ should not have been, and should not be, held beyond the trading session in which they had been, or are, purchased. At that point, Plaintiff Stoopler became concerned about Direxion's disclosures, so he

referred the matter to his attorney for further investigation.  Before July 2009, Plaintiff Stoopler made no inquiry concerning whether FAZ shares were intended to be bought and sold during the same trading session.

c.      Plaintiff Stoopler commenced this action on September 18, 2009, less than one year after he first learned or could have learned facts that would suggest the wrongdoing alleged herein was probable, and less than one year after the Prospectuses at issue in this action were issued.

Lead Plaintiff Schwack

d.      Plaintiff Schwack purchased ERY shares on April 1, 2009, without knowing that the shares were intended to be bought and sold during the same trading session, and without knowing the nature and magnitude of the risks associated with holding ERY shares for longer than a single trading session.   Before Defendants materially altered their disclosures with the filing of the April 10, 2009 prospectus, Plaintiff Schwack did not know, and had no reason to know, that the shares were intended to be bought and sold during the same trading session, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding ERY shares for longer than a single trading session.

e.      Plaintiff Schwack was aware that he was losing money on his investment in ERY shares, but could not understand why.  Plaintiff Schwack first learned that ERY shares were intended to be bought and sold during the same trading session on or about November 24, 2009, when he sought legal advice in connection with his loss on the investment.  Before that date, Paintiff Schwack did not know that ERY shares were intended to be bought and sold during the same trading session.  Before approximately

November 24, 2009, Plaintiff Schwack made no inquiry concerning whether ERY shares were intended to be bought and sold during the same trading session.

       f.      Plaintiff Schwack commenced this action on January 13, 2010, less than one year after he first learned or could have learned facts that would suggest the wrongdoing alleged herein was probable, and less than three years after the Prospectuses at issue in the action were issued.

Plaintiff Behnken

       g.      Plaintiff Behnken purchased FAZ shares on December 2, 2008, December 3, 2008 and December 5, 2008, without knowledge that such shares should not be held beyond a single trading period, and without knowledge of the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session. Before Defendants materially altered their disclosures with the filing of the April 10, 2009 Supplemental Prospectus, Plaintiff Behnken did not know, and had no reason to know, that the FAZ shares were intended to be bought and sold during the same trading period, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.

       h.      Sometime in 2009, Plaintiff Behnken noticed, based on the returns on his FAZ investments relative to the returns of the market as a whole and the returns of the Russell 1000 Financial Services Index underlying the FAZ Fund, that his FAZ investments had not performed as he would have expected.  Plaintiff Behnken's suspicions that the Defendants had failed to make full and truthful disclosures concerning the features of and material risks associated with the FAZ Fund, were confirmed in Fall 2009 when he read a press release issued by Federman & Sherwood on September 18,

2009, announcing that a class action lawsuit had been filed on behalf of investors in the FAZ Fund.

i.      Plaintiff Behnken joined this lawsuit on April 8, 2011 when the Second Consolidated Amended Class Action Complaint was filed, less than three years after the Prospectuses at issue in this action were issued.

Plaintiff Haas

j.      Plaintiff Haas purchased FAZ shares on November 24 and 25, 2008, without knowledge that such shares should not be held beyond a single trading period, and without knowledge of the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.  Before Defendants materially altered their disclosures with the filing of the April 10, 2009 Supplemental Prospectus, Plaintiff Haas did not know, and had no reason to know, that the FAZ shares were intended to be bought and sold during the same trading period, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.

k.      Sometime around July 2009, Plaintiff Haas learned that the Defendants had failed to make full and truthful disclosures concerning the features of and material risks associated with the FAZ Fund. He learned this from information that was published in an article linked to the Google Finance website.

l.      Plaintiff Haas joined this lawsuit on April 8, 2011 when the Second Consolidated Amended Class Action Complaint was filed, less than three years after the Prospectuses at issue in this action were issued.

Plaintiff Killmon

m.      Plaintiff Killmon first purchased ERY shares on November 14, 2008 and again on March 16, 2009 during the Class Period, without knowing that the shares were intended to be bought and sold during the same trading period, and without knowing the nature and magnitude of the risks associated with holding ERY shares for longer than a single trading session.   Before Defendants materially altered their disclosures with the filing of the April 10, 2009 prospectus, Plaintiff Killmon did not know, and had no reason to know, that the shares were intended to be bought and sold during the same trading period, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding ERY shares for longer than a single trading session.

n.      Plaintiff Killmon first learned that ERY shares were intended to be bought and sold during the same trading period on or about October 27, 2010, when he sought legal advice in connection with his loss on the investment.   Before that date, Plaintiff Killmon did not know that, and had no reason to know or investigate whether, ERY shares were intended to be bought and sold during the same trading period.   Before approximately October 27, 2010, Plaintiff Killmon made no inquiry concerning whether ERY shares were intended to be bought and sold during the same trading period.

o.      Plaintiff Killmon joined in the Second Consolidated Amended Complaint this action on April 8, 2011, less than one year after he first learned or could have learned facts that would suggest the wrongdoing alleged herein was probable, and less than three years after the Prospectuses at issue in the action were issued.   Plaintiff Killmon's claims relate back to the ERY claim first advanced by Lead Plaintiff Schwack in the Complaint filed on January 13, 2010.

Plaintiff Remmells

p.    Plaintiff Remmells purchased FAZ shares on March 17, 2009, without knowing that the shares were intended to be bought and sold during the same trading period, and without knowing the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.  Before Defendants materially altered their disclosures with the filing of the April 10, 2009 prospectus, Plaintiff Remmells did not know, and had no reason to know, that the shares were intended to be bought and sold during the same trading period, nor did he know or have any reason to know the nature and magnitude of the risks associated with holding FAZ shares for longer than a single trading session.

q.    Plaintiff Remmells first learned that FAZ shares were intended to be bought and sold during the same trading period on or about November 10, 2009, when he sought legal advice in connection with his loss on the investment.  Before that date, Plaintiff Remmells did not know that, and had no reason to know or investigate whether, FAZ shares were intended to be bought and sold during the same trading period.  Before approximately November 10, 2009, Plaintiff Remmells made no inquiry concerning whether FAZ shares were intended to be bought and sold during the same trading period.

r.    Plaintiff Remmells joined in the First Consolidated Amended Complaint on November 23, 2010, and his claims relate back to the FAZ claims first advanced by Lead Plaintiff Stoopler on September 18, 2009, which was less than three years after the Prospectuses at issue in the action were issued.

353.    This action is timely filed under Section 13 of the Securities Act of 1933.

## COUNT II
**Violations of § 15 of the Securities Act Against the Individual Defendants and Rafferty**

354.     Plaintiffs incorporate by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants and Rafferty.

355.     Each of the Individual Defendants named herein and Rafferty acted as a controlling person of Direxion shares within the meaning of Section 15 of the Securities Act. The Individual Defendants and Rafferty were each trustees or officers and/or directors and/or otherwise control persons of Direxion Shares charged within the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause his controlled person to engage in the unlawful acts and conduct complained of herein.

356.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of shares of the Bear Funds, including the FAZ, ERY, BGZ and TZA Funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding punitive damages to Plaintiffs and members of the Class;

D.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      For a declaratory judgment that Defendants' Registration Statements were false and misleading;

F.      Awarding damages in the form of rescission; and

G.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs and the class hereby demand a trial by jury of all issues so triable.

Dated: February 10, 2012                       Respectfully submitted,

                                   __/s Mark C. Rifkin_____
                                   Mark C. Rifkin
                                   rifkin@whafh.com
                                   Maja Lukic
                                   lukic@whafh.com
                                   **WOLF HALDENSTEIN ADLER**
                                   **FREEMAN & HERZ LLP**
                                   270 Madison Avenue
                                   New York, NY  10016
                                   Phone:  (212) 545-4600
                                   Fax:  (212) 545-4653

                                   Kenneth G. Gilman
                                   kgilman@gilmanpastor.com
                                   Rene Potkay
                                   rpotkay@gilmanpastor.com
                                   **GILMAN LAW LLP**
                                   Beachway Professional Center Tower
                                   3301 Bonita Beach Road
                                   Suite 307
                                   Phone: (239) 221-8301
                                   Fax: (239) 676-8224

                                   *Co-Lead Counsel for the ERY Plaintiffs and*
                                   *Proposed Class*

                                   William B. Federman
                                   wbf@federmanlaw.com
                                   Stuart Emmons
                                   swe@federmanlaw.com

**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112

*Lead Counsel for the FAZ Plaintiffs and Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be served upon counsel for the defendants by first-class mail and by email on this 10th day of February, 2012.


        /s Mark C. Rifkin
Mark C. Rifkin

# Exhibit A

In re Direxion Shares ETF Trust Securities Litigation
Exhibit A
List of Plaintiffs' Purchases of Direxion Exchange Traded Funds

1.    Lead Plaintiff Evan Stoopler bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

2.    Additional named plaintiff David Remmells bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

3.    Additional named plaintiff Joel Behnken bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

4.    Additional named plaintiff Jason Haas bought shares of the FAZ Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

5.    Lead Plaintiff Howard Schwack bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

6.    Additional named plaintiff James Killmon bought shares of the ERY Fund during the Class Period and was caused loss by the violations.  *See* Exhibit A.

# Exhibit B

In re Direxion Shares ETF Trust Securities Litigation
Exhibit B
Registration Statements and Amendments

1.      **Direxion Shares ETF Trust, Prospectus (Form 497) (Supplement dated November 3, 2008 to the Prospectus dated October 1, 2008) (November 3, 2008)**

2.      **Direxion Shares ETF Trust, Prospectus (Form 497) (Supplement dated December 9, 2008 to the Supplement dated November 3, 2008 to the Prospectus dated October 1, 2008) (December 9, 2008)**

3.      **Direxion Shares ETF Trust, Registration Statement, Post-Effective Amendment No. 2 under Securities Act of 1933, Amendment No. 4 under the Investment Company Act of 1940 (Form N-1A) (December 17, 2008)**

4.      **Direxion Shares ETF Trust, Prospectus (Form 497) (Supplement dated April 10, 2009 to  the Prospectus dated October 1, 2008) (April 10, 2009)**

# Exhibit C

In re Direxion Shares ETF Trust Securities Litigation
Exhibit C
List of Direxion Exchange Traded Funds and Index

| Fund | Ticker | Index | Ticker |
|---|---|---|---|
| Financial Bear 3X Shares | FAZ | Russell 1000® Financial Services Index | RGUSFL |
| Energy Bear 3X Shares | ERY | Russell 1000® Energy Index | RGUSEL |
| Large Cap Bear 3X Shares | BGZ | Russell 1000® Index | RIY |
| Small Cap Bear 3X Shares | TZA | Russell 2000® Index | RTY |

# Exhibit D

**Estimated Fund Return Over One Year of 3X Bear Funds.**

| One Year Index Performance | 300% Inverse of One Year Index Performance | Index Volatility | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
| -50% | 150% | 646.16% | 526.52% | 367.83% | 210.27% | 82.30% | -5.83% | -56.92% | -82.75% | -94.02% | -98.16% |
| -45% | 135% | 462.16% | 371.63% | 252.06% | 132.80% | 36.63% | -29.20% | -67.72% | -87.22% | -95.56% | -98.67% |
| -40% | 120% | 333.89% | 263.88% | 171.20% | 79.08% | 4.73% | -45.87% | -75.48% | -90.23% | -96.66% | -99.00% |
| -35% | 105% | 241.84% | 186.47% | 113.21% | 40.76% | -17.82% | -57.91% | -80.87% | -92.48% | -97.40% | -99.23% |
| -30% | 90% | 174.04% | 129.54% | 70.66% | 12.62% | -34.34% | -66.31% | -84.69% | -93.93% | -97.94% | -99.39% |
| -25% | 75% | 122.98% | 86.72% | 38.73% | -8.73% | -46.94% | -72.77% | -87.75% | -95.18% | -98.36% | -99.52% |
| -20% | 60% | 83.86% | 53.86% | 14.16% | -24.84% | -56.35% | -77.65% | -90.01% | -96.05% | -98.66% | -99.61% |
| -15% | 45% | 53.34% | 28.29% | -4.90% | -37.43% | -63.71% | -81.50% | -91.74% | -96.75% | -98.90% | -99.68% |
| -10% | 30% | 29.22% | 7.99% | -19.99% | -47.46% | -69.65% | -84.59% | -93.12% | -97.32% | -99.10% | -99.74% |
| -5% | 15% | 9.86% | -8.23% | -31.99% | -55.50% | -74.20% | -86.85% | -94.19% | -97.73% | -99.24% | -99.78% |
| 0% | 0% | -5.81% | -21.33% | -41.83% | -61.95% | -78.04% | -88.87% | -95.02% | -98.08% | -99.36% | -99.81% |
| 5% | -15% | -18.65% | -32.07% | -49.84% | -67.11% | -81.14% | -90.44% | -95.78% | -98.36% | -99.47% | -99.85% |
| 10% | -30% | -29.28% | -40.99% | -56.40% | -71.49% | - | - | - | - | - | - |

2

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 83.62% | 91.76% | 96.37% | 98.61% | 99.53% | 99.87% |
| 15% | -45% | -38.13% | -48.39% | -61.93% | -75.17% | 85.74% | 92.80% | 96.83% | 98.79% | 99.60% | 99.89% |
| 20% | -60% | -45.57% | -54.62% | -66.57% | -78.23% | 87.48% | 93.73% | 97.25% | 98.95% | 99.66% | 99.90% |
| 25% | -75% | -51.88% | -59.92% | -70.50% | -80.80% | 88.99% | 94.49% | 97.58% | 99.08% | 99.70% | 99.92% |
| 30% | -90% | -57.24% | -64.41% | -73.83% | -82.99% | 90.31% | 95.15% | 97.87% | 99.19% | 99.74% | 99.93% |
| 35% | -105% | -61.86% | -68.26% | -76.66% | -84.91% | 91.38% | 95.70% | 98.15% | 99.29% | 99.77% | 99.94% |
| 40% | -120% | -65.82% | -71.57% | -79.13% | -86.48% | 92.33% | 96.21% | 98.36% | 99.38% | 99.80% | 99.95% |
| 45% | -135% | -69.26% | -74.49% | -81.32% | -87.96% | 93.16% | 96.60% | 98.55% | 99.46% | 99.83% | 99.95% |
| 50% | -150% | -72.26% | -76.98% | -83.17% | -89.16% | 93.88% | 96.98% | 98.69% | 99.52% | 99.85% | 99.96% |

The foregoing tables are intended to isolate the effect of index volatility and index performance on the return of a Bull Fund. The fund's actual returns may be significantly greater or less than the returns shown above as a result of any of factors discussed above or under "Correlation Risk" in the Prospectus.